Peter C. Harvey, Esq.
Geoffrey Potter, Esq. (*pro hac vice*)
Aron Fischer, Esq. (*pro hac vice*)
Timothy A. Waters, Esq. (*pro hac vice*)
R. James Madigan III, Esq. (*pro hac vice*)
Nicholas R. Hartmann, Esq. (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2000

*Attorneys for Plaintiffs*
*Roche Diagnostics Corp. and*
*Roche Diabetes Care, Inc.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROCHE DIAGNOSTICS CORP. and ROCHE DIABETES CARE, INC.;<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY C. SMITH; STEVEN L. HADLOCK; SAHILY PAOLINE; DAVID GRANT; JUSTIN LEAVITT; BLAINE SMITH; TRAVIS HUGHES; ALISON WISTNER; ADAM KOOPERSMITH; LEE H. ROSEBUSH; ZIONS BANCORPORATION, N.A.; HUGHES & COMPANY; HUGHES & COMPANY INVESTMENT PARTNERS, LLC; KESMAN HUGHES & COMPANY, LLC; HS MEDSOURCE HOLDCO, LLC; MERCATO MANAGEMENT, LLC; MERCATO PARTNERS, LLC; MERCATO PARTNERS GROWTH II GP, LLC; MERCATO PARTNERS GROWTH II, L.P.; MERCATO PARTNERS GROWTH AFFILIATES II, L.P.; MERCATO PARTNERS AI II, L.P.; MERCATO PARTNERS INGRAM, LLC; MERCATO PARTNERS INGRAM CO-INVEST, LLC; JABODON PT COMPANY d/b/a PRITZKER GROUP VENTURE CAPITAL; NWV-ALLIANCE LLC; and NWV-ALLIANCE-2 LLC;<br><br>Defendants. | Civil Action No. 2:19-cv-08761-CCC-CLW<br><br>Civil Action No. 2:17-cv-5552-CCC-CLW (Related Case)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Roche Diagnostics Corp. and Roche Diabetes Care, Inc. (together, "Roche"), for their First Amended Complaint against Defendants Jeffrey C. Smith; Steven L. Hadlock; Sahily Paoline; David Grant; Justin Leavitt; Blaine Smith; Travis Hughes; Alison Wistner; Adam Koopersmith; Lee H. Rosebush; Zions Bancorporation, N.A.; Hughes & Company; Hughes & Company Investment Partners, LLC; Kesman Hughes & Company, LLC; HS Medsource Holdco, LLC; Mercato Management, LLC; Mercato Partners, LLC; Mercato Partners Growth II GP, LLC; Mercato Partners Growth II, L.P.; Mercato Partners Growth Affiliates II, L.P.; Mercato Partners AI II, L.P.; Mercato Partners Ingram, LLC; Mercato Partners Ingram Co-Invest, LLC; Jabodon PT Company d/b/a Pritzker Group Venture Capital; NWV-Alliance LLC; and NWV-Alliance-2 LLC, hereby allege as follows:

## NATURE OF THE ACTION

1.      Roche, a manufacturer of blood glucose test strips for diabetes patients, brings this lawsuit against the persons responsible for operating, managing, and financing a sophisticated insurance-fraud enterprise that caused Roche more than $87 million in damages.

2.      Defendants are former officers and directors of Alliance Medical Holdings, LLC d/b/a Alliance Health and its corporate predecessors, subsidiaries, and affiliates (collectively, "Alliance"); investment funds that knowingly financed Alliance's fraud and supervised its operations through their agents on Alliance's Board of Directors; and the bank that provided financing and banking services knowingly and purposefully directed at facilitating Alliance's fraudulent business model.

3.      Through Alliance, Defendants ran an elaborate scheme to gain illicit profits by means of fraud.  Defendants conspired to obtain not-for-retail ("NFR") blood glucose test strips manufactured and packaged by Roche for sale by mail order to beneficiaries of

insurance plans that cover test strips under a medical benefit.  Instead, Defendants dispensed the test strips to beneficiaries of insurance plans that cover test strips under a pharmacy benefit. Defendants then submitted insurance claims to the pharmacy-benefit plans falsely representing that they had dispensed retail strips.

4.     By doing this, Defendants illegally exploited the substantial difference in wholesale list price and insurance reimbursement rates between the NFR strips intended for medical beneficiaries and the retail strips intended for pharmacy beneficiaries.

5.     According to the sworn testimony of former Alliance executives, dispensing NFR strips and submitting fraudulent insurance claims for retail strips was the "foundational practice" of Alliance and an "integral part of [Alliance's] business model."  The practice was openly discussed among Alliance's senior management, its Board of Directors, and its key investors.

6.     In a November 2015 memorandum to Alliance's Board of Directors, Alliance's general counsel described this fraudulent practice as a "fact" that gave rise to legal risks.  The memorandum concluded, however, that Alliance could not afford to stop the practice because Alliance's viability as a company depended on it.  Alliance continued to engage in that fraud at the direction and with the assistance of Defendants until its bankruptcy in 2017.

7.     By carrying out their fraudulent scheme through Alliance, Defendants caused Roche to wrongfully pay over $87 million in rebates and to lose a similar amount in sales of retail strips.  Roche brings this lawsuit to obtain compensation for the damages caused by Defendants' fraud and other wrongful acts.

## PARTIES

**Plaintiffs**

8.     Plaintiff Roche Diagnostics Corp. is a corporation organized under the laws of the State of Indiana, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Holding AG is the ultimate parent company of Roche Diagnostics Corp.

9.     Plaintiff Roche Diabetes Care, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Diagnostics Corp. included Roche's U.S. commercial diabetes business until November 2015, when the U.S. commercial diabetes business was transferred to a separate legal entity, Roche Diabetes Care, Inc.  Roche Diabetes Care, Inc. is engaged in the business of manufacturing and marketing blood glucose test strips.  Roche Holding AG is the ultimate parent company of Roche Diabetes Care, Inc.

**Defendants**

10.     Defendant Jeffrey C. Smith is a Utah resident, having an address at 987 East Old English Road, Draper, Utah 84020.  Smith was Chief Executive Officer of Alliance until the middle of 2017.

11.     Defendant Steven L. Hadlock is a Utah resident.  Hadlock was a Director of Pharmacy Operations for Alliance.

12.     Defendant Sahily Paoline is a Utah resident.  Paoline was the Pharmacist in Charge of Medsource Rx, a pharmacy controlled by Alliance.  Paoline later became Director of Pharmacy Operations, Senior Vice President of Pharmacy Operations, and the Chief Pharmacy Officer of Alliance.

13.     Defendant David Grant is a Utah resident.  Grant was General Counsel of

Alliance beginning in November 2013.

14.     Defendant Justin Leavitt is a Utah resident.  Leavitt is the former Chief Financial Officer of Alliance.

15.     Defendant Blaine Smith is a Utah resident.  Smith was the Senior Vice President of Sales, and later Chief Revenue Officer, of Alliance.

16.     Defendant Travis Hughes is an Illinois resident.  Hughes was a director of Alliance and principal of the Hughes Entities, a major investor in Alliance.

17.     Defendant Alison Wistner is a Utah resident.  Wistner was a director of Alliance and Managing Director of Mercato Partners, a major investor in Alliance.

18.     Defendant Adam Koopersmith is an Illinois resident.  Koopersmith was a director of Alliance and Partner at Pritzker Group, a major investor in Alliance.

19.     Defendant Lee H. Rosebush is a Maryland resident.  Rosebush was a director of Alliance.

20.     Defendant Zions Bancorporation, N.A. is a national banking association with its principal place of business at One South Main Street, Salt Lake City, Utah 84133.  Zions First National Bank is a division of Zions Bancorporation, N.A.

21.     Non-party Alliance Medical Holdings, LLC d/b/a Alliance Health is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9883 South 500 West, Sandy, Utah 84070, and later at 10855 South River Front Parkway, South Jordan, Utah 84095.  On April 4, 2017, Alliance and many of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas.

22.     Defendants HS Medsource Holdco, LLC, Kesman Hughes & Company, LLC, Hughes & Company, and Hughes & Company Investment Partners, LLC (collectively, the

"**Hughes Entities**") are each organized under the laws of the State of Delaware.  Hughes &

Company and Hughes & Company Investment Partners, LLC each have a principal place of

business at 161 North Clark Street, Suite 1310, Chicago, Illinois 60601.  Defendant Kesman

Hughes & Company, LLC has a principal place of business at 1200 Longmeadow Lane, Lake

Forest, Illinois 60045.  HS Medsource Holdco, LLC has a principal place of business at 747

North LaSalle Boulevard, Suite 500, Chicago, Illinois 60654.

23.     Defendants Mercato Management, LLC, Mercato Partners, LLC, Mercato

Partners Growth II GP, LLC, Mercato Partners Growth II, L.P., Mercato Partners Growth

Affiliates II, L.P., Mercato Partners AI II, L.P., Mercato Partners Ingram, LLC, and Mercato

Partners Ingram Co-Invest, LLC (collectively, "**Mercato Partners**") are each organized under

the laws of the State of Delaware with a principal place of business at 2750 East Cottonwood

Parkway, Suite 500, Cottonwood Heights, Utah 84121.

24.     Defendants Jabodon PT Company d/b/a Pritzker Group Venture Capital

LLC, NWV-Alliance LLC, and NWV-Alliance-2 LLC (collectively, "**Pritzker Group**") are

each organized under the laws of the State of Delaware with a principal place of business at 111

South Wacker Drive, Suite 4000, Chicago, Illinois 60606.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 and 1367; 18 U.S.C. §§ 1964 and 1965; and general principles of ancillary and

pendent jurisdiction.

26.     The Court has personal jurisdiction over each Defendant pursuant to Fed.

R. Civ. P. 4(k) and 18 U.S.C. § 1965(d), and/or 18 U.S.C. § 1965(b).

27.     As further alleged below, the Court also has personal jurisdiction over

each Defendant because the tortious acts described herein (which occurred in New Jersey, among

other places) were committed and/or caused by each Defendant, and because the conspiracy described in this Complaint took place in substantial part in New Jersey and each Defendant knowingly took part in that conspiracy.

28.   Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred in this District, and one or more of the Defendants is subject to personal jurisdiction in this District.

29.   Venue is also proper in the District of New Jersey under 18 U.S.C. § 1965.

**Individual Defendants**

30.   The Court has personal jurisdiction over Defendants Jeffrey C. Smith, Steven L. Hadlock, Sahily Paoline, David Grant, Justin Leavitt, Blaine Smith, Travis Hughes, Alison Wistner, Adam Koopersmith, and Lee H. Rosebush (collectively, the "**Individual Defendants**") because they committed and/or caused the commission of the torts and RICO predicate acts/incidents alleged herein in New Jersey.

31.   This Court has personal jurisdiction over each of the Individual Defendants pursuant to 18 U.S.C. § 1965(d) because each of the Individual Defendants is a resident of the United States and is liable for substantive RICO violations under 18 U.S.C. § 1962(c) as alleged herein.

32.   As further alleged below, the Individual Defendants sold, aided and abetted the sale of, and conspired to sell Roche products in the State of New Jersey as part of an illegal scheme to fraudulently obtain improper insurance reimbursements for the New Jersey sales.  To further their scheme, and as further alleged herein, each of the Individual Defendants:

A.   Owned, operated, and/or managed businesses operating in New Jersey;

B.   Personally perpetrated fraud in New Jersey, and/or caused businesses that they owned, operated, and/or managed to perpetrate fraud in New Jersey;

C.   Employed and managed pharmacists and pharmacy technicians operating in and

committing fraud in New Jersey;

D.   Applied for and received, or directed the application and receipt of, pharmacy permits from the New Jersey Board of Pharmacy;

E.   Owned, operated, and/or managed businesses that received insurance reimbursements from insurance companies located in New Jersey;

F.   Caused the businesses that they owned, operated, and/or managed in New Jersey to use the Postal Service and/or other commercial carriers to ship test strips to persons both in and outside of New Jersey tens of thousands of times; and

G.   Caused the businesses that they owned, operated, and/or managed in New Jersey to use interstate wires to transmit fraudulent insurance claims both in and outside of New Jersey, and to receive and transfer the illicit proceeds from such fraudulent insurance claims into bank accounts both in and outside of New Jersey, tens of thousands of times.

33.    While the Defendants' fraud was national in character—having been perpetrated in at least Arizona, California, Florida, Georgia, Iowa, Illinois, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia—New Jersey was a major center of operations for the fraud Defendants carried out through Alliance.  Specifically, one New Jersey arm of Defendants' fraudulent enterprise—Peterson Pharmacy in South Amboy, New Jersey—submitted false insurance claims for *over 8 million* Roche test strips between 2014 and 2017, the most of any Alliance-affiliated pharmacy during that period.  The Peterson Pharmacy in New Jersey was thus a location of a substantial part of the tortious acts giving rise to the claims in this Complaint.

34.    The Individual Defendants established, operated, managed, and directed the Peterson Pharmacy and other pharmacies in New Jersey to carry out the tortious and predicate acts/incidents described herein, and by doing so, affirmatively and expressly directed their tortious conduct into the State of New Jersey.  As alleged below, Defendants Jeffrey Smith, Hadlock, Paoline, Grant, Leavitt, and Blaine Smith (collectively, the "**Officer Defendants**")

were each personally involved in establishing, operating, and/or managing Alliance's fraudulent activities in New Jersey through Peterson Pharmacy. *See* ¶¶ 206–07 (Jeffrey Smith), 210–13 (Hadlock), 215–16 & 218–19 (Paoline), 225–27 (Grant), 230 & 232 (Leavitt), 239 (Blaine Smith), *infra*, incorporated here.

35.     In 2016, Alliance's directors—including Defendants Hughes, Wistner, Koopersmith, and Rosebush (collectively, the "**Director Defendants**")—approved Alliance's acquisition of Peterson Pharmacy. As alleged below, the Director Defendants were aware of and openly discussed Alliance's fraudulent billing practices, and each Director Defendant approved Alliance's acquisition of Peterson Pharmacy knowing and intending that doing so would improve Alliance's ability to perpetrate and profit from those fraudulent practices in New Jersey. *See* ¶¶ 246–48, *infra*, incorporated here.

**Investor Defendants**

36.     The Court has personal jurisdiction over the Hughes Entities, Mercato Partners, and Pritzker Group (collectively, the "**Investor Defendants**") because they knowingly funded and approved in writing the Individual Defendants' scheme to fraudulently obtain reimbursement for retail strips despite having dispensed NFR strips. *See* ¶¶ 328–29 (Hughes Entities), 336–41 (Mercato Partners), 349–51 (Pritzker Group), *infra*, incorporated here. The Investor Defendants agreed to fund this fraudulent scheme knowing that it was carried out through New Jersey pharmacies.

37.     The Investor Defendants also directed Alliance's fraud into New Jersey through their agents on Alliance's Board of Directors. As further alleged herein, the Investor Defendants' agents on Alliance's Board of Directors—Defendants Hughes, Wistner, and Koopersmith—were intimately aware of Alliance's fraudulent billing practices and approved Alliance's acquisition of Peterson Pharmacy precisely because doing so would enable Alliance to

better perpetrate its fraud in New Jersey and thus protect the Investor Defendants' investment. *See* ¶¶ 308 (all Investor Defendants), 324–25 (Hughes Entities), 333–35 (Mercato Partners), 354–55 (Pritzker Group), *infra*, incorporated here.

38.     This Court also has personal jurisdiction over each of the Investor Defendants pursuant to 18 U.S.C. § 1965(d) because each of the Investor Defendants is a resident of the United States and is liable for substantive RICO violations under 18 U.S.C. § 1962(c) as alleged herein.

**Zions Bancorporation, N.A.**

39.     Zions Bancorporation, N.A. ("Zions Bank" or "Zions") has consented to personal jurisdiction by choosing not to assert a personal jurisdiction defense in response to prior pleadings in this action.  Moreover, as alleged in detail below, Zions knowingly funded, and expressly approved in writing, the Individual Defendants' scheme to fraudulently obtain reimbursement for retail strips while dispensing NFR strips.  Zions expressly agreed to fund the execution of this fraudulent scheme through pharmacies located in New Jersey and received payments directly from the same New Jersey pharmacies.

40.     Zions entered into a Credit Agreement with Alliance effective June 24, 2014.  As alleged in detail below, the Credit Agreement explicitly acknowledged that Zions was providing credit to Alliance so that its pharmacy-subsidiaries/affiliates could fraudulently dispense NFR strips to patients but submit reimbursement claims for retail strips.

41.     After acquiring Peterson Pharmacy in 2016, Alliance operated the pharmacy through New Jersey Rx, LLC ("New Jersey Rx"), a New Jersey limited liability corporation.  By no later than April 2016, Alliance notified Zions that it was submitting insurance reimbursement claims from Peterson Pharmacy.  And by April 2016, Zions began including Peterson Pharmacy's accounts receivable in its analysis of Alliance's financial

position.

42.     By no later than November 2016, Alliance notified Zions it was submitting reimbursement claims from Newton Pharmacy in Newton, New Jersey.  Newton Pharmacy is owned and operated by Newton Rx, LLC ("Newton Rx"), a New Jersey limited liability corporation and subsidiary of Alliance.

43.     Zions established bank accounts for New Jersey Rx, Newton Rx, and other Alliance subsidiaries.  Proceeds from the fraudulent reimbursement claims made by Peterson Pharmacy and Newton Pharmacy were deposited into their accounts with Zions and used to pay down Alliance's credit line with Zions.

44.     On November 15, 2016, Alliance's Chief Financial Officer, Scott Klossner, provided a certificate to Zions showing Alliance's compliance with the Credit Agreement.  The certificate included a list of guarantors of Alliance's obligations under the Credit Agreement, including New Jersey Rx and Newton Rx.

45.     On February 22, 2017, Zions entered into a Joinder Agreement with New Jersey Rx, Newton Rx, and several other Alliance subsidiaries whereby the subsidiaries purported to become guarantors of Alliance's obligations under the Credit Agreement.  That same day, Zions entered into a Pledge and Security Agreement with New Jersey Rx, Newton Rx, and several other Alliance subsidiaries whereby the subsidiaries purported to grant Zions security interests in property to secure Alliance's debt under the Credit Agreement.

## FACTS COMMON TO ALL CLAIMS

### Roche's Blood Glucose Test Strip Products

46.     Roche is one of the leading manufacturers of blood glucose test strips, which Roche markets and sells under the Accu-Chek® brand.  Diabetes patients place a drop of blood on a strip and insert the strip into a meter, which provides a blood glucose reading.

Millions of people depend on Roche's test strips to monitor their blood sugar.

47.     In the United States, the vast majority of Roche's test strips are paid for by health insurance.  Some health insurance plans cover test strips under a pharmacy benefit, the same benefit that covers prescription drugs.  Other plans cover test strips under a medical benefit (also known as a "durable medical equipment" or "DME" benefit), the same benefit that covers medical equipment such as wheelchairs.  Like all major manufacturers, Roche sells its test strips in different packages and through different distribution channels targeted to patients with these different types of insurance coverage.

48.     Specifically, Accu-Chek test strips that are intended for patients with DME insurance are packaged and labeled as "not for retail sale" (or "NFR").  Patients with DME insurance typically purchase test strips from mail-order DME distributors.  The DME distributors purchase Accu-Chek NFR products under contracts that require them to sell only to patients with DME insurance.

49.     Accu-Chek test strips intended for sale to patients with pharmacy-benefit insurance are packaged and labeled as retail products for distribution to retail pharmacies.  Although the vast majority of retail Accu-Chek test strips are paid for by pharmacy-benefit insurance, retail products may be sold to anyone, including people who do not have insurance and pay cash.

50.     During the relevant time period, Roche sold retail strips to wholesalers at list prices ranging from about $51.25 to $78.07 per 50-strip vial.  The wholesalers sell the retail strips to retail pharmacies at a small markup above the wholesale price.  When a patient with pharmacy-benefit insurance purchases Roche retail strips, the patient's insurance plan reimburses the pharmacy at an additional markup.  Under contracts with the pharmacy-benefit insurers, Roche pays them rebates ranging from about $30 to $70 for every box or retail strips they

reimburse.  As a result of these rebates, Roche's net revenue per box of retail strips was substantially less than the $51.25 to $78.07 wholesale price.  It was and is well known throughout the diabetes product industry that test strip manufacturers paid these rebates to pharmacy-benefit insurers.

51.     By contrast, Roche sells its NFR strips primarily to mail-order distributors for under $20 per 50-strip vial, and medical-benefit insurance plans reimburse the mail-order distributors at a small markup on this price.  Roche does not pay rebates to insurance plans that cover test strips under a medical benefit.

52.     Each of Roche's test strip products has a different National Drug Code ("NDC").  An NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration, which regulates these devices.  As an example, one of Roche's most widely used test strip products is Accu-Chek Aviva Plus, most commonly sold in 50-strip vials.  The NDC for the principal NFR version of this product is 65702-0436-10, while the NDC for the retail version is 65702-0407-10.  The NDC is printed on each vial's package.

53.     The package for the principal NFR version of Roche's Aviva Plus test strips also features the following warnings, printed in easy-to-read, bolded black lettering on a yellow background:  "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use."  These warnings are **not** printed on the retail package for Aviva Plus test strips.

**Adjudicating Claims for Blood Glucose Test Strips**

54.     When a patient with insurance purchases a box of Roche's test strips, the seller is paid by the patient's insurer.  To obtain reimbursement from insurance, the seller must submit a claim.  This process is referred to as "adjudication."

55.     When a patient has pharmacy-benefit insurance, the seller—*i.e.*, a pharmacy—adjudicates the claim for reimbursement by submitting the NDC of the dispensed

product to the patient's insurance.  Submitting the dispensed product's NDC is necessary because pharmacy-benefit plans only cover specific pharmaceuticals and medical devices, listed by NDC, that are on their formularies.  Products not listed on the formulary are not entitled to any reimbursement.[1]

56.     Because of the significant differences in how retail strips and NFR strips are sold and paid for, it is crucial for fairness and functioning of the marketplace that the test strips be sold only within their intended channels.  Diversion of NFR strips to retail channels not only deprives Roche of retail sales, it also causes an out-of-pocket loss on each vial of NFR strips that is paid for through a pharmacy benefit.  That is because the rebate that Roche pays on each claim for a box of retail strips is higher than the total price that Roche receives on the sale of a box of NFR strips.

57.     Because of this harm, Roche and the insurance companies that pay for test strips have implemented systems to prohibit distributors from dispensing NFR strips to pharmacy beneficiaries.  For example, the NDCs for NFR strips are not on pharmacy-benefit plans' formularies.  Reimbursement by a pharmacy-benefit plan thus requires the seller to dispense retail strips and submit reimbursement claims using the NDC for retail strips.  It is fraudulent for a seller to obtain the higher retail reimbursement rate by adjudicating a claim for retail strips (by submitting the retail NDC) when NFR strips had in fact been dispensed to the patient.

**Defendants' Fraudulent Scheme**

58.     Defendants are or were officers, directors, financiers, and/or banking service providers of Alliance.  Alliance was the successor entity of Warner Diabetic, LLC d/b/a

---

[1] No NDC is submitted in reimbursement claims for NFR product.  This is because medical-benefit plans are "brand-agnostic," meaning that they provide the same reimbursement rate regardless of the brand the customer buys.  Instead, the claim utilizes a Healthcare Common Procedure Coding System code (an HCPCS or "Hic Pic" code) that designates the type of equipment sold, but not the brand (unlike an NDC).  Of course, no company would dispense retail strips and then seek reimbursement from a medical-benefit plan, because the wholesale price of retail product is substantially higher than the reimbursement rate offered by medical-benefit plans.

Ingram Medical ("Ingram") and, before that, Medsource Rx Pharmacy, LLC.

59.     At all times relevant to this Complaint, Alliance and/or its predecessor entities owned, controlled, or were affiliated with a large network of companies used to defraud Roche and other test strip manufacturers.

60.     Alliance's network of subsidiaries included entities involved in purchasing test strips, such as Alta Distributors, LLC ("Alta"); Ollin Pharmaceutical, LLC ("Ollin"); SP Diabetic LLC ("SP Diabetic"); Medsource-Direct, Inc.; and Western Diabetic Supply Corp.

61.     Alliance's network of subsidiaries also included operating, managing, and holding entities, such as Alliance Medical Administration, Inc.; AHN Holding Company, LLC; Alliance Health Networks, LLC; Steel Medical, LLC; Chronic Care Health Foundation, LLC; Skyline Health Services, LLC; White Capital Management, LLC; CSL Capital Holdings, LLC; Ingram Diabetic, LLC; Genshai Holdings, LLC; Namaste Capital Holdings, LLC; Warner Diabetic, LLC; Cloud Management, LLC; and Ingram Medical Administration, Inc.

62.     Alliance and/or its predecessor entities also owned, controlled, and/or were affiliated with a large network of pharmacies and their associated holding companies, including:  Alameda Rx Holdings, LLC; Alameda Rx, LLC; Aspire Rx, LLC; Baytree Rx, LLC; Belle Pharmacy, LLC; Benson Pharmacy, Inc.; Berkshire Pharmacy, LLC; Best Rx Holdings, LLC; Best Rx, LLC; Better Care Rx Holdings, LLC; Bridgestone Pharmacy Holdings, LLC; Bridgestone Pharmacy, LLC; Brighton Pharmacy, LLC; Brookhill Pharmacy, LLC; BrooksideRx Holdings, LLC; BrooksideRx, LLC; Bubba's Rx Holdings, LLC; Burbank Pharmacy, LLC; Canyon Medical, LLC; Canyons Pharmacy, LLC; Central Medical, LLC; Charleston Rx Holdings, LLC; Charleston Rx, LLC; Cheshire Rx Holdings, LLC; Cheshire Pharmacy, LLC; Conoly Pharmacy Holdings, LLC; Conoly Pharmacy, LLC; Cordele Pharmacy, LLC; Cottonwood Pharmacy, LLC; Crestwell Pharmacy Holdings, LLC; Cure Rx, LLC; David

Pharmacy, LLC; Delaney Pharmacy, LLC; Eat Great Café, LLC; El Dorado Pharmacy, LLC; El Dorado Rx Holdings, LLC; Everest Pharmacy, LLC; Galena Pharmacy Holdings, LLC; Galena Pharmacy, LLC; Garnett Pharmacy, LLC; Genesee Pharmacy, LLC; Geneva Pharmacy, LLC; Geneva Rx Holdings, LLC; Glendale Square Rx, Inc.; Good Wave, LLC; Goodman Pharmacy, LLC; Hawkins Pharmacy Holdings, LLC; Hawkins Pharmacy, LLC; Hawthorne Pharmacy, LLC; Hawthorne Rx Holdings, LLC; Hazelwood Pharmacy, LLC; Health Rx Holdings, LLC; Health Saver Holdings, LLC; Health Saver Rx, LLC; Improve Rx Holdings, LLC; Improve Rx, LLC; Innovative Rx, LLC; Insight Rx Holdings, LLC; Jefferson Pharmacy, LLC; JTK Medical, LLC; Kendall Pharmacy, Inc.; Living Again Holding Co, LLC; Lockeford Rx Holdings, LLC; Lockeford Rx, Inc.; Lone Peak Rx, LLC; Med Mart Holdings, LLC; Medina Pharmacy, LLC; Medsource Rx Pharmacy, LLC; New Jersey Rx Holdings, LLC; New Jersey Rx, LLC; New Life Pharmacy, LLC; Newton Rx Holdings, LLC; Newton Rx, LLC; Norwood Pharmacy, LLC; Oak Creek Pharmacy Holdings, LLC; Oak Creek Rx, LLC; Ohana Pharmacy Holdings, LLC; Ohana Rx, LLC; On Track Rx Holdings, LLC; On Track Rx, LLC; OpusRx, LLC; Osceola Clinic Pharmacy, LLC; Osceola Rx Holdings, LLC; Peach Medical Holdings, LLC; Peterson Rx, LLC; Pharmacare Holdings, LLC; Philadelphia Pharmacy Holdings, LLC; Pineview Rx Holdings, LLC; Pinnacle Pharmacy Solutions, LLC; Pro Rx Holdings, LLC; Raven Pharmacy Holdings, LLC; Raven Pharmacy, LLC; Richardson Pharmacy, LLC; Riverbend Prescription Services, LLC; Riverbend Pharmacy, LLC; Riverfront Pharmacy, LLC; Riverfront Rx, LLC; Rock City Pharmacy, LLC; Rx Pro Holding Co., LLC; Rx Solutions Holdings, LLC; Smart Rx Holdings, LLC; Staley Pharmacy, LLC; Stonybrook Pharmacy, LLC; Twin Lakes Pharmacy, LLC; Uinta Rx Holdings, LLC; Uinta Rx, LLC; Uplift Rx Holdings, LLC; Uplift Rx, LLC; Vitality Holdings, LLC; Waverly Pharmacy, LLC; Woodward Drugs, LLC; and Woodward Rx Holdings, LLC (together and with other, currently unidentified affiliates, the "**Alliance Pharmacies**").

63.     Defendants used various methods to obtain Roche's NFR strips through Alliance's purchasing entities.  Those strips were then sold or distributed to the Alliance Pharmacies.  Instead of dispensing NFR strips to DME beneficiaries, the Alliance Pharmacies dispensed them to pharmacy beneficiaries.  To obtain reimbursement for those NFR strips, the Alliance Pharmacies adjudicated **over one million** insurance reimbursement claims in which they falsely stated that they had dispensed retail strips.

64.     In sworn deposition testimony given on July 19, 2017, two Alliance employees readily admitted to this massive fraud, with one describing it as "the foundational practice" of Alliance.  A third employee testified in deposition that "delivering one product but billing for another . . . was an integral part of [Alliance's] business model."

**Alliance Builds a Patient Base**

65.     In 2007, Defendant Jeffrey Smith purchased Medsource-Direct, a test strip wholesaler.  By September 2011, Medsource-Direct discontinued its wholesale business and began operating as the mere "purchasing arm" of Medsource Rx Pharmacy, an entity created by Jeffrey Smith for the purpose of selling test strips directly to patients.

66.     Medsource Rx Pharmacy was succeeded by Warner Diabetic, LLC ("Warner") in December 2011.  Warner began branding itself as Ingram Medical ("Ingram") in February 2012.

67.     To expand its test strip business, Ingram purchased customer leads from vendors that identified diabetes patients.  In January 2014, Ingram acquired its largest lead vendor, Alliance Health Networks.  Ingram then adopted the "Alliance Health" brand name.

68.     Alliance maintained several websites and online social networks that provided information to diabetes patients.  Alliance's primary social network for diabetes patients was called "Diabetic Connect."  By asking Diabetic Connect users to sign up for various

services and discounts, these websites obtain valuable personal information from users, including names, addresses, medical issues, and insurance information.  Alliance had hundreds of employees in call centers who earned commissions by phoning these "leads" and convincing them to purchase their test strips from Alliance.  On average, Alliance telephoned a lead within 30 seconds of receiving it.

69.     From among these leads, Alliance pursued specific patients based on their location, insurance carrier, preferred/prescribed brand of test strips, and profitability in order to create a "low risk" customer base.  "Low risk," a term frequently used by Alliance in its internal communications, referred to the risks associated with detection of Alliance's scheme by those being defrauded or harmed.

70.     If a lead was too risky or insufficiently profitable, Alliance would attempt to sell the lead to another company.  As Alliance came under increasing scrutiny from certain manufacturers and insurers, it would adjust its profitability/risk metrics and "fire" large pools of existing patients who did not meet the new standards.

71.     The single most important criterion for Alliance's potential customers was having insurance that covered test strips under a pharmacy benefit that would reimburse for retail strips.  The vast majority of Alliance's patients had pharmacy-benefit insurance.

**<u>Alliance Acquires Roche NFR Test Strips on the Secondary Market</u>**

72.     After developing a base of patients with pharmacy-benefit insurance that reimbursed for the sale of retail strips, Alliance needed test strips to dispense.  Alliance recognized that purchasing retail strips through legitimate channels and dispensing them to pharmacy beneficiaries would result in low or nonexistent profit margins—especially given that Alliance often did not collect co-pays.  Seeking the highest profit margins possible, Alliance opted to purchase low-cost NFR strips, dispense them to pharmacy beneficiaries, and submit

fraudulent insurance claims falsely stating that they had dispensed retail strips.

73.     Jose Vargas, Alliance's Director of Procurement, testified that Defendant Jeffrey Smith instructed him to buy as many NFR strips as possible from unauthorized distributors.  In an e-mail to a business partner, Vargas stated that Alliance "only buy[s] MO or NRS strips."  "MO" (mail order) and "NRS" (not for retail sale) strips are NFR strips.

74.     Alliance purchased the vast majority of its NFR strips from third-party "diverters."  Diverters obtain NFR strips from distributors willing to breach their contracts with manufacturers and sell NFR strips on the "secondary" or "gray" market, where they can obtain a higher price from parties like Alliance who intend to use them to commit insurance fraud.  The secondary market for diabetes test strips consists almost entirely of NFR strips, because the high wholesale price at which manufacturers like Roche sell retail strips into the market leaves little opportunity for diverters to make a profit.  Buying NFR strips from the secondary market was so commonplace for Alliance that its employees used "secondary product" as a synonym for NFR strips.

75.     Alliance did not purchase Roche's NFR strips under Alliance's own name, but instead purchased them through its subsidiary purchasing entities.  The first such entity was Medsource-Direct, Inc., which changed its name to SP Diabetic in September 2011.  At some point, health insurers refused to reimburse Alliance pharmacies for sales of Roche test strips that they "purchased" from SP Diabetic, so Alliance began purchasing through Alta and Ollin.

76.     After Alliance purchased NFR strips from the secondary market, it falsely identified them in its inventory management system using the NDC number for retail strips.  As a result, the purchase orders ("POs"), invoices, and other inventory reports generated by Alliance's inventory management system always falsely displayed the retail NDC for the corresponding brand of test strips, even though Alliance was purchasing NFR strips.

77.     Alliance's use of the retail NDC on all of its POs and invoices was crucial to hiding its fraud.  When auditors demanded proof from Alliance-affiliated pharmacies that they had purchased sufficient retail strips to support their thousands of adjudications, the pharmacies would produce phony invoices from Medsource-Direct, SP Diabetic, Alta, or Ollin purporting to show that the strips purchased by the pharmacies were retail strips.  The auditors were not told that these purchasing entities—like the pharmacies themselves—were part of the same fraudulent enterprise.  Nor were auditors told that the records generated by the purchasing entities falsely displayed retail NDCs despite the fact that the strips being dispensed by the pharmacies were NFR strips.

**Alliance Builds a Network of Pharmacies to Execute and Mask its Fraud**

78.     Pharmacy benefit plans typically contract with pharmacy benefit managers ("PBMs") to manage insurance claims and reimbursements.  The PBMs, in turn, have contracts with retail pharmacies that govern the insurance reimbursement process.  Those contracts prohibit pharmacies from receiving reimbursements for sales of NFR strips and typically prohibit them from operating entirely by mail order.  In addition, the contracts give PBMs the right to audit pharmacies' compliance and, if breaches are discovered, to seek repayment of reimbursements—called "chargebacks"—and/or terminate the contract outright.

79.     It therefore was essential that the Alliance Pharmacies deceive PBMs into believing they were dispensing retail strips at brick-and-mortar retail locations, when they were in fact dispensing NFR strips exclusively by mail.  As Defendants' fraudulent enterprise grew, however, they could not hide the massive number of diabetic test strips (and relative lack of other items) purportedly being dispensed to walk-in customers at these locations.  As PBMs began to catch on to Alliance's mail-order business model, Defendants expanded their enterprise beyond a single corporate-owned pharmacy—the MedSource Rx Pharmacy—to additional

corporate-owned pharmacies with independent branding.  These included Aspire Rx Pharmacy,

Everest Pharmacy, and Brighton Pharmacy.

       80.     Numerous PBMs audited, claimed chargebacks, and cancelled their

contracts with these Alliance-owned pharmacies.  For example:

- Prime, a PBM, claimed a $1,860,423 chargeback against Medsource Rx Pharmacy, LLC, and the PBM Catamaran claimed a $3,200,000 chargeback against Medsource.

- Prime claimed a $519,170 chargeback against Aspire Rx, LLC, and Catamaran claimed an $83,883 chargeback against Aspire.

- Prime claimed a $653,207 chargeback against Everest Pharmacy, LLC, and Express Scripts Inc. ("ESI"), another PBM, asserted Everest breached its contract.  A third PBM, OptumRX, claimed a $1,466,725.60 chargeback against Everest.  A fourth, Caremark, claimed a $583,974 chargeback against Everest.

- OptumRX suspended payments and claimed a $1,422,379 chargeback against Brighton Pharmacy, LLC.  Prime claimed a $560,717.86 chargeback against Brighton.  ESI claimed a $3,337,693 chargeback against Brighton.

Nevertheless, by operating through multiple pharmacies, each with multiple PBM contracts,

Alliance was able to absorb the losses of particular PBMs terminating their contracts with

particular pharmacies.

       81.     Defendants became concerned, however, that PBMs were beginning to

notice common ownership and locations of Alliance's corporate-owned pharmacies, and that

they were cutting off multiple Alliance pharmacies at once rather than one pharmacy at a time.

This sort of systemic PBM risk was devastating to Alliance's business:  Medsource Rx Pharmacy

was forced to close on May 1, 2014; Aspire Pharmacy closed by May 30, 2014; Everest

Pharmacy closed by June 30, 2014; and Brighton Pharmacy closed by August 2015.

       82.     To mitigate the risk of being discovered and shut down *en masse*, Alliance

began operating through a network of nominally "independent" pharmacies throughout the

United States.  These pharmacies each had separate contracts with PBMs, and they each had

their own National Provider Identifiers ("NPI"), unique ten-digit numbers assigned to

pharmacies and other healthcare providers by the Federal Government and used in adjudication

of insurance claims.  The pharmacies also had independent branding and ostensibly independent

ownership—usually a friend, neighbor, or business associate of Defendant Jeffrey Smith.  In

substance, however, these "independent" pharmacies acted as fronts for Alliance's insurance-

fraud scheme.

83.    As alleged throughout this Complaint, it was well understood by all

Defendants that Alliance used "independent" pharmacies for the sole purpose of mitigating the

risks associated with its fraudulent business model.  A May 15, 2016 memo prepared for

Alliance's Board of Directors, including Defendants Hughes, Wistner, and Koopersmith,

summarized the "independent" pharmacy strategy succinctly:

> In late 2013, the company determined to grow its fulfillment capability not by
> adding new internally owned pharmacies, but by adding pharmacies owned by
> independent investors owning pharmacies managed by the company.  The PBMs
> cancelled contracts and imposed chargebacks against the internally owned
> pharmacies because the pharmacies had retail contracts but were fulfilling by
> mail.  Based on updated "transparency" requirements that mandated reporting
> ownership structure, the PBMs were able to tie all of the internal pharmacies
> together.  The independent pharmacy model was an attempt to diversify and shift
> risk.

84.    As the May 15, 2016 memo makes clear, the "independent" label was a

ruse—Alliance's affiliated pharmacies operated under its direct control.

85.    Alliance required the "independent" pharmacies to use its proprietary

software called Pharmacy Patient Management System ("PPMS"), which managed patients'

prescriptions and insurance information, as well as the costs, profit margins, and shipment of test

strips.  Using the PPMS software's insurance tracking capability, Alliance would assign specific

patients to each "independent" pharmacy, depending on whether that pharmacy had a contract

with the patient's PBM.  The PPMS software also tracked the prescription and usage data for the

patients assigned to each "independent" pharmacy, which Alliance then used to determine the

number and brands of test strips the pharmacy would need to fill its assigned patients'

prescriptions.  Alliance's purchasing entities then "sold" the requisite number of NFR strips to

the pharmacy.

86.     Alliance also required the "independent" pharmacies to use software

(called "FSI") that allowed for real-time, electronic adjudication of insurance claims over the

internet or modem.  Alliance trained the pharmacists and pharmacy technicians at its pharmacies

to adjudicate claims in FSI by entering a "short code" or "quick code" for the corresponding

brand of test strips.  Unbeknownst to the pharmacists, Alliance had modified FSI so that entering

the "short code" caused the software to adjudicate an insurance claim using the NDC for retail

strips—even though NFR strips were being dispensed.  For example, when adjudicating a 50-

count box of Roche's Accu-Chek test strips, pharmacists were instructed to input the short code

"ACCU50" regardless of the NDC on the box dispensed to the patient.  The ACCU50 short code

acted as a stand-in for the NDC of a retail box of Accu-Chek test strips.

87.     Use of short codes resulted in the uniform adjudication of all test strips as

retail strips at all of Alliance's pharmacies.  In sworn testimony, Alliance's former Director of

Pharmacy Operations, Amy McMurtry, stated that "[a]ny adjudication that went through was for

the retail NDC regardless of the box received in or dispensed out" and that she could not "think

of any exception to that."  Former Alliance pharmacist Masum Amin likewise agreed at her

deposition that when she "delivered DME test strips to a patient, their insurance would be billed

for retail test strips."  "DME" test strips are NFR strips.

88.     The use of short codes in FSI also had the benefit of hiding Alliance's

fraud from its own pharmacists and technicians.  Those employees did not themselves have to

enter false NDC numbers into Alliance's software—they simply entered a short code, and the software provided by Alliance would automatically bill the patients' insurance using the retail NDC.

89.     The pharmacies remitted the resulting insurance reimbursements to Alliance.  Importantly, Alliance's name was divorced from the entire transaction with the PBM, which would have no way of knowing of Alliance's involvement.  In this way, Alliance reduced the risk that a PBM discovering problems at one Alliance pharmacy would respond by cutting off the entire Alliance network of pharmacies.  Alliance's former Director of Pharmacy Operations Amy McMurtry testified that Alliance's network of "independent" pharmacies was intentionally structured "so that . . . in the event of a contract loss, it would not be across the entire network of pharmacies."

90.     Isolating contract cancellations to a single pharmacy was key to Defendants' fraudulent enterprise.  By employing a network of nominally "independent" pharmacies, Alliance could mitigate the impact of PBM contract terminations by simply shifting patients to another pharmacy.  Because Alliance's PPMS software tracked patients by insurance plan, that software could easily reassign patients to a different Alliance pharmacy that still had a contract with that PBM (because the PBM had not yet discovered that the new pharmacy was affiliated with Alliance and committing fraud).  Alliance shifted its patients in this way on numerous occasions.

91.     Alliance went to great lengths to conceal that its "independent" pharmacies were affiliated with each other or with Alliance, including by instructing the pharmacists at its affiliated pharmacies to deny association with other Alliance pharmacies.

92.     For example, in a July 31, 2014 e-mail from former Director of Pharmacy Operations McMurtry to Defendant Paoline and the pharmacists in charge of Alliance-affiliated

Oak Creek Pharmacy, David Pharmacy, River Front Pharmacy, Cure Pharmacy, Hawkins

Pharmacy, Peterson Pharmacy, Norwood Pharmacy, and Stonybrook Pharmacy, McMurtry

wrote:

> Team,
>
> I know that many of the Independent locations have sheets containing information about the other Independent sites (Name, Address, NPI, etc.).  In an effort to reduce confusion, I am asking that you take down all site information sheets.  Please either file them away for future reference or place them in a HIPAA container.  The information on these sheets was probably not useful to most of you anyways, as it was mostly just information.  We are making the change for a couple of reasons:
>
> 1) Each site is an Independent site with a separate owner.  There is no correlation or tie between the two sites.
>
> 2) When a site is asked questions like: "are you a chain or an independent?"; "Are you linked to any other pharmacies?"  I think it gets confusing if you do have the other sites information, and gives an inaccurate sense of connection to each other.
>
> . . .

93. McMurtry agreed during her deposition that pharmacists at Alliance's

"independent" pharmacies "were instructed to not tell anyone that they were affiliated with

Alliance or affiliated with other pharmacies."  She further testified that one reason they were

instructed to do so was because a "PBM could cut contracts at more than one pharmacy."

94. Despite these various safeguards designed to avoid detection by PBMs and

mitigate risk, Alliance knew that the massive quantities of illegal adjudications running through

each "independent" pharmacy would eventually be noticed and that the pharmacies were

operating on borrowed time.  The May 15, 2016 memorandum to Alliance's Board of Directors

stated that Alliance had anticipated that the independent pharmacies would have a "three year

life span" before their fraud was detected and shut down, but that this had turned out to be too

generous of an estimate:

> The company anticipated a three year life span for the independent pharmacies. Unfortunately, the PBMs have been cancelling contracts at a faster rate than anticipated, and have imposed chargebacks, although the company is assisting the independent pharmacies to challenge cancellations where appropriate and chargebacks.

The memorandum further explained that its "independent" pharmacy model had become "extremely difficult" to manage because of potential regulatory issues, the straw owners taking excessive draws and using independent accountants, and questions raised by Alliance's auditors.

95.     To address these problems while preserving its "independent" pharmacy ruse, Alliance began acquiring the formerly "independent" pharmacies as part of a so-called "10% PIC" ownership model.  Under this model, Alliance would acquire the pharmacy but grant the pharmacist-in-charge (the "PIC") a 10% equity stake, allowing the PIC to act as a straw owner.  Alliance would then over-charge the pharmacy in fees and wholesale markup "to assure that the pharmac[y] lose[s] money" until the fourth quarter of each year, when Alliance would allow the pharmacy to break even.  The 10% equity share thus would be profitless, but would allow Alliance to take advantage of the identity of the PIC as the ostensible owner and appear "as independently owned pharmacies in licensure applications and PBM contracts."  As with the "independent" pharmacy model, the 10% PIC model was designed for the express purpose of making the pharmacies appear as independent from Alliance to obfuscate discovery of the fraudulent scheme.

96.     Pursuant to this switch in ownership model, between May 31 and July 1, 2016, Alliance entered into agreements to manage and eventually acquire:  Alameda Pharmacy, LLC; Baytree Pharmacy, LLC; Cordele Pharmacy, LLC; CureRx Pharmacy, LLC; David Pharmacy, LLC; El Dorado Pharmacy, LLC; Genesee Pharmacy, LLC; Hawkins Pharmacy, LLC; Jefferson Pharmacy, LLC; Oak Creek Pharmacy, LLC; PetersonRx, LLC; Rock City Pharmacy, LLC; Staley Pharmacy, LLC; and Twin Lakes Pharmacy, LLC.

**Defendants Actively Managed the Risk of Having Their Fraud Discovered**

97.     In addition to using a network of ostensibly independent pharmacies to disguise their fraud, Defendants devoted constant attention to the task of hiding their fraud from PBM auditors and government regulators, and to mitigating the fallout when detected.

98.     One of the foundational "disciplines" of Alliance was "Productive Paranoia."  A May 9, 2012 slide presentation to Alliance's Board of Directors described "productive paranoia" as "The Company's plan for 'protecting the golden goose.'"  As the source of over 90% of Alliance's revenue, the "golden goose" was the false adjudication of NFR strips as retail strips.

99.     As Defendant Jeffrey Smith stated in an April 10, 2013 e-mail to, among others, Defendants Paoline, Blaine Smith, and Leavitt, "the biggest concern under Productive Paranoia is PBM/Payor Risk."  Smith was referring to the ever-present risk that PBMs would cancel their contracts with the Alliance Pharmacies as a result of Alliance's deceptive practices. This risk was perennially one of Alliance's biggest business concerns and was well known to all of the Defendants.

100.    Alliance created a "Productive Paranoia Committee" dedicated to mitigating the risks associated with Alliance's fraudulent and deceptive business practices.  The Productive Paranoia Committee operated as Alliance's clearing house for new and innovative ways to deceive PBMs, hide its practice of submitting insurance claims containing false NDC numbers (which Defendants referred to as "the NDC issue"), and continue growing Alliance's "golden goose."  The Individual Defendants regularly participated in "Productive Paranoia" discussions.

101.    Alliance developed a number of methods for mitigating the risks of PBM contract cancellations.  As alleged above, the primary method was by maintaining a constant

flow of new "independent" pharmacies to which Alliance could shift patients in the event of contract cancellations.  For example, on January 31, 2015, Defendant Paoline e-mailed a "Productive Paranoia" slide deck to, among others, Defendants Jeffrey Smith, Leavitt, Blaine Smith, and Grant.  On a slide labeled "Challenges/Concerns," the deck listed cancellation of contracts by two PBMs, ESI and CVS/Caremark, at four separate Alliance pharmacies.  A later slide showed that Alliance was mitigating the risks of such cancellations by opening ten new "independent" pharmacies in Iowa, Texas, Michigan, North Carolina, Nevada, Illinois, Florida, and California.

102.    Alliance also addressed the risk of contract cancellation by establishing high "profit thresholds" for new patients whose claims for test strips had to be adjudicated to "high-risk" PBMs—*i.e.*, PBMs that were more likely to audit Alliance's pharmacies and discover the fraud.  In a May 31, 2013 e-mail with the subject "Protect the Golden Goose Issue," Defendant Jeffrey Smith wrote to Leavitt, Paoline, and Blaine Smith (among others), "We are signing up too many of the wrong customers (risky customers)."  A slide deck prepared for that quarter's meeting of Alliance's Board of Directors explained that a "key company objective is to diversify its payer base away from the largest PBMs," and that it was doing so by implementing "[a]utomated gross profit thresholds."  Under those profit thresholds, Alliance would only service risky patients if doing so resulted in a high profit.  For example, in an October 9, 2013 e-mail to Defendant Wistner, Jeffrey Smith recalled that Alliance would often abandon patient leads when those patients did "not meet [Alliance's] profit guidelines."  "For the big 3" PBMs, Smith continued, "it is a high threshold ($40) to minimize the big three customers we bring on."

103.    Alliance was able to achieve such high profit margins on boxes of Roche test strips only by purchasing low-cost NFR strips and fraudulently adjudicating them as retail strips.  In this way, Alliance's efforts to address the risk of having its fraudulent practices

discovered actually led to the further entrenchment of these practices.  The purpose of Alliance's compliance and risk management efforts was to maximize Alliance's profits, not to avoid engaging in fraud.

**Defendants Actively Obstructed Outside Inspections and Audits**

104.    As part of their efforts to manage the risk of PBMs and others discovering their deceptive and fraudulent business practices, Defendants took active measures to conceal those practices from outside auditors and inspectors.  On numerous occasions, Alliance, with the knowledge and active participation of Defendants, worked to prevent auditors and inspectors from discovering that it was shipping NFR strips by mail order and billing PBMs for retail strips.

**Misleading Pictures and Samples of Retail Strips**

105.    On multiple occasions, Alliance showed auditors and inspectors pictures or samples of retail strips to create the false appearance that its pharmacies had been stocking and dispensing retail strips, when in fact they had been dispensing NFR strips.

106.    For instance, in March 2016, inspectors from the Mississippi Board of Pharmacy conducted a surprise on-site inspection of the Alliance-affiliated Hawkins Pharmacy.  The inspectors noticed that despite adjudicating huge quantities of retail strips, the pharmacy had no such strips in stock.  The inspectors expressed concern and stated that they would conduct a follow-up inspection in one month.  Alliance sprang into action, "order[ing] a small amount of retail strips" and "keep[ing] a small supply on hand" to make it appear as though Hawkins Pharmacy was regularly stocking retail strips, despite the fact that it continued to dispense NFR strips.  When Defendant Grant was informed in April 2016 that the inspectors had returned, he asked Defendant Paoline, "Had we stocked with correct NDCs as we discussed?"  Paoline replied:  "Yes."  Grant wrote back:  "Perfect.  The quick action by you and your team likely saved the day.  Well done."

107.    Later in 2016, the Alliance-affiliated Cure Pharmacy, Baytree Pharmacy, and Alameda Pharmacy were audited by the PBM Express Scripts ("ESI").  One of the purposes of the audit was to determine whether these pharmacies had purchased enough retail strips to justify their thousands of adjudications.

108.    On September 15, 2016, Defendant Paoline sent an e-mail to Alliance employees with the subject "ESI Corrective Action Plan."  That plan included the "[p]hysical separation of primary/secondary product" and taking "[p]ictures of primary product on shelf" at the audited pharmacies.  "Primary product" meant retail strips; as alleged above, "secondary product" meant NFR strips.  Paoline's action plan also included "Pharmacist education on how to respond to ESI onsite auditor" and "[e]nsur[ing] there is retail product at these sites."

109.    On September 16, 2016, Alliance's outside counsel wrote letters to ESI on behalf of Baytree Pharmacy, Cure Pharmacy, and Alameda Pharmacy.  The letter from Baytree Pharmacy read in part:

> [I]n order to demonstrate that Baytree Pharmacy is purchasing retail product from manufacturers and/or what Baytree Pharmacy understands to be "authorized distributors," Baytree Pharmacy has provided several photos of current inventory on Baytree Pharmacy's shelf that contain retail lot numbers and NDCs . . . .

110.    The boxes of retail strips shown to ESI were never intended to be dispensed to patients.  In fact, on August 29, 2016, after requesting that the audited pharmacies be provided with only five boxes each of certain brands of retail strips (Alliance's pharmacies adjudicated hundreds of boxes a week), John Renola, Alliance's Vice President of Operations, added:  "***If possible, can we put some kind of caution tape or something like that on these boxes so that the pharmacies have a reminder not to use them***? . . . And then we should brainstorm how to write off so that we don't keep counting this as usable inventory."

111.    In these and other cases, Alliance showed auditors retail strips (or pictures of retail strips) for the purpose of misleading them into believing that Alliance was dispensing

retail strips, when in fact it was dispensing NFR strips.

**Falsified Invoices**

112.    Alliance also had a regular practice of responding to outside audits and investigations with falsified or misleading invoices in order to avoid detection of its adjudication fraud.  This practice was known to and approved by Defendants.

113.    PBMs would sometimes conduct "purchasing audits" of Alliance's pharmacies, wherein they would seek documentation showing that a pharmacy had purchased enough retail strips to justify its massive number of claims.  In response, Alliance would produce invoices from its purchasing entities:  Medsource-Direct, SP Diabetic, Alta Distributors, and Ollin Pharmaceutical.  As alleged above, these invoices already were falsified because they displayed the NDC for retail strips even though Alliance only purchased and dispensed NFR strips.  Even so, Alliance would redact any other information that might reveal that the pharmacy was dispensing NFR strips.  For example, Alliance regularly redacted pricing information from invoices because observant auditors would see that those prices were too low for legitimate purchases of retail strips.

114.    When the PBM Optum Rx audited the Alliance-affiliated Hawkins pharmacy in March 2015, it requested invoices from Alta Distributors as the pharmacy's supplier of test strips.  Alliance employee Kassie Thomas sought advice on how to respond, and later e-mailed Defendant Sahily Paoline:  "I just met with David [Grant] and Justin [Leavitt] (by phone) I am going to white out the dollar amounts on the invoices but they want me to have the item number that is listed on the invoice, verified by . . . someone that that is the NDC number that we are billing them for the product."  In other words, Grant and Leavitt explicitly instructed Alliance employees to both remove incriminating information (pricing) and affirmatively provide false information (retail NDCs) in documents provided in response to PBM audits.

115.     Sometimes, PBMs would not be satisfied with invoices from Alliance's purchasing entities like Alta and would demand to see "pedigree" invoices from the external sources that had sold those test strips to Alliance.  Alliance's purchasing director Jose Vargas described these requests as "tricky since we don't have all invoices showing the Retail NDC."  Vargas explained that although some of Alliance's outside vendors would falsely "put the retail NDC" on their invoices for NFR strips, some would not.

116.     In fact, many external suppliers falsified the NDCs on their invoices at Alliance's request.  For example, in a June 18, 2013 e-mail to one of Alliance's vendors, Jose Vargas wrote:

> Could you please have your invoices match our item numbers and descriptions as they are on the list below?  We expect the NRS [not for retail sale] and MO [mail order] packaging, however this will help with receiving in our warehouse since these are our internal codes and descriptions.

The "item numbers" Vargas listed were the retail NDCs for, among other things, Roche test strips.  Alliance thus "expect[ed]" its suppliers to ship NFR strips but asked them to produce false invoices listing the NDCs for retail strips.

117.     On August 14, 2013, Vargas made the same request to two more of Alliance's suppliers of NFR strips.  These requests came just days after the PBM OptumRx had initiated a purchasing audit for the Medsource Rx Pharmacy, in which Alliance was asked to provide "year-to-date summaries or invoices of each wholesaler/distributor . . . supporting all medication purchases by NDC."

118.     Over the course of many years, Alliance made systematic efforts to ensure that its external suppliers of test strips would provide invoices listing the NDCs for retail strips even though these suppliers were shipping NFR strips to Alliance.

**Multiple Internal Whistleblowers Call Defendants' Attention to the Fraud**

119.     Despite Defendants' efforts to automate and conceal Alliance's

foundational practices of deception and fraud, a number of its pharmacists and employees caught

on and became whistleblowers.  Having adopted fraud as their fundamental business strategy,

Defendants did not respond to these whistleblowers by stopping it.  Rather, they sought to deter

and silence the whistleblowers in order to perpetuate Alliance's fraudulent business model and

enrich themselves.

**Chad Gubler**

120.    Chad Gubler was a pharmacy technician who worked at an Alliance-

owned pharmacy in Utah.  In early 2014, Gubler complained to his superiors at Alliance about

Alliance's adjudication fraud.

121.    On February 10, 2014, Gubler sent an e-mail to Defendant Paoline with

the subject line "NDC," apprising Paoline of his concern over whether he was "following the

laws" when he shipped NFR strips but adjudicated them as retail strips:

> I hope this NDC issue does not cause a lot [of] issues, but I thought that it should
> be brought to light.  I've been aware of the issue for nearly a year now and other
> technicians have been as well.  Corre[c]t me if I am wrong, but do we ship these
> products for financial gain?  Would it be too expensive for the company to ship
> the correct NDC if purchased from McKesson or another manufacturer?  If the
> NDC issue is a mistake of not updating the correct NDC in FSI [Alliance's
> adjudication software], then **why do we ship products that are labeled "DME
> beneficiary only," "Not for retail sale," "HMO use only," and "Mail order
> only?"**

122.    Paoline forwarded Gubler's e-mail to a coworker named Alison

Humphrey, writing:  "WTH?!?!"  Humphrey responded later that day:  "What are we going to do

about this???  I know he probably talks about this to others.  I was hoping that we were able to

distract him enough in the meeting.  This is not good ...."

123.    On February 12, 2014, Paoline e-mailed Defendant Grant with a draft

response to Gubler's e-mail.  The response avoided the "NDC issue"—*i.e.*, Alliance's practice of

submitting insurance claims that fraudulently misrepresented the NDC on the product that had

been dispensed—and attempted to distract and misdirect Gubler with references to Alliance's supply chain. Grant, who had recently been hired as General Counsel of Alliance, opined that the response was "Perfect." Paoline also sought input on her draft response to Gubler from Defendant Hadlock, who responded: "Nicely done."

124. Paoline e-mailed her response to Gubler on February 12, 2014. Gubler was not fooled. He forwarded Paoline's e-mail to a personal friend, writing: "This is the response from my pharmacist. I don't think it addresses my concerns or the ndc issue at all." Gubler also forwarded Paoline's response to multiple coworkers.

125. On February 13, 2014, Hadlock met with Gubler and instructed him "not to further this conversation with others unless it is with either me or" Paoline. Hadlock instructed Gubler that "[a]ny further issues are to be brought to us if he has any questions."

126. Gubler ignored Hadlock's demand that he keep his concerns to himself. Gubler's insistence on discussing those concerns with others earned him a stern rebuke from Alliance management. On March 5, 2014, Hadlock e-mailed Gubler:

> Chad,
>
> It has come to my attention that there may or may not have been a cancellation of an insurance at a site.
>
> It has also been mentioned that you are talking about this with other technicians.
>
> When we spoke several days ago, I asked you not to talk about items like this. I requested that you come and speak to me or [Sahily Paoline] if anything like this would occur and not speak to members of any team.
>
> I need to hear from you as to what the issue is and why you would speak to others when you had agreed not to.

127. On March 4, 2014, Gubler e-mailed a hotline for the Utah Department of Professional Licensing ("DOPL"), asking:

> Is it legal to dispense a different NDC than the NDC billed to the insurance company? What if the product being dispensed is an OTC, does that mean you

can dispense a different NDC than what you bill the insurance? Is it legal for a retail pharmacy to dispense HMO, DME, or Mail Order only products?

128.    On March 12, 2014, a Utah DOPL employee responded:

Dear Chad,

I'm sorry for the delay in responding to your email. I suggest you consult with a competent attorney about this, but I think it is illegal to dispense a different NDC than the NDC billed to the insurance company. . . .

129.    On April 2, 2014, Gubler forwarded Paoline's February 12, 2014 response e-mail to an attorney. He also sent an e-mail to the same attorney with the subject line "Ndc pictures." Attached to the e-mail were photographs of boxes of mail order blood glucose test strips with close-up photographs of those boxes' NDCs.

130.    Gubler resigned from Alliance in March or April 2014.

131.    On April 23, 2014, Alliance employee Tammy Hermansen accessed Gubler's work e-mail account and forwarded several of his e-mails to Paoline. Among the e-mails forwarded to Paoline were Gubler's e-mails to his attorney with the pictures he took of NDCs. Paoline later admitted in an e-mail that she was aware Gubler was working with an attorney on the "NDC issue."

132.    In addressing Gubler's complaints, Paoline, Hadlock, and Grant expressed no surprise concerning Gubler's complaint about the "NDC issue" because they were well aware that Alliance's foundational practice was dispensing NFR strips but submitting fraudulent insurance claims using the NDC for retail strips. Their objective was to deter Gubler from pursuing his complaints and prevent him from hindering Alliance from profiting from its fraud.

**Masum Amin**

133.    Masum Amin was the pharmacist-in-charge ("PIC") of the Alliance-affiliated Peterson Pharmacy in New Jersey. In 2014, Amin raised concerns about Alliance's practice of dispensing NFR strips but adjudicating them using the NDC for retail strips—*i.e.*, the

"NDC issue."

134.   On April 8, 2014, Amin e-mailed Defendant Paoline (copying Defendant

Hadlock), writing:

> I have told my shippers that I do not want any DME products on my picking
> station, as I will not send them out.  I am concerned and need much more detailed
> information on the use of DME products.

Again, "DME products" are NFR strips.

135.   In a follow-up e-mail, Amin asked:  "Where do pharmacists stand on a

liability standpoint?  Every box that goes out has my name on it.  How do other dispensing

pharmacist[s] feel about this?"

136.   Paoline forwarded Amin's e-mail to McMurtry and wrote, "How in the

heck do I answer this??  Ughhh."  McMurtry suggested:  "Most of the liability falls on the

insurance billing and purchasing side, so maybe we try to find a way to emphasize that the

patient is getting the right product, the package is just a package."

137.   When Paoline later learned that Amin was withholding shipments of test

strips due to her concerns, Paoline contemplated replacing Amin with Robert Bucco, a part-time

pharmacist at Peterson.  On April 10, 2014, Paoline wrote to McMurtry:

> Do we know where Robert stands on this issue?  Is he concerned as well.  Just
> wonder if she's stirring him up.  Also, thinking ahead on a possible change in PIC
> and whether he would be interested.

138.   In May 2016, the PBM ESI sent letters to multiple Alliance-affiliated

pharmacies alleging that they were engaged in test strip adjudication fraud.  In a June 13, 2016 e-

mail with the subject line "Express investigation" and attaching copies of POs and invoices

issued by Alliance's wholesaling subsidiary Alta, Amin, who had recently returned from leave,

wrote:

> After getting a little overview of this . . . investigation I wanted to be more
> thorough in our PO and inventory process and I have come across a few

concerns[.]

> As you can see the NDC numbers we are receiv[ing] and what is on the Invoice
> do not match.  The product received does not match the ACCU50 and ULT50
> billing NDC #s.  How are we to proceed to correct this? . . .

Amin had discovered that Alliance's wholesaling subsidiaries falsified invoices to show only

retail NDCs for Roche products, and that the "short codes" she was trained to input into

Alliance's adjudication systems were a stand-in for the retail NDC.

139.    Amy McMurtry forwarded Amin's e-mail to Defendant Paoline, writing:

> Masum is back from maternity leave and after reading the letter from ESI
> regarding NDC she has some questions/concerns over the NDC's on shipments
> and invoices not aligning.  We have previously had the secondary market and
> DME/Medicare beneficiaries discussion with Masum, but we have not discussed
> the NDC issue or anything surrounding adjudications.  Knowing Masum, I feel
> like she may respond better to legal having this discussion with her, but before I
> scheduled a call I was hoping to get your opinion.  Thoughts?

Paoline responded: "Totally agree, we should enlist Legal from the get go."  On June 14, 2016,

McMurtry e-mailed Defendant Grant, Alliance's General Counsel, to request his help with

addressing "Peterson PIC NDC concerns."  Grant agreed to conduct a conference call with

Amin.

140.    On June 16, 2016, Amin sent an e-mail to Grant and McMurtry with the

subject line "Call Follow up Regarding Product selection and dispensing."  That e-mail

summarized the excuses for Alliance's adjudication fraud that Grant had given Amin during their

conference call, and asked Grant to confirm:

> **As dispensing pharmacists we are billing PBMs, including medicare-d, for
> retail NDC# which is linked to a specific reimbursement rate, while we may
> be sending out a differently packaged product.**  Regardless of the integrity of
> the product and the use of FDA's definition of an NDC#, the reimbursement rates
> are established by PMBs [sic] and they are linking that rate to the different NDC #
> numbers on the manufacturers packaging.

141.    A few hours after Amin sent this e-mail, McMurtry forwarded it to

Paoline, writing:  "Well she nailed it below. . . ."  Paoline responded:  "She sure did!"

142.     On June 16, 2016, in response to Amin's point-by-point recap of Alliance's adjudication fraud, McMurtry wrote to Paoline:  "I'm assuming this is her attempt to receive David [Grant]'s buyoff for legal documentation??"  Paoline responded:  "Not sure if her intention, do you have a feel for it?"  McMurtry replied:  "I am pretty sure she is looking for documentation in writing, and I am pretty sure David [Grant] is not going to give it."  Later that night, Grant wrote to Paoline:  "I will come over shortly to talk" about Amin's e-mail.  The next day, Paoline wrote to McMurtry that Grant was "very apprehensive to respond.  He said this would be exhibit A."

143.     Amin subsequently requested Grant's written confirmation that Alliance pharmacists were "expected to knowingly/intentionally dispense different NDC # products while billing the retail NDC#."  Amin explained at her deposition that this expectation was imposed by "[a]ll of the management" at Alliance, "starting with my direct management all the way to David Grant."  Knowing that Amin's concerns were correct and that there was no legitimate response to them, Grant asked Amin to sign a confidentiality agreement as a condition of providing a response to her concerns in writing.  When Amin refused to sign the agreement, Grant declined to give her a written response.

144.     Paoline, Hadlock, and Grant took no action in response to Amin's complaints because they and the other Defendants were well aware that Alliance's "foundational practice" was to dispense NFR strips while adjudicating claims using the NDCs for retail strips. Instead of stopping the fraud, Defendants' response was to convince Amin to engage in that fraud or, failing that, to prevent her from expressing her concerns to others.

**David Goldsmith**

145.     David Goldsmith, Alliance's Vice President of Corporate Strategy and Business Development, blew the whistle on Alliance's widespread practice of adjudication fraud

in 2015.  Goldsmith's concerns were conveyed to Alliance's management and its Board of

Directors, including Defendants Hughes, Wistner, and Koopersmith.

146.    On October 26, 2015, Goldsmith e-mailed his resignation to Defendants

Jeffrey Smith, Blaine Smith, and David Grant.  Addressing his resignation directly to Jeffrey

Smith, Goldsmith wrote:

> Dear Jeff,
>
> I appreciate the chance to sit down with you and David Grant on Friday to lay out my concerns regarding our business practices as it relates to the pharmacy fulfillment strategy I have been tasked to execute.  As I shared with you two weeks ago after returning from the NCPA conference, I have had growing concerns about the propriety and sustainability of these practices, especially with respect to NDC coding of secondary product for reimbursement purposes and our copay collections.  As I explained to you on Friday, I have been wrestling with how to reconcile my current understanding of these practices with the need to protect my professional reputation.
>
> After speaking with you and David about these concerns, I spent the better part of this weekend doing additional due diligence.  I consulted with my employment attorney and conferred with two people I know professionally – one with deep expertise in health law and the other in civil litigation.  These conversations only heightened my concerns and made it clear that it is untenable for me to continue my employment with Alliance Health.  Doing so places my career, my professional reputation, and my livelihood in clear jeopardy. **That risk would be only greater given my responsibility for executing a pharmacy fulfillment strategy specifically designed to perpetuate business practices that are without question unethical, and quite possibly illegal**.  You also expressed your concerns on Friday when you said you are not comfortable with the "morality" of our practices but view them as necessary, at least for the foreseeable future.
>
> When I rejoined Alliance Health in January, I did so with a great deal of enthusiasm.  I was excited about the future of the company and optimistic I could play a significant role in its success.  In hindsight, had I known last December what I know today about the company's business practices, I can say unequivocally that I would not have accepted my offer of employment.  Beyond the risk to my professional reputation, I simply cannot work in an environment so ripe for regulatory and legal scrutiny one in which the risk of civil, and potentially more serious penalties, appears quite significant.
>
> You told me on Friday that if I'm not comfortable in this environment I should move on.  After considerable thought and due diligence, I feel compelled to do so, effective immediately.

147.   As further alleged below, Goldsmith expressed these same concerns to Koopersmith, who relayed them to Alliance's Board of Directors including Defendants Wistner and Hughes.  Instead of putting an end to Alliance's fraudulent practices, the Defendants continued the practices to maintain Alliance's profit margins.

**Geoffrey Swindle**

148.   Geoffrey Swindle was the founder and President of Alliance Health Networks ("AHN"), a digital marketing and patient lead vendor.  In January 2014, AHN was acquired by Ingram.  After acquiring AHN, Ingram adopted the "Alliance" brand name and Swindle became Alliance's Chief Revenue Officer, and later its Chief Strategy Officer.

149.   In June 2015, a former employee of AHN notified Swindle that attorneys for Johnson & Johnson ("J&J"), a manufacturer of diabetic test strips, had visited his home to ask questions about Alliance's "product sourcing." ██████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████

150.   ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████

151.   In an October 1, 2015 e-mail, Defendants Jeffrey Smith, Blaine Smith, Paoline, and Leavitt discussed "Loyalty concerns" with Swindle arising out of his "Adam k.

communication," and also noted that Swindle "said he doesn't agree with our strategy."  This e-mail was later forwarded to Defendant Wistner.

152.   Swindle resigned from Alliance on October 19, 2015.

**External Companies Complain About Alliance's Fraud**

153.   In addition to internal whistleblowers, companies affected by Alliance's fraud, including PBMs and manufacturers, repeatedly complained to Alliance about the fraud. Defendants responded to these complaints by obstructing the companies' efforts and continuing to perpetrate the fraud.

**Express Scripts ("ESI")**

154.   In 2016, the PBM ESI caught on to the systematic nature of Alliance's fraud.  In May 2016, ESI sent letters to a number of Alliance-affiliated pharmacies stating in part:

> Express Scripts [ESI] is aware of ongoing fraud and abuse in the area of diabetic supplies, including schemes involving purposely dispensing a "not for retail sale" product and billing payors using more expensive retail NDCs.

The letter also noted that Alliance's purchasing subsidiary—Alta Distributors—was not an approved distributor of certain brand-name test strips.

155.   Jelani Davis, the PIC of the Alliance-affiliated Cordele Pharmacy in North Carolina, received one of these letters.  On May 25, 2016, Alliance employee Amanda Haynie e-mailed McMurtry and Oltmans:

> Hey ladies- Jelani got this in the mail today- is that what you have seen on your end regarding the ESI stuff going on?  He's kinda freaking out…  I told him we were just made aware that for 'some reason' Alta was not being recognized as a wholesaler with ESI, which is the root cause of this letter, but that our Pharmacy Operations and Legal team are looking into the reasoning.  **He is also very concerned about the claim regarding dispensing "not for retail sale" product but billing for more expensive NDC's- which I just kind of breezed over at this point and did not directly respond to.**  I told him not to be nervous, and that we have a great Pharmacy Ops/Legal team who will get to the bottom of things and that I would get back to him with more information once I had more

details.

I'm concerned that this letter will soon arrive at the other affected pharmacies, and they will call with the same questions.  Do we want to draft some sort of general email to this PIC's with some sort of explanation or assurance that these issues are being looked into/addressed, and not to be alarmed?  So they don't freak out when they get these letters?

McMurtry forwarded Haynie's e-mail to Defendant Paoline, writing:  "The letter attached that Cordele received today does reference . . . the NDC issue."

156.    The assertions in ESI's letter were correct, and the concerns of the Alliance-affiliated pharmacists that received the letter were well-founded.  The Defendants, however, refused to end the practices that ESI complained of.  Instead, the Defendants, including Paoline and Grant, undertook a concerted effort to convince the Alliance-affiliated pharmacists that they should not be concerned about Alliance's adjudication fraud and should continue to engage in it.

157.    ESI later issued a chargeback for insurance claims for approximately 30,000 patients, corresponding to millions of dollars in reimbursements previously paid to Alliance pharmacies.  This action caused Alliance to suffer approximately $5.5 million in losses in the third quarter of 2016.

**LifeScan**

158.    In 2015, LifeScan, another manufacturer of test strips, began to investigate Alliance's billing practices.  As alleged above, counsel for LifeScan (at that time, a subsidiary of Johnson & Johnson) visited former Alliance employees to determine whether Alliance was engaged in fraud.  When Defendants learned of these visits, they took active measures to obstruct LifeScan's investigation and to prevent LifeScan from obtaining proof of their fraud.

159.    On June 23, 2015, Greg Heaps, one of the former Alliance employees visited by LifeScan's counsel, told Defendant Jeffrey Smith about the encounter.  Smith notified

Alliance's outside counsel and Defendant David Grant.  Grant spoke to Heaps and reported to

Jeffrey Smith and others that it "is apparent that they are probing the NDC issue"—*i.e.*,

Alliance's foundational practice of dispensing NFR strips but adjudicating claims using the NDC

for retail strips.

160.    Instead of recommending that Alliance take action to end the fraud, Grant

began to formulate a strategy to thwart LifeScan's investigation.  He stated that LifeScan was

"ignoring the fact that they are causing former employees to violate their contractual

obligations."  In other words, Grant suggested that Alliance use confidentiality agreements with

its former employees as a pretext for concealing Defendants' fraud from the victims of the fraud.

161.    Alliance quickly executed on Grant's plan.  On June 24, 2015, Alliance

filed suit against LifeScan and its outside counsel in Utah state court, seeking an injunction to

prevent LifeScan's investigators from questioning former Alliance employees about Defendants'

fraudulent enterprise.  The decision to file suit to obstruct LifeScan's investigation was approved

by Grant and Jeffrey Smith.  Alliance's Board of Directors—including Defendants Wistner,

Koopersmith, and Hughes—was informed of the suit.

162.    On June 25, 2015, LifeScan's counsel e-mailed Alliance's outside counsel

stating:  "the current allegation is that Alliance is engaged in massive billing fraud."  Later that

day, Alliance's outside counsel forwarded this message to Jeffrey Smith, Leavitt, and Grant with

the note:  "Well—see below.  Looks like we've fleshed out the issue.  It's the billing issue

you've discussed with us. . . ."

163.    Responding to that e-mail, Leavitt wrote to Grant on June 25, 2015:

"What are your thoughts?"  Grant replied:

> I had a long call with [outside counsel].  He seemed to agree with my assessment
> that the risk is a civil risk.  The real issue is the means of determining damages of
> [LifeScan], and the ability to pierce the veil.  The email does nothing more than
> confirm what we already suspected, and validates our filing of the lawsuit.

In other words, Defendants' were counseled that the "real issue" was how LifeScan's damages could be quantified and who could be held liable for the fraud.  Defendants never questioned— and never received legal advice disputing—that Alliance was engaged in pervasive insurance fraud, because they knew that it was.

### Roche

164.    In early February 2017, Roche sent a letter to several of the Alliance Pharmacies stating that they were involved in "a scheme whereby you obtained and sold heavily discounted vials of Roche test strips not intended for general retail sale, and then submitted insurance claims as if they were retail product."

165.    On February 15, 2017, Cromartie Nickerson, the PIC of the Alliance-affiliated Jefferson Pharmacy in Florida, wrote to Alliance:

> I was not aware of the process of procuring and dispensing certain discounted products made for Medicare/DME, Cash, and Mail Order Only patients until I received the Roche letter.  The Roche letter explained that these items are discounted for these special patient cases in which the insurance company receives back a rebate from the manufacturer to offset the special discounted price.  These products should not be dispensed to regular retail customers through retail PBM contracts.  **To do so is insurance fraud**. . . .

Nickerson's e-mail was forwarded to Defendant Paoline.

166.    Neither Paoline nor any of the other Defendants took any significant action in response to Roche's or Nickerson's complaints about Alliance's fraud.

### The Alliance Board Makes the Business Decision to Continue Alliance's Fraud

167.    In 2015, Alliance's management and Board of Directors undertook an in-depth study of the legal liability Alliance faced as a result of its fraudulent and deceptive practices.  Despite knowing that Alliance was committing fraud and faced substantial liability for doing so, Defendants concluded that abandoning the fraud would be financially unfeasible.  They therefore chose to continue the fraud.

168.     On October 22, 2015, after David Goldsmith discussed his concerns about Alliance's fraudulent billing practices with Defendant Koopersmith, Koopersmith sent an e-mail to Defendants Hughes and Wistner about these practices, noting, among other things, that Alliance was getting higher reimbursements by "illegally billing PBMs for products as if it was retail even though it is mail order."

169.     In an October 28, 2015 e-mail to Defendants Jeffrey Smith, Hughes, Koopersmith, and Wistner, Defendant Grant wrote:

Dear Board members:

I am preparing a memorandum addressing the concerns raised in Adam's October 22 email.  In order to better achieve completeness and objectivity, I am planning on sending a draft of the memorandum to outside counsel for review before circulating the memorandum to the Board.  Accordingly, although I will likely complete the initial draft of the memorandum tomorrow, I am anticipating that outside counsel will require a few days to complete their review.

Let me add an additional note.  The attached email is not a privileged communication and potentially is subject to discovery and use against the company in litigation.  Communications between Board members can be the subject of a subpoena or discovery during litigation.  A clever and thorough attorney will determine the identity of Board members and will directly subpoena those members.  Accordingly, the best means to discuss issues that may involve potential liability is by telephone.  When analyzing whether a particular action may involve civil or criminal liability, it is best to seek advice from an attorney and include that attorney in any written correspondence sharing the advice from the attorney so that the written documents would be subject to the attorney/client privilege and not be discoverable.  The key is to imagine any written correspondence as an exhibit in court, and if the exhibit could lend weight to an unfavorable ruling, either make sure that the correspondence is privileged or is not sent or maintained.

With regard to maintenance of emails, it is prudent to have a regular and documented practice of deleting emails after they have been maintained for a period of time and no longer serve a business purpose.  Of course, it is important to preserve and maintain emails and other correspondence relevant to a pending or threatened legal action (such as the notice given by Johnson & Johnson).  But invariably, it is common for individuals to make imprudent observations based on imperfect data or analysis, and there is nothing improper in having a regular email maintenance practice so long as documents relevant to pending or threatened litigation are preserved.

170.    In a November 2015 memorandum to Alliance's Board of Directors, including Defendants Wistner, Koopersmith, and Hughes, Defendant Grant addressed a number of "compliance concerns" at Alliance, including adjudication fraud.  This memorandum was later sent to Defendant Rosebush.

171.    In the memorandum, Grant made no attempt to deny the allegations made by Roche, LifeScan, ESI, and others that Alliance was engaged in a massive insurance fraud scheme.  To the contrary, he confirmed that it was Alliance's practice to submit fraudulent insurance claims that misrepresented the NDC number on the products that Alliance had dispensed to customers.  Grant and the other Defendants had long known that this was Alliance's practice.

172.    Grant also did not say that Alliance's practice of intentionally submitting insurance claims with incorrect NDCs was lawful.  Two of Alliance's outside law firms, which reviewed the memo before it was circulated, advised Grant against making such a statement. Indeed, neither Alliance nor any of the Defendants ever obtained a legal opinion that the practice of adjudication fraud was lawful.  This was despite the fact that multiple Defendants desired such a legal opinion, and that Alliance engaged multiple outside counsel in connection with issues related to its adjudication fraud.

173.    Despite his inability to certify that Alliance was in compliance with the law, Grant's November 2015 memo advised the Board that changing Alliance's foundational practice of insurance fraud would be "extremely difficult if not impossible" because obtaining retail strips through legitimate channels was too expensive.  Grant advised Alliance's Board that purchasing retail strips at their regular price would cause strips to become a "loss leader" rather than a golden goose for Alliance.

174.    Grant stated that none of Alliance's options for eliminating adjudication

fraud was "feasibly available in the short term."  He concluded that "[i]n the medium term, the business decision will be based on the perceived risk of further contract loss and/or chargebacks from the PBMs or threat of litigation from the manufacturers versus the lost revenues resulting from the chosen course of action."

175.    In other words, Grant advised Alliance management and the Board that Alliance had two choices:  (1) continue its practice of false adjudication and accept the risk of liability, or (2) stop falsely adjudicating test strips and accept the resulting loss of revenue, which would not be financially feasible.

176.    In response, the Individual Defendants, including Jeffrey Smith, Blaine Smith, Grant, Hughes, Wistner, and Koopersmith, chose the former option.  They made the business decision to continue Alliance's adjudication fraud, accepting the risk of liability over the devastating loss of net revenue that would result from ceasing the fraud.

**Defendants Consider But Reject Reporting Themselves to Authorities**

177.    In 2016, as more and more PBMs began to catch on to Alliance's fraudulent practices, certain Individual Defendants considered disclosing Alliance's fraudulent practices to federal authorities.

178.    On September 27, 2016, Defendant Grant wrote to Defendants Jeffrey Smith and Rosebush (at that time, a member of Alliance's Board of Directors):

> Jeff,
>
> After speaking with Lee Rosebush, I recommend that Alta Distributors, LLC ("Alta") and the pharmacies involved as identified in the Johnson & Johnson draft complaint self-disclose to the federal authorities the practice by Alta of identifying all secondary market product distributed to the network of pharmacies it sells to using the retail NDC on the invoice regardless of the class of trade NDC established by the manufacturer for the particular boxes sold. . . .

Smith responded:  "Per our conversation, I completely agree and support the self disclosure on the timeline you discussed below."

179.    This e-mail triggered an internal audit whereby Alliance gathered and provided documentation regarding its practices to outside counsel.  Upon further consideration and consultation with counsel, the Defendants realized that reporting their adjudication fraud to federal authorities would result in enormous financial liabilities they were unwilling to accept.

180.    On September 28, 2016, Grant e-mailed Defendants Jeffrey Smith, Blaine Smith, and Paoline to discuss the possibility of making a voluntary disclosure to the United States Department of Health and Human Services' Office of Inspector General in order to settle any civil claims arising from Alliance's practice of fraudulent adjudication.  In the e-mail, Grant noted that self-disclosure would be in Alliance's interests only if the company could promise that it had ended its practice of adjudication fraud:

> With regard to informal settlement with DOJ on the criminal side, we discussed that self-disclosure might make sense later once we have settlement on the civil side and the company can affirmatively state that there will be no more dispensing of secondary market product using a product packaged for other than retail sale.

181.    But these Defendants again became concerned that the consequences of self-disclosure would be financially devastating to Alliance's business.  On October 18, 2016, Grant circulated a slide deck titled "Self-Disclosure Analysis."  In the third slide, titled "Previous Rational for Self-Disclosure," Grant wrote:  "Getting full civil settlement with the federal government on the NDC billing issues would resolve the question for future financing, merger and acquisition sources."

182.    In the fourth slide, titled "New Data," Grant wrote:

- Pharmacy techs have run test claims, and determined that the pharmacies could not have submitted claims on the pharmacies' retail plans for dispensing mail-order, DME or institutional packaged DTS, because the retail plans do not accept the mail order, DME or institutional 'NDC' codes.

- Accordingly, the issue may be whether the pharmacies should be required to disgorge the entire adjudicated amount rather than the amount that the federal government was harmed.

Grant recommended a two-part course of action:  first, "Pursue Civil Action Against ESI, Prime and J&J"; and second, "Do Not Self-Disclose."

183.    The eighth slide of Grant's presentation stated:

- After discussion, outside counsel recommends and I recommend that the pharmacies and distribution companies do not self-disclose.

  o Any benefit may only come at the cost of the Company's ultimate survival.

  o The potential downside does not justify whatever benefits might come from self-disclosure.

184.    These Individual Defendants thus made the business decision to continue committing fraud and not to disclose their adjudication fraud to the federal government.

**Defendants' Fraudulent Scheme Collapses**

185.    On or about February 23, 2017, the Federal Bureau of Investigation and U.S. Postal Inspection Service executed search warrants at Alliance's headquarters, its warehouses, and several of the Alliance Pharmacies as part of an investigation into potential criminal wrongdoing.  The FBI also seized the Zions Bank accounts belonging to Alliance and its affiliates and issued damming warrants to seize incoming receivables.

186.    On April 9, 2017, unable to access cash held in its own bank accounts due to an asset freeze, and under increasing government and commercial scrutiny for its fraud, Alliance and a number of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas.

187.    Within weeks after the commencement of the bankruptcy case, Defendant Jeffrey Smith was forced by the Board to resign and replaced with an interim CEO.  Just a few weeks after that, the Bankruptcy Court entered an order appointing a Chapter 11 Trustee to manage all aspects of the business.

188.    On information and belief, the Department of Justice's investigation into Alliance and certain Defendants remains ongoing.

**The Individual Defendants Knew and Intended that Roche Would be Injured by their Fraud**

189.    Amy McMurtry, former Director of Pharmacy Operations for Alliance, testified that "the fact that Alliance billed for one type of product but delivered another version of the product was well-known within Alliance" and "was something that all of the senior managers . . . [a]nd a lot of the employees" knew about.  McMurtry added that the practice of false adjudication "was openly discussed" within Alliance.  When asked at her deposition, "Is there any senior people at Alliance, to your knowledge, who didn't know about the practice?" McMurtry answered, "not that I'm aware of, no."  As further alleged herein, Alliance's "foundational practice" of adjudication fraud was also known to and freely discussed among members of Alliance's Board of Directors, including Defendants Travis Hughes, Alison Wistner, Adam Koopersmith, and Lee Rosebush.

190.    At all relevant times, the Individual Defendants not only knew that Alliance's pharmacies systematically adjudicated NFR strips using the NDCs for retail strips— they knew and intended that those claims would be transmitted to manufacturers like Roche via rebate claims.  As experienced managers, sophisticated investors, and (in the case of Lee Rosebush) accomplished attorneys in the health care industry, the Individual Defendants understood that these rebates are why pharmacy-benefit plans reimburse retail strips at higher rates than the rates at which medical-benefit or DME plans reimburse for NFR strips.

191.    Numerous internal communications between the Individual Defendants demonstrate their personal knowledge of the fact that manufacturers like Roche pay rebates to PBMs on sales of retail strips.  Such communications spanned the years of Alliance's operation

and included informational slide decks, memoranda, and valuation reports prepared and circulated internally at Alliance.  For example, in late 2013 and early 2014, Alliance's officers and directors—including Defendants Jeffrey Smith, Paoline, Blaine Smith, Leavitt, Hughes, Wistner, and Koopersmith—discussed creating or acquiring an "in-house" PBM for Alliance.  In connection with those discussions, Alliance retained consultants who prepared and circulated slide decks and memoranda explicitly discussing the rebates that PBMs receive from test strip manufacturers like Roche.

192.   Defendants also were explicitly informed about the differential prices and rebates between NFR and retail strips, and that fraudulently substituting one for the other would harm manufacturers like Roche.  In fact, Roche itself informed Alliance that it pays rebates on retail strips but not NFR strips, and that if NFR strips were adjudicated as though they were retail strips, Roche would pay rebates that would cause it to lose money on the sale.  These communications from Roche were circulated internally at Alliance, including to Defendants Jeffrey Smith and Travis Hughes.

193.   In July 2015, after Alliance became aware of LifeScan's investigation, Alliance's outside counsel e-mailed David Grant, Jeffrey Smith, Justin Leavitt, Blaine Smith, and Sahily Paoline:

> All—
>
> I communicated with a client that received a demand letter from Lifescan last year. . . .  I don't know how much I can read into our situation based on theirs, but that client shared with me some Lifescan correspondence that outlines its case for damages, as follows below. . . .
>
> Lifescan says:
>
> . . .
>
> In submitting insurance claims to pharmacy benefit payors using the incorrect NDC number, your company has caused Lifescan to pay rebates to Medi-Cal and managed care organizations for discounted product which was intended for DME

beneficiaries only.

Defendants were further informed that LifeScan claimed damages from the payment of rebates "which is the difference between the list price of the retail product . . . and the net price of the DME mail order products."  Roche alleges the same damages below.

194.    LifeScan's claim that it was harmed by Alliance's adjudication fraud were both discussed in David Grant's November 2015 memorandum to Alliance's Board of Directors, which was circulated to Defendants Hughes, Wistner, Koopersmith, and Rosebush.

195.    Despite such repeated and explicit warnings that fraudulent adjudication harmed manufacturers like Roche, Alliance continued that practice—at the Individual Defendants' direction—until it was raided by the FBI and went bankrupt in 2017.

**The Officer Defendants' Participation in a Scheme to Defraud**

196.    As further alleged below, each of the Officer Defendants actively participated in, provided substantial assistance to, and/or conspired to further Alliance's "foundational practice" of adjudication fraud.

197.    Furthermore, as officers of Alliance, the Officer Defendants operated and managed Alliance as a fraudulent enterprise, knowingly and intentionally causing it to carry out a scheme to defraud that spanned more than six years and involved millions of discrete acts of insurance fraud and millions of discrete uses of interstate carriers (*e.g.*, to dispense and receive test strips) and interstate wires (*e.g.*, to falsely adjudicate test strips).  Managing this scheme was not an incidental part of their duties:  the vast majority of Alliance's revenue came from fraudulently adjudicating test strips.  The Officer Defendants knew this, but elected to affirmatively perpetuate this scheme rather than stop or report it.

**Jeffrey Smith**

198.    As the founder and former CEO of Alliance and its predecessor entities,

Defendant Jeffrey Smith was the architect and driving force behind Defendants' fraudulent enterprise.

199.    Beginning in 2010, Jeffrey Smith was personally involved in developing Alliance's scheme of fraudulently adjudicating test strips, working closely with Alliance pharmacists.  Smith also was personally involved in sourcing the NFR strips that his pharmacies would falsely adjudicate using the NDCs for retail strips.  In a December 2011 memorandum, an investor in Alliance wrote: ███████████████████████████████████████ ███████████ Jose Vargas, Alliance's Director of Procurement, likewise testified that it was Smith who directed him to purchase NFR strips, not retail strips, to be dispensed and adjudicated as retail strips.

200.    Throughout the period that Alliance was engaged in adjudication fraud, Jeffrey Smith was aware that this practice exposed the company to legal liability and risk.  For example, in an April 22, 2014 e-mail, Smith wrote:

> I think we basically have two diversification problems from where we derive our profits and revenue for the company.
>
> 1. Product Risk (most of our profit and revenue from diabetic testing supplies which have NDC and supply issues)
>
> 2. Payor Risk (most of our business is from two payers and we have PBM risks with Mail order risks)

"NDC and supply issues" is a euphemism for Alliance's practice of purchasing NFR strips from the secondary market and falsely adjudicating them using the NDCs for retail strips.  Similarly, "mail order risks" refers to the fact that Alliance sold NFR strips by mail order but submitted insurance claims for retail strips, fraudulently and in violation of its pharmacies' agreements with PBMs.

201.    Jeffrey Smith directed or approved of efforts to conceal Alliance's fraud from government inspectors, PBMs, and manufacturers.  For example, Smith directed Alliance's

General Counsel David Grant, as well as Alliance's outside counsel, to file suit against LifeScan

to prevent LifeScan from investigating the "NDC issue."  Smith also discussed and explicitly

approved plans to submit falsified or misleading invoices to PBMs in response to purchasing

audits.

202.    Jeffrey Smith initially approved plans to disclose Alliance's fraudulent

practices to federal authorities, but ultimately directed that no such disclosure be made after it

was determined that disclosure would require Alliance to stop committing fraud and to pay large

fines and restitution to the federal government.

203.    Jeffrey Smith's central role in perpetuating the fraudulent enterprise is

further demonstrated by ████████████████████████████████

████████████████████████████████████████

██████████████████

███████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████

███████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████

███████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████████████

204.    As alleged above, David Goldsmith's resignation e-mail to Jeffrey Smith stated that Smith "said [he was] not comfortable with the 'morality' of [Alliance's] practices but view[ed] them as necessary, at least for the foreseeable future."  Goldsmith later testified under oath that Jeffrey Smith "was concerned about what he described as the morality of the practice" of false adjudication, but that "[h]e said . . . his job was to increase the revenue of the company and that this business model ensured that that would happen."  Goldsmith similarly testified: "what Jeff Smith said to me was, in essence, it was his job to continue to increase revenue for the company and that he would do what it took to do that," and that Smith "said that on the heels of saying he felt these practices were a concern from a moral standpoint."  Goldsmith recalled telling Jeffrey Smith that Alliance's practice of false adjudication "was tantamount to fraud, and I had two attorneys who I had spoken to informally reinforce that for me."

205.    Jeffrey Smith was aware of these and other complaints about Alliance's fraud from internal whistleblowers, government inspectors, PBMs, and test strip manufacturers. Despite these complaints, and despite knowing they were true, Smith continued to direct Alliance to commit fraud in order to maximize Alliance's profit and to enrich himself.

206.    Jeffrey Smith also devoted considerable effort to expanding Defendants' fraudulent enterprise by adding new "independent" pharmacies to Alliance's network.

207.    For example, Jeffrey Smith was actively involved in the selection and acquisition of Peterson Pharmacy in New Jersey as a major hub from which Alliance would perpetrate its fraud.  Smith directed Defendant Sahily Paoline to visit and assess Peterson Pharmacy; Smith declared "Let's rock NJ" when Paoline's assessment proved promising.  Dow Jones testified that Jeffrey Smith personally recruited him to become Peterson Pharmacy's straw owner.  When Jones later confronted Jeffrey Smith with concerns about Alliance's billing practices, Smith solved that problem by simply purchasing the pharmacy outright.  To finalize

the purchase, Smith signed multiple contracts on behalf of Alliance-affiliated entities, including New Jersey Rx, LLC and New Jersey Rx Holdings, LLC.  When Alliance purchased a *second* pharmacy in New Jersey, Smith signed that pharmacy's New Jersey Certificate of Formation.

### Steven Hadlock

208.    As the Chief Pharmacist at Medsource Rx Pharmacy starting in June 2010, and later as Alliance's Director of Pharmacy Operations, Defendant Hadlock knew of and carried out the complex scheme to build a network of pharmacies to adjudicate fraudulent insurance claims while concealing that fraud from PBMs, pharmacy plans, and manufacturers like Roche.

209.    In his role as Chief Pharmacist of Medsource Rx, Hadlock personally dispensed NFR test strips that he knew had been falsely adjudicated as retail strips.  On information and belief, Hadlock also helped design the systems and workflows that caused all Alliance-affiliated pharmacies to submit fraudulent insurance claims for retail strips, despite the fact that those pharmacies dispensed NFR strips to patients.

210.    In his pharmacy operations role, Hadlock trained Alliance's pharmacists to use the systems he helped design, which caused NFR strips to be adjudicated as retail strips. Hadlock also served as a "remote manager" for Alliance-affiliated pharmacies.  For example, Masum Amin testified that Hadlock served as one of the "remote managers" for Peterson Pharmacy in New Jersey.  Hadlock trained and coordinated the hiring of personnel for Peterson Pharmacy and was so intimately involved with the pharmacy's day-to-day operations that he was consulted on such quotidian issues as name tags for its personnel and the proper dimensions and placement of furniture in the Pharmacy needed to comply with New Jersey pharmacy regulations.

211.    Hadlock also helped to coordinate the Alliance pharmacies' responses to PBM audits that might lead to discovery of the fraud.  For example, on July 1, 2014, Amy

McMurtry e-mailed Masum Amin at Peterson Pharmacy in New Jersey stating, "When you receive a request for an audit please forward this to Steve Hadlock and he will work with you . . . . He is now taking care of audits for all locations."

212.    As alleged above, when Alliance's pharmacists and technicians complained about Alliance's fraudulent billing practices, Hadlock attempted to overcome their objections and prevent them from being communicated to others.  Hadlock did this so regularly that he developed a set of established practices for addressing pharmacists' concerns about Alliance's fraud.  Typically, Hadlock would re-cast Alliance's systematic fraud as a mere product sourcing issue, even though Hadlock knew that retail strips were freely available from legitimate wholesalers.  Hadlock encouraged Defendant Paoline to adopt the same dishonest approach when Masum Amin of Peterson Pharmacy in New Jersey began raising concerns about dispensing non-retail strips.

213.    Internal Alliance communications indicate that Hadlock worked to preserve other Alliance pharmacies' ability to dispense test strips to New Jersey patients by, for example, registering with the New Jersey Prescription Monitoring and Reporting System, and renewing the out-of-state pharmacy licenses for other Alliance-affiliated pharmacies so that they could dispense fraudulently adjudicated test strips to patients in New Jersey.

**Sahily Paoline**

214.    Defendant Paoline, as Alliance's Chief Pharmacy Officer, knew of and implemented the complex scheme to build a network of pharmacies to execute fraudulent insurance claims and conceal Alliance's fraud from PBMs, pharmacy plans, and test strip manufacturers.

215.    Paoline worked to expand Defendants' fraudulent enterprise by adding new "independent" pharmacies to Alliance's network.  For example, Paoline was actively

involved in the selection and acquisition of the Peterson Pharmacy in New Jersey as a hub from which Alliance could perpetrate its fraud.  Paoline repeatedly visited the Peterson Pharmacy, both before and after it became part of Alliance's network.  After visiting Peterson Pharmacy in August 2013 to assess its suitability as an arm of Defendants' fraudulent enterprise, Paoline sent Jeffrey Smith and Justin Leavitt twenty-one pictures and a report of her findings, triumphantly declaring:  "This is a WIN."

216.    In her pharmacy operations role, Paoline was aware that the insurance billing systems developed by Alliance and provided to Alliance-affiliated pharmacies caused pharmacies to submit insurance claims for retail strips, despite the fact that the pharmacies dispensed NFR strips to patients.  Paoline played a central role in directing, managing, and executing this system for submitting fraudulent insurance claims.  Numerous Alliance documents—too many to recount here—demonstrate Paoline's involvement in the Alliance pharmacies' day-to-day operations; the pharmacist in charge of Peterson Pharmacy in New Jersey summarized Paoline's role succinctly when she testified that Paoline served as one of her "remote managers."  This testimony is corroborated by Alliance's internal communications, which show that Paoline personally hired Peterson staff, helped to resolve PBM audits of Peterson, and coordinated with David Grant and Dow Jones on completing service agreements between Peterson and Alliance.

217.    As alleged above, Paoline was a member of Alliance's Productive Paranoia Committee and directed efforts to "mitigate" the risks associated with Alliance's fraudulent scheme by deceiving PBMs.  For example, Paoline coordinated the submission of falsified or misleading invoices to PBMs in response to purchasing audits.  Similarly, Paoline personally oversaw the shifting of patients between Alliance-affiliated pharmacies to reduce the risk of discovery and the financial impact of PBM contract terminations.  Paoline participated in

efforts to deceive government inspectors and PBM auditors by ordering small numbers of retail strips for Alliance-affiliated pharmacies to display during on-site inspections, despite knowing that those pharmacies would continue dispensing NFR strips. Paoline also was involved in Alliance's efforts to thwart LifeScan's investigation of the fraud.

218.   Paoline played a lead role in Alliance's efforts to silence and sideline its internal whistleblowers. Paoline tried to downplay Gubler's objections to Alliance's fraud. She similarly attempted to overcome complaints by Masum Amin, the pharmacist in charge of the Peterson Pharmacy in New Jersey. Dow Jones, the owner of Peterson Pharmacy, testified that Paoline "encouraged Masum Amin to continue" dispensing NFR strips while adjudicating claims for retail strips. When Amin remained firm in her refusal to dispense NFR strips that would be adjudicated as retail strips, Paoline used her own credentials as a licensed New Jersey pharmacist to fill those prescriptions herself. Both Amin and Jones testified under oath that Paoline personally dispensed NFR strips being adjudicated as retail strips from Peterson Pharmacy by affixing her initials to those prescriptions.

219.   A number of Alliance's internal communications show that Paoline lived in New Jersey in or about 2014—*i.e.*, during the relevant time period. On September 6, 2013, Hadlock wrote to the pharmacists in charge of several Alliance pharmacies: "As you may have heard by now, Si [Sahily Paoline] will be relocating back to the great state of New Jersey." On March 5, 2014, Jeffrey Smith wrote to Paoline: "I very rarely hear from you, unless I reach out to you. . . . I think if we meet once a week by phone of course when you are in NJ. That will help." In an August 18, 2014 e-mail, Alliance employee Morgan Mower wrote: "Si lives in new jersey and would like to possibly visit your pharmacy tomorrow. . . ." In various Alliance documents, including the Amended and Restated Limited Liability Company Agreement of Alliance Medical Holdings, LLC dated January 17, 2014, Sahily Paoline's address is listed as

125 East Main Street #2028, Marlton, New Jersey 08053.

**David Grant**

220.    As Alliance's General Counsel, Defendant Grant was responsible for monitoring Alliance's compliance with the law.  Instead of fulfilling this responsibility, Grant worked incessantly to overcome internal objections to Alliance's fraudulent and deceptive business practices and to perpetuate them in order to maintain Alliance's profits.

221.    Grant was notified multiple times that Alliance's foundational practice was adjudication fraud, including by receiving the complaints of multiple internal whistleblowers.  As early as March 13, 2014, for example—only a few months after he joined Alliance—Grant participated in a meeting with Defendants Hadlock and Paoline to discuss "the challenge of multiple NDCs for like products and pharmacist's liability."  As a result of that meeting, Hadlock, Paoline, and Grant resolved to defend Alliance's practice of adjudication fraud.

222.    At times, Grant served as the head of Alliance's Productive Paranoia Committee.  In that role, Grant led Alliance's efforts to perpetuate Alliance's fraudulent and deceptive business practices by mitigating the risks that these practices posed to Alliance's bottom line.  Shortly before February 1, 2015, for example, Grant told Defendant Blaine Smith that he did not want Alliance to contest PBM complaints about its failure to collect co-pays because "he didn't want to expose the potential of revealing the NDC issue"—*i.e.*, Alliance's adjudication fraud.  When Alliance learned that LifeScan was investigating "the NDC issue," Grant developed and executed Alliance's strategy of suing to enjoin that investigation under the guise of enforcing non-disclosure agreements.

223.    In an October 28, 2015 e-mail to Jeffrey Smith and Alliance board members Hughes, Koopersmith, and Wistner, Grant admonished the Board to discuss Alliance's

adjudication fraud by telephone rather than by e-mail and to "have a regular practice of deleting emails" in order to avoid exposing incriminating statements to discovery.

224.    As alleged above, Grant's November 2015 memorandum advised Alliance's Board of Directors regarding Alliance's practice of adjudication fraud.  Grant acknowledged that Alliance faced legal risks as the result of the fraud but advised that Alliance should continue the fraud because eliminating it would be financially unfeasible.

225.    Grant also worked to expand Defendants' fraudulent enterprise by adding new "independent" pharmacies to Alliance's network.  For example, Dow Jones testified that Grant was one of his "primary points of communication at Alliance during the process of buying" Peterson Pharmacy in New Jersey.  Grant prepared and negotiated contracts between Alliance and Peterson Pharmacy; he sought advice on maintaining Peterson's pharmacy license; and he was involved in audits of Peterson Pharmacy.  Grant also was personally involved in Alliance's subsequent purchase of Peterson Pharmacy from Dow Jones.  Indeed, in the Asset Purchase Agreement for Peterson Pharmacy, Grant was listed as the "general counsel" of New Jersey Rx Holdings—the holding company that Alliance created for the acquisition.

226.    Grant also acted as Alliance's final line of defense when Alliance pharmacists or employees raised concerns about Alliance's business practices.  For example, when Masum Amin of Peterson Pharmacy noticed discrepancies in the NDCs on invoices her pharmacy had received from Alliance's subsidiary wholesaler, Grant conducted a conference call with Amin during which he explained Alliance's adjudication fraud and attempted to convince Amin to participate in the fraud.

227.    When asked at her deposition whether Grant "encouraged [her] to send out DME test strips and bill for retail test strips," Amin responded:

> I took it as encouragement.  He was very adamant on just telling me that it's not a pharmacy issue, that I'm not giving somebody the wrong product, it's a

contractural [sic] issue.  It was – that was, like, the only thing that he had on repeat, despite my concerns not being that I'm giving somebody the wrong product.

228.   When Alliance Pharmacies received letters disclosing Alliance's adjudication fraud from ESI in May 2016, and from Roche in February 2017, Grant sent e-mails to Alliance pharmacists advising the pharmacists to ignore the allegations in the letters.  Grant also made phone calls to several Alliance pharmacists in an attempt to alleviate their concerns about Alliance's fraud and encourage them to continue engaging in the fraud.

**Justin Leavitt**

229.   Defendant Leavitt, as former Chief Financial Officer of Alliance, also knew of and provided substantial assistance for the fraud.

230.   Leavitt worked to expand Defendants' fraudulent enterprise by adding new "independent" pharmacies to Alliance's network.  For example, internal Alliance communications from August to October 2013 show that Leavitt worked extensively on the purchase of Peterson Pharmacy in New Jersey.  In fact, Leavitt was the first Defendant to consider making Peterson Pharmacy the New Jersey arm of Defendants' fraudulent enterprise.  At his deposition, former Peterson owner Dow Jones recalled that Leavitt participated in negotiating the management agreement between Alliance and Peterson, discussing "[t]he compensation, the terms, conditions, [Jones'] share of the profits, et cetera."  Jones testified that Leavitt was a "primary point of contact" for Jones and would "keep [him] in the loop" during the purchase process.  After Peterson was added to Alliance's network, Leavitt "managed the lockbox and collection of the reimbursements" for Peterson Pharmacy, which was required to send Leavitt profit and loss statements on the 15th of every month.

231.   As a member of Alliance's "Productive Paranoia Committee," Leavitt actively perpetuated Alliance's fraudulent and deceptive practices by working to mitigate the

risks these practices posed to the business.  For example, Leavitt participated in decisions to respond to PBM audits with falsified or misleading invoices, and to supply the Alliance Pharmacies with small amounts of retail strips to display in the event of an on-site audit.

232.   Internal Alliance communications show that Leavitt was aware of and involved with Alliance's efforts to silence internal whistleblowers.  For example, an April 10, 2014 e-mail from Jose Vargas to Sahily Paoline shows that when Masum Amin of Peterson Pharmacy first raised red flags about Alliance's practices, Leavitt spoke to Alliance's director of procurement, Jose Vargas, "about the situation with Peterson and [test strips] not being shipped out because they are DME."

233.   In response to contract cancellations and chargebacks by the PBMs ESI and CVS/Caremark, Leavitt—rather than addressing the fraudulent practices that were the basis for the cancellations and chargebacks—announced new "profit thresholds" for patients whose claims were processed by those PBMs.  For example, on July 23, 2015, Leavitt e-mailed the Alliance executive team and David Grant:  "All ESI and CRK NEW patient[s] shall be subject to a $30 profit threshold effective as soon as possible . . . .  All existing ESI and CRK [diabetic testing supply] patients with profit of less than <$15 shall be 'fired' immediately through an appropriate manner."  The purpose of setting higher profit thresholds and "firing" patients who relied on Alliance for their test strips was to manage the risk resulting from Alliance's fraudulent practices without ending those practices.

234.   As discussed below, Alliance obtained investments and credit refinancing from Zions, the Hughes Entities, Mercato Partners, and Pritzker Group by disclosing its fraud and then signing agreements explicitly acknowledging the fraud.  Leavitt was intimately involved in drafting Alliance's disclosures and negotiating those agreements.

235.   When Alliance discovered that LifeScan was investigating its fraudulent

billing practices, Leavitt took a lead role in formulating Alliance's responses.  Leavitt's knowledge of Alliance's fraud and resulting legal liability was such that when Leavitt resigned from Alliance in 2016, he told the consultant hired to find his replacement that he did not "feel prepared to navigate the legal challenges that he sees coming forward."

**Blaine Smith**

236.    As Alliance's Chief Revenue Officer, Defendant Blaine Smith was responsible for growing and protecting Alliance's "golden goose"—*i.e.*, the fraudulent adjudication of diabetic test strips.

237.    Blaine Smith was well aware that fraudulent adjudication was Alliance's "foundational practice."  For example, in a February 1, 2015 e-mail to Defendant Paoline, Smith noted that Alliance was not disputing PBM chargebacks based on Alliance's failure to collect co-pays because it "didn't want to expose the potential of revealing the NDC issue."

238.    As a member of Alliance's Board of Directors, Blaine Smith received Defendant Grant's November 4, 2015 memo advising the Board that it would not be financially feasible to end Alliance's practice of adjudication fraud.  Blaine Smith participated in the Board's decision to continue the fraud.

239.    Blaine Smith also oversaw the expansion of Alliance's vast network of pharmacies, which served as the engine for Alliance's fraudulent revenue stream.  For example, Dow Jones testified that Blaine Smith "was part and privy to conversations I was having with Jeff [Smith] . . . and David Grant at the time" of his sale of Peterson Pharmacy in New Jersey to Alliance.  Internal Alliance communications corroborate Jones' testimony, showing that Blaine Smith received and signed documents pertaining to Alliance's purchase of pharmacies in New Jersey.  Because of Blaine Smith's role in expanding Alliance's pharmacy network, David Goldsmith copied Smith in his October 26, 2015 resignation e-mail, in which Goldsmith

observed that the "pharmacy fulfillment strategy" overseen by Blaine Smith was "specifically designed to perpetuate" Alliance's practice of fraudulent adjudication.

240.    Blaine Smith was a member of Alliance's Productive Paranoia Committee. In that capacity, he worked to perpetuate Alliance's fraudulent and deceptive business practices by managing the risks they posed to the business.  For example, Smith was personally involved in Alliance's decision to submit doctored and misleading invoices in response to PBM audits and to stonewall inspectors and auditors by providing them with as little information as possible.

**The Director Defendants' Participation in and Authorization of the Fraud**

241.    The Director Defendants—again, Travis Hughes, Alison Wistner, Adam Koopersmith, and Lee H. Rosebush—operated and managed Defendants' fraudulent enterprise from their positions on Alliance's Board of Directors.  The Director Defendants actively authorized, directed, participated in, provided substantial assistance to, and/or conspired to further Alliance's foundational practice of fraud.

242.    Each of the Director Defendants understood that Alliance's business model required an ever-expanding web of pharmacies that could not be tied to each other or to Alliance—this was discussed in numerous Board meeting presentations and compliance memoranda received by each Director Defendant.  The Director Defendants were well aware that this business model was implemented through Alliance's "independent" pharmacy strategy, which concealed Alliance's fraudulent and deceptive business practices from PBMs and thereby enabled Alliance to continue profiting from its fraud.

243.    For example, in connection with the March 5, 2014 meeting of Alliance's Board of Directors attended by, among others, Defendants Jeffrey Smith, Leavitt, Blaine Smith, Grant, Hughes, Wistner, and Koopersmith, attendees were provided a slide deck.  Slide twelve in that deck was titled "Recent Headwinds" and listed "Prime / Optum Rx Chargebacks," as well as

"Express Scripts [ESI] contract cancellations" at Alliance's corporate-owned Medsource

Pharmacy, Aspire Pharmacy, Brighton Pharmacy, and Everest Pharmacy.  The next slide was

titled "How we are addressing the aforementioned headwinds…."  Under headings for "Prime /

Optum Rx Chargebacks" and "Express Scripts [ESI] contract cancellations" was written:

"Transferred patients using these PBMs out of our corporate owned pharmacies to an

independently owned pharmacy."

      244.    The Director Defendants were regularly apprised of Alliance's progress in

growing its network of independent pharmacies:

- A March 5, 2014 memo to the Board stated that "As part of the continuing plan to diversify and avoid concentration of patients with any one pharmacy, we have established relationships with four currently operating independent pharmacies. . . .  An additional six independent pharmacies are at various stages of development."

- A November 18, 2014 memo to the Board of Directors stated that "Alliance is currently working with ten independent pharmacies in the network, and there are six additional independent pharmacies in the pipeline."

- A February 24, 2015 memo to the Board of Directors stated:  ███████ ████████████████████████████████████████████████ ███████████████████████████

- A May 13, 2015 memo to the Board of Directors stated:  "Alliance is currently working with fifteen independent pharmacies in the network, and there [is] one additional independent pharmacy in the pipeline."

- An August 19, 2015 memo to the Board of Directors stated:  "Alliance is currently working with sixteen independent pharmacies in the network."

- A November 17, 2015 memo to the Board of Directors stated that Alliance was "developing prospects for new independent pharmacy sites," and that "[n]ine of the sixteen independent pharmacy customers only dispensed diabetic supplies."

      245.    These same memoranda provided the Director Defendants with regular

updates on mounting PBM audits, chargebacks, and contract cancellations at Alliance's affiliated

pharmacies.  For example:

- The August 19, 2015 memo to the Board contained a table titled "PBM Contracts Lost Since 1/1/15." That table listed 18 contract cancellations at 8 different Alliance-owned and independent pharmacies.

- The August 24, 2016 memo to the Board contained a table titled "PBM Contracts Lost Since 1/1/2016" and listing 29 contract cancellations at 16 different Alliance-owned and independent pharmacies.

- The November 16, 2016 memo to the Board's table of "PBM Contracts Lost Since 1/1/16" listed 41 contract cancellations at 18 different Alliance-owned and independent pharmacies.

246.    Each of the Director Defendants approved of—and, in the case of Lee Rosebush, helped develop—Alliance's plan to streamline its fraud by acquiring its "independent" pharmacies as part of the "10% PIC ownership" model. As already alleged, the purpose of that model (as outlined in the May 2016 memo to the Board) was to allow Alliance to continue deceiving PBMs and regulators while simultaneously increasing Alliance's profit and control by cutting out the pharmacies' straw owners.

247.    In discussing and approving that plan, none of the Director Defendants expressed concern with doubling down on Alliance's fraudulent business model. Instead, their primary concern was the significant cash outlay required to acquire the previously "independent" pharmacies. That problem was solved when each of the Director Defendants signed an August 5, 2016 Board resolution approving $9,000,000 in additional debt for Alliance. By the time Alliance's Board held its next meeting on August 24, 2016, it had either acquired or was in the process of acquiring 18 new pharmacies in Florida, Utah, New Jersey, North Carolina, Maryland, Virginia, Georgia, Pennsylvania, Michigan, Nebraska, New York, Texas, Ohio, Kentucky, Tennessee, Indiana, Louisiana, and California. A memo provided to the Board for that meeting boasted: "With the acquisitions discussed above, the Company will have approximately 35 pharmacies in its internal pharmacy network by the end of the year."

248.    One of the pharmacies approved for purchase by the Director Defendants

was Peterson Pharmacy in New Jersey.  As with the other formerly "independent" pharmacies, the Director Defendants approved the purchase of Peterson Pharmacy with the knowledge and intent that doing so would improve their enterprise's ability to commit fraud in New Jersey.

### Alison Wistner

249.    Defendant Wistner served on Alliance's Board of Directors as the representative of Mercato Partners, a major investor in Alliance.  Throughout her years-long tenure on Alliance's Board, Wistner ignored her fiduciary obligations to Alliance—which required her to stop Alliance from defrauding the federal government and manufacturers like Roche—and instead opted to help perpetuate the fraud in order to maximize return on Mercato Partners' investment and, thereby, enrich herself.

250.    From the beginning of her involvement with Alliance, Wistner was aware that Alliance was fraudulently adjudicating NFR strips as retail strips.   Negotiations around Mercato Partners' investment began in March 2013, when Mercato signed a term sheet with Alliance's predecessor corporation, Warner Diabetic, LLC d/b/a Ingram Medical.  Immediately thereafter, Wistner began the process of conducting due diligence on Ingram.  In connection with that process, Wistner hired an industry specialist named Craig Hartman to serve as a consultant.  Hartman had previously worked at Caremark, a large PBM, and Simplex, a diabetes test strip seller.

251.    During the course of Mercato's due diligence, Hartman repeatedly sought documentation sufficient to verify that Alliance was purchasing retail test strips—*i.e.*, the strips it was adjudicating. ██████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

████████████

252.     Alliance's ████████████████████ was not the only red flag

Wistner received before joining Defendants' enterprise. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████

253.     A different investor in Ingram named Plexus Fund was conducting due

diligence on Ingram at the same time as Wistner.  When Plexus learned ████████████

████████████████████████████████████████████████

████████████████████████████████ A partner from Plexus

personally called Wistner on April 30, 2013, to inform her that Plexus was divesting and why.

Wistner pushed forward with Mercato's investment despite knowing that Alliance's business

was built on deception.

254.     On May 15, 2013, Mercato executed a Unit Purchase Agreement

effectuating its multi-million dollar investment.  The Agreement contained disclosures explicitly

describing Ingram's practice of fraudulently adjudicating test strips.  As alleged below, the

disclosures stated that Ingram's pharmacies would "bill the patient's insurance under the retail

pharmacy benefit but ship mail order diabetic testing supplies nationwide."  Wistner reviewed

the disclosures on behalf of Mercato, ██████████████████████████████████████████

█████████████████████████

255.     As part of its investment deal, Mercato gained a seat on Alliance's Board of Directors, which it ultimately filled with Wistner.  As a member of the Board, Wistner actively operated and managed Alliance's business knowing that adjudication fraud was a "golden goose" for its owners and investors.

256.     As alleged above, Wistner received numerous Board presentations and memoranda discussing Alliance's deceptive practices and the frequent cancellation of PBM contracts at Alliance's pharmacies.

257.     No later than 2015, Wistner became aware that test strip manufacturer LifeScan and other entities were accusing Alliance of actionable fraud based on its practice of dispensing NFR strips while adjudicating insurance claims for retail strips—a practice which Wistner had long known about.

258.     On July 27, 2015, Defendant Koopersmith e-mailed Wistner and Defendant Hughes regarding Alliance's practice of "[b]illing insurance companies under the retail reimbursement rate, even though we're fulfilling via mail order," stating that "[t]his issue can be exacerbated if we're buying one mail order product on the secondary market than [*sic*] billing back for a retail product that receives higher reimbursement."  Koopersmith wrote that "the concern is that we're prioritizing the short term margin."  At the time, Koopersmith, Wistner, and Hughes already were aware of Alliance's adjudication fraud.  Their objective was not to end the fraud, but rather to manage it and make Alliance more acquirable and/or more profitable.

259.     Later on July 27, 2015, Wistner replied to Koopersmith:

███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████

260.     On October 22, 2015, Koopersmith again wrote to Wistner and Hughes, this time noting that he'd spoken with "a very concerned Alliance employee" who "reiterated that we are still . . . illegally billing PBMs for products as if it was retail even though it is mail order."  Koopersmith continued:

> They think it's immoral, illegal and are pissed that the practices are still going on and will likely expand as we bring on more "independent" pharmacies (they plan to resign in the coming weeks).

261.     As alleged above, Defendant Grant prepared a November 4, 2015 memorandum in response to Koopersmith's e-mail that discussed Alliance's fraud in detail. Before circulating that memo to the full Board of Directors, Grant sought and received Wistner's input on a preliminary draft.

262.     On November 1, 2015, Wistner provided comments on certain aspects of the memo, but made no comment on the fact that Grant's memo admitted that Alliance engaged in adjudication fraud, or that Alliance had no intention of stopping that practice because doing so was not economically feasible.

263.     Wistner participated in the Alliance Board's decision to authorize and continue Alliance's practice of adjudication fraud.  Wistner made the decision to accept the risk of being held legally liable for the fraud in exchange for continuing to profit from the fraud as an Alliance Board member and investor.  Wistner continued to operate and manage Alliance, an enterprise she knew to be engaged in fraud, until Alliance's bankruptcy in 2017.

**Adam Koopersmith**

264.    Defendant Koopersmith served on Alliance's Board as the representative of Pritzker Group, another major investor in Alliance.  At the times relevant to this Complaint, Koopersmith was a partner at Pritzker Group.  Throughout his years-long tenure on Alliance's Board, Koopersmith ignored his fiduciary obligations to Alliance—which required him to stop Alliance from committing fraud—and instead opted to help perpetuate the fraud in order to maximize return on the Pritzker Group's investment and, thereby, enrich himself.

265.    Pritzker Group originally invested in AHN, Geoffrey Swindle's digital marketing and patient lead generation company.  As a member of AHN's Board of Directors, Koopersmith was intimately involved in the negotiations around AHN's acquisition by Ingram.  Like Wistner, Koopersmith conducted due diligence prior to that acquisition.  In an October 22, 2013 e-mail to members of AHN's Board of Directors, Koopersmith wrote ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

266.    On November 15, 2013—when Ingram and AHN were still negotiating the acquisition—Alison Wistner e-mailed Koopersmith ████████████████████████

████████████████████████████████████████████

267.    On January 17, 2014, Ingram and AHN executed a Contribution and Asset Purchase Agreement effectuating Ingram's acquisition of AHN.  Incorporated into that Agreement was a set of "Purchaser Disclosure Schedules" explicitly describing Ingram's practice of fraudulent adjudication.  As a member of AHN's Board of Directors, Koopersmith reviewed and approved the terms of the acquisition, including that disclosure.

268.    When Ingram acquired AHN in January 2014, Pritzker Group retained approximately $10 million of equity in the newly formed "Alliance," and Koopersmith became a member of the merged entity's Board of Directors.  As a member of Alliance's Board, Koopersmith actively operated and managed Alliance's business knowing that adjudication fraud was a "golden goose" for its owners and investors.

269.    As alleged above, Koopersmith received numerous board presentations and memoranda discussing Alliance's deceptive practices and the cancellation of numerous PBM contracts at Alliance's affiliated pharmacies.

270.    No later than 2015, Koopersmith became aware that LifeScan and other entities were accusing Alliance of actionable fraud based on its practice of dispensing NFR strips while adjudicating insurance claims for retail strips—a practice that Koopersmith had long known about.

271.    On July 27, 2015, Koopersmith e-mailed Defendants Wistner and Hughes regarding conversations he had had about Alliance's practice of "[b]illing insurance companies under the retail reimbursement rate, even though we're fulfilling via mail order."  Koopersmith noted that "[t]his issue can be exacerbated if we're buying one mail order product on the secondary market than [sic] billing back for a retail product that receives higher reimbursement." Koopersmith wrote that "the concern is that we're prioritizing the short term margin."

272.    Like Wistner, Koopersmith was not concerned about ending Alliance's fraudulent practices, but rather about managing them in such a way as to enable Alliance to be acquired by other investors and earn profits for Pritzker Group.

273.    On October 22, 2015, Koopersmith again wrote to Wistner and Hughes, noting that he had spoken with "a very concerned Alliance employee" who "reiterated that we are still . . . illegally billing PBMs for products as if it was retail even though it is mail order."

Koopersmith continued:

> They think it's immoral, illegal and are pissed that the practices are still going on
> and will likely expand as we bring on more "independent" pharmacies (they plan
> to resign in the coming weeks).

274.    The employee Koopersmith had most recently spoken to about Alliance's

fraud was Goldsmith.  Goldsmith testified that:

> I believe that the general conversation at that time Adam [Koopersmith] and I had
> was in relation to what I had learned about the NDC billing practices and felt that
> that was – you know, that that was fundamentally unethical, potentially illegal,
> and he needed to be aware of – I thought he should be aware of that as a board
> member.

Goldsmith testified that he "raised the issue with Adam because [he] felt that he should know

about it and, in his capacity, act on it in some way."

275.    Koopersmith took no action to end the practices Goldsmith complained

about.

276.    On November 4, 2015, Defendant Grant circulated a memorandum to

Alliance's Board of Directors, including Koopersmith, responding to Koopersmith's October 22,

2015 e-mail.  Grant's memo recommended that Alliance continue its practice of adjudication

fraud and accept the legal risks of doing so rather than accept the loss of profits that would result

from ending the fraud.

277.    Koopersmith thereafter participated in the decision of the Alliance Board

to authorize and continue Alliance's practice of adjudication fraud.  Koopersmith made the

decision to accept the risk of being held legally liable for the fraud in order to continue profiting

from the fraud as an Alliance Board member and a principal of one of its largest investors.

278.    In December 2015, shortly after directing Alliance to continue its fraud,

Koopersmith assisted Alliance in finding new "independent" pharmacies to carry out the fraud.

On December 4, 2015, Alliance employee Morgan Mower e-mailed Koopersmith about seeking

out "potential pharmacy acquisition[s]."  Later that day, Koopersmith replied:  "Thanks Morgan. This is very helpful.  I'll see what I can do."  █████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

279.    Koopersmith later approved Alliance's plan to acquire its network of "independent" pharmacies with the understanding that such acquisition would improve Alliance's ability to commit fraud.

280.    Koopersmith continued to operate and manage an enterprise he knew to be engaged in fraud until Alliance's bankruptcy in 2017.

**Travis Hughes**

281.    Defendant Hughes served on Alliance's Board of Directors as the representative of the Hughes Entities, which invested millions in Alliance's predecessor corporation on March 23, 2012.  Throughout his years-long tenure on Alliance's Board, Hughes ignored his fiduciary obligations to Alliance—which required him to stop Alliance from committing fraud—and instead opted to help perpetuate the fraud in order to maximize return on the Hughes Entities' investment and, thereby, enrich himself.

282.    The Series A Preferred Unit Purchase Agreement effectuating the Hughes Entities' multi-million-dollar investment in Alliance's predecessor corporation ███████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████  Thus, Hughes knew from the beginning of his affiliation that Alliance was engaged in adjudication fraud.

283.    But even before Hughes finalized the Hughes Entities' investment in Alliance, he was using his business connections to help Alliance escape PBM scrutiny.  For example, on February 7, 2012, Hughes wrote to Defendant Jeffrey Smith:  "Jeff - did you receive

audit materials from cvs [a PBM] yesterday afternoon?  We heard they were coming but no indication on what they say."  Smith forwarded Hughes's e-mail to Defendant Hadlock, writing:

> Please get me a copy of the CVS Audit report as soon as you get it.  Our investor is friends with their Head Legal Counsel and has given the heads up we should be getting the audit material any day now.

284.    As Hughes predicted, the PBM CVS/Caremark initiated a purchasing audit of Alliance in February or March of 2013.  Travis Hughes played a key role in mediating that audit, ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

285.    Despite knowing how fraudulent adjudication harmed manufacturers like Roche, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████  As alleged above, redacting pricing information from invoices was key to hiding Alliances fraud, as an auditor would notice that the prices Alliance was paying for strips were too low for legitimate sales of retail strips.

286.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

██████████████████████████

████████████████████████████████████████████

██████████████

████████████████████████████████████████████



287.     Alliance's deception during the audit worked, but Alliance's relationship with CVS did not last long. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

288.     This letter raised concerns for Alliance's outside counsel, who e-mailed Jeffrey Smith and Travis Hughes a few days later:

In November 2012, Alliance's counsel followed up to ask Jeffrey Smith whether "the third party payor reimbursement rate [is] different for the mail order and retail strips," adding:  "I just want to get a better sense of what would concern the PBMs if they knew exactly what was happening."

289.     A week after this spot-on question, Jeffrey Smith had a call with outside counsel that caused a flurry of activity.  Smith directed Alliance employees to run "test claims" using the NDCs for NFR product to see if PBMs would allow them to adjudicate (they did not).



290.    On information and belief, ███████████████████████████████████████████████████████████████████████████ Travis Hughes knew that Alliance's practices carried this risk, but continued to serve as a Board member of Alliance.  Indeed, during the intervening years, Hughes diligently worked to protect Defendants' fraudulent practices from both internal and external scrutiny.

291.    In July and October 2015, for example, Defendant Koopersmith e-mailed Defendants Wistner and Hughes regarding whistleblower complaints about Alliance's practice of "illegally billing PBMs for products as if it was retail even though it is mail order."

292.    Concerned that Koopersmith had exposed Alliance's practice of adjudication fraud in writing to the Board, Defendant Jeffrey Smith sent Hughes an e-mail regarding the Koopersmith e-mail stating:  "Looking for an email from you.  Would love to talk about it.  Our attorney spoke with him."  Hughes thereafter spoke to Smith and/or Defendant Grant to discuss how to create a record that minimized the evidence of Alliance management's and the Board's knowledge of Alliance's fraud.

293.    On October 26, 2015, Hughes responded to Koopersmith's e-mails about concerned Alliance employees.  In the response, Hughes stated that the "issues outlined" in Koopersmith's e-mails were "not new" and had repeatedly been considered by the Alliance Board and its management.  Hughes went on to say that the allegations of illegality were more "specific" and that "[t]here are internal processes to address such concerns," which he "hope[d]" had been used.  Hughes concluded by stating:  "Given the escalation to the Board, the Board will

need to seek counsel as how best to address the concerns, ensuring that the Company's practices meet compliance guidelines."

294.    As alleged above, Grant prepared a November 4, 2015 memorandum in response to Koopersmith's e-mail that discussed Alliance's fraud in detail.  Before circulating that memo to the full Board of Directors, Grant sought Hughes's input on a preliminary draft.

295.    Hughes did not respond to Grant's request for feedback in writing. Hughes made no written comment on the fact that Grant's draft and final memorandum admitted that Alliance engaged in adjudication fraud, or that Alliance had no intention of stopping that practice because doing so was not economically feasible.  Hughes also did not comment on the obvious conflict of interest in being asked to comment on a memorandum that ostensibly was intended to provide the Board of Directors with an independent legal opinion on fraudulent practices within Alliance.

296.    Hughes participated in the Alliance Board's decision to authorize and continue Alliance's practice of adjudication fraud, because ending the fraud would be financially catastrophic.  Hughes made the decision to accept the risk of being held legally liable for the fraud in order to continue profiting from the fraud as an Alliance investor.  Thus, Hughes continued to operate and manage an enterprise he knew to be engaged in fraud until its bankruptcy in 2017.

**Lee H. Rosebush**

297.    Defendant Rosebush accepted appointment to Alliance's Board of Directors on June 9, 2016.  Before his appointment to Alliance's Board, Rosebush worked as Alliance's outside counsel beginning in early 2015.  In his capacity as outside counsel, Rosebush became fully aware of Alliance's fraudulent practices.

298.    In November 2015, Rosebush learned that Alliance was under civil

investigation by the Department Health and Human Services (HHS) for its fraudulent business practices. In connection with this investigation, Rosebush discussed with Alliance certain "issues around NDC codes." Rosebush also received a copy of Defendant Grant's November 4, 2015 memorandum to Alliance's Board of Directors, in which Grant confirmed that Alliance had a practice of submitting fraudulent insurance claims containing false NDC numbers.

299.    In his capacity as Alliance's outside counsel, Rosebush negotiated with the PBM ESI to secure a contract for the Alliance-owned New Life Pharmacy. During those negotiations, ESI informed Rosebush that Defendant Jeffrey Smith had "provided materially misleading and inaccurate information to Express Scripts [ESI] as part of the credentialing process for another pharmacy."

300.    On March 25, 2016, Grant informed Rosebush that the Mississippi Board of Pharmacy was investigating Alliance for adjudication fraud. On that same day, Grant informed Rosebush that Alliance's subsidiary wholesalers regularly prepared fraudulent invoices that falsely identified NFR strips as retail strips.

301.    On May 20, 2016, Rosebush received a letter from ESI regarding Peterson Pharmacy and indicating that "Express Scripts [ESI] is aware of . . . schemes involving purposely dispensing a 'not for retail sale' product and billing payors using more expensive retail NDCs."

302.    On September 19, 2016, Grant e-mailed Rosebush to inform him that "Johnson and Johnson [LifeScan] ha[d] presented a draft complaint . . . alleging fraud and RICO based on adjudicating retail claims after dispensing diabetic testing supplies packaged not for retail sale (mail order, DME, etc.)."

303.    Rosebush was aware that Alliance's practice of purchasing NFR strips on the secondary market and adjudicating them as retail strips was illegal. On September 26, 2016,

Rosebush wrote to Grant that he "would not go so far as to say that secondary market is perfectly legal." He pointed out that if Alliance made that statement, PBMs and test strip manufacturers would "likely argue that the secondary market product is in the class of retail vs. institutional vs. mail order and bring up that you are dispensing mail order in lieu of retail."

304.    Rosebush also was aware of the differential rebates and pricing between NFR and retail strips giving rise to Roche's damages. In addition to receiving David Grant's November 2015 memorandum, Rosebush noted in an October 6, 2016 e-mail to Grant that the fact of differential rebates could be used by manufacturers like Roche "for damages considerations."

305.    Rosebush also discussed with Grant "the practice by Alta of identifying all secondary market product distributed to the network of pharmacies it sells to using the retail NDC on the invoice regardless of the class of trade NDC established by the manufacturer for the particular boxes sold."

306.    Despite his knowledge of Alliance's practice of fraudulent adjudication, Rosebush voluntarily elected to serve as an Alliance director. As alleged above, Rosebush operated and managed an enterprise he knew to be engaged in fraud, including by approving funding to execute a plan to expand and improve Alliance's network of pharmacies with the "10% PIC ownership" model. Rosebush was well aware that approving this plan would help expand and conceal Defendants fraudulent enterprise: the May 2016 memorandum to Alliance's Board regarding "10% PIC ownership" stated: "The company has consulted Lee Rosebush, who has indicated his belief that this ownership structure will appear as independently owned pharmacies in licensure applications and PBM contracts."

307.    When Rosebush resigned from Alliance's Board in November 2016, he did not disclose Alliance's fraud to anyone. Rosebush's resignation was not precipitated by

Alliance's fraud; rather, Rosebush resigned in order to better position himself and his firm for pursuing affirmative litigation against the PBM ESI on behalf of Alliance.

**Facts Common to the Investor Defendants**

308.    The Investor Defendants—again, the Hughes Entities, Mercato Partners, and Pritzker Group—managed and operated Alliance's fraudulent enterprise through their agents on Alliance's Board of Directors.  As alleged above, the Investor Defendants' agents (Hughes, Wistner, and Koopersmith) ignored their independent fiduciary duties to Alliance—which required them to stop the company they directed from perpetrating a massive insurance fraud scheme—and instead acted in the interests of their respective funds to maximize the Investor Defendants' return on investment.

309.    In addition, the Investor Defendants invested substantial sums in Alliance knowing they were financing and enabling its fraudulent and deceptive practices.

310.    Shipping diabetic testing supplies directly to patients was not a novel idea when Alliance entered that market in 2010.  What made Alliance unique were the ways it increased profits by deceiving insurance companies and test strip manufacturers.  Indeed, it was Alliance's fundamentally deceptive business model that made it a "disruptor" in the industry and an enticing opportunity for investors like the Investor Defendants (and, as detailed below, Zions Bank).

311.    Each of the Investor Defendants knew prior to its investment that Alliance's business model and profits depended on misleading PBMs into believing that pharmacies surreptitiously owned and/or run by Alliance were brick-and-mortar "retail" businesses selling test strips to walk-in customers.  They also knew—because they received disclosures stating—that Alliance's pharmacies were in fact operating by mail order, and that they were shipping NFR strips to patients while claiming reimbursement from the PBMs for

sales of retail strips.  The profits generated by this fraud were the incentive for the Investor Defendants to invest in Alliance.

312.    Unlike the Investor Defendants, Plexus Fund, an early institutional investor in Alliance's predecessor entities, withdrew as an investor when it learned about these practices. ███████████████████████████████████████

███████████████████████████████████████

313.    By 2013, Medsource (which had re-branded to Ingram) was seeking additional investments. ████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

314.    Unlike Plexus, the Investor Defendants did not have to conduct due diligence to learn about Alliance's deception:  Alliance disclosed it to them in their investment agreements.  Alliance also disclosed to the Investor Defendants that its business was premised on adjudication fraud.

315.    Each of the Investor Defendants received substantially the same disclosure upon investing in Alliance or its predecessors:

> Certain Subsidiaries are licensed as retail pharmacies.  Such Subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such Subsidiaries have contracted, owns its own mail order companies and will not contract with such Subsidiaries if such Subsidiaries are licensed as a mail order pharmacy; however, all of such Subsidiaries' business is through mail order.  **Such Subsidiaries bill patients insurance under the retail pharmacy**

**benefit __but__ ship mail order diabetic testing supplies nationwide.**  Due to such practices of the Subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such Subsidiary and seek contractual remedies, which could have a material adverse effect on the Company and its Subsidiaries.

(emphasis added).

316.     In 2015, when Alliance learned that LifeScan was investigating the fraudulent adjudication practices described in this Complaint, Defendants Leavitt and Grant confirmed that the above-quoted disclosure to the Investor Defendants described those exact practices.

317.     On June 23, 2015, after Grant concluded that LifeScan was investigating "the NDC issue," Leavitt e-mailed Grant:

David,

I just spoke with Jeff [Smith].  Not sure if he said he's talked to you about this yet or not, but wanted you [and Alliance's outside counsel] to have a call tomorrow and start thinking about developing a loose plan of defense and try to identify, to the extent possible, what kind of liability we could have from this?

Also, to help bring [outside counsel] up to speed, I wonder if we ought to provide him the paragraph on this issue that is in the schedules in Mercato's purchase agreement?

Later on June 23, 2015, Grant replied:

Justin,

I think providing the schedule to [outside counsel] is a great idea.  I am not sure where to lay my hands on it.

318.     On June 24, 2015, in response to this request, Leavitt forwarded Grant the language from the disclosures made to the Investor Defendants:

Certain subsidiaries of Purchaser are licensed as retail pharmacies.  Such subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such subsidiaries have contracted, owns its own mail order companies and will not contract with such subsidiaries if such subsidiaries are licensed as a mail order pharmacy; however, all of such subsidiaries' business is through mail order.  Such subsidiaries bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing

supplies nationwide.  Due to such practices of such subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such subsidiary and seek contractual remedies . . . .

319.    Similarly, after Defendant Koopersmith's October 22, 2015 e-mail to Defendants Wistner and Hughes discussing Goldsmith's complaints about Alliance's fraudulent billing practices, Grant began to prepare for the possibility of a shareholder or securities action against Alliance.  On October 29, 2015, Grant sent Alliance's outside counsel the "Purchaser Disclosure Schedules" made to AHN's Board of Directors.

320.    On October 30, 2015, Grant e-mailed Leavitt, writing that Alliance had a strong defense against any shareholder derivative or securities actions seeking to hold Alliance's management responsible to Alliance's investors for adjudication fraud because "there were sufficient disclosures on these issues."  In other words, Alliance had informed its investors about it practice of adjudication fraud and could not be sued by the investors for allegedly concealing it from them.

321.    Each of the Investor Defendants—the Hughes Entities, Mercato Partners, and Pritzker Group—understood and anticipated that it might face civil liability for the actions of the respective agents each Investor Defendant installed on Alliance's Board of Directors.  Each of the Investor Defendants demanded in connection with its investment that Alliance indemnify them for any liability arising from their agents' actions.  As a result, each Investor Defendant is the beneficiary of an indemnity agreement with Alliance.  Each such indemnity agreement states that each Investor Defendant has a "representative on the Company's [*i.e.*, Alliance's] Board," and in it, Alliance promises to indemnify the Investor Defendant for any civil liability arising from the actions of their representative on the Board.  Such indemnification agreements are atypical, and demonstrate the Investor Defendants' knowledge and expectation that the Director Defendants would act as their agents while sitting on Alliance's Board; that the Investor

Defendants would be directly liable for their agents' actions; and that the Investor Defendants

risked facing liability for knowingly funding and operating a company whose "foundational

practice" was fraud.

**The Hughes Entities**

322.    On information and belief, Hughes & Company has at all relevant times

held its investment in Alliance and its predecessors through HS MedSource Holdco, ███████

████████████████████████████████████████████████████████

███████  The manager of HS MedSource Holdco is Kesman Hughes & Company, and the

manager of Kesman Hughes & Company is Travis Hughes.

323.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████  Hughes & Company Investment

Partners, LLC lists its address as 161 North Clark Street, Suite 1310, Chicago, Illinois 60601

with the Illinois Secretary of State.  That address is also listed as the address for Hughes &

Company on its website.

324.    The Hughes Entities were represented on Alliance's Board of Directors by

Defendant Hughes, who was fully aware of Alliance's fraudulent practices.  Hughes was

appointed to the Alliance Board as a result of the Hughes Entities' substantial investment in

Alliance's predecessor entity, Ingram.  Hughes's service on the Alliance Board was part of his

duties for the Hughes Entities.  Hughes used the information he obtained as a member of

Alliance's Board to keep the Hughes Entities apprised of Alliance's activities and help the

Hughes Entities manage their investment.

325.    When Hughes operated and managed Alliance's practice of fraudulent

adjudication (as alleged above), he did so for the purpose of maximizing Alliance's profits for the benefit of the Hughes Entities and with the knowledge and approval of the Hughes Entities. Hughes acted as an agent of the Hughes Entities in operating and managing Alliance's fraudulent enterprise.

326. Travis Hughes is the Managing Director of Hughes & Company, which describes itself as a "growth-oriented private equity firm focused exclusively on the healthcare industry." At the time this action was filed, Hughes & Company's public-facing website, www.hughes-co.com, still advertised Alliance as part of its investment portfolio (references to Alliance have since been removed). Travis Hughes conducted business as a member of Alliance's Board of Directors through an e-mail address with the @hughes-co.com domain.

327. Although the Hughes Entities operated and managed Defendants' fraudulent enterprise through Travis Hughes, the Hughes Entities also learned of and provided substantial assistance to Alliance's fraud independently of Travis Hughes.

328. 

329. The Hughes Entities thus invested substantial sums in Ingram knowing

that its business was based on deceiving PBMs and fraudulently adjudicating NFR strips as retail strips. By their investment, the Hughes Entities substantially assisted Ingram, and subsequently Alliance, in carrying out their fraudulent activities.

330. Rather than use their agent on Alliance's Board of Directors to stop Alliance's fraudulent scheme, the Hughes Entities chose to protect their substantial investment in that scheme. Through Travis Hughes, the Hughes Entities continued to operate and manage Alliance, which they knew to be a fraudulent enterprise, until Alliance went bankrupt in 2017.

**Mercato Partners**

331. On information and belief, Mercato Partners has at all relevant times held its investment in Alliance and its predecessors through two special purpose vehicles, Mercato Partners Ingram, LLC, and Mercato Partners Ingram Co-Invest, LLC. An entity named Mercato Partners Growth II GP, LLC is the general partner of both of those SVPs, and Greg Warnock is the Managing Director of Mercato Partners Growth II GP, LLC. Together, Mercato Partners Ingram, LLC, and Mercato Partners Ingram Co-Invest, LLC invested at least $14 million in Alliance.

332. On information and belief, all of the above-named Mercato Partners entities, as well as Mercato Management, LLC, Mercato Partners Growth II GP, LLC, Mercato Partners Growth Affiliates II, L.P. and Mercato Partners AI II, L.P. share a principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

333. Mercato Partners was represented on Alliance's Board of Directors first by Greg Warnock, who was made a member of Alliance's Board of Directors upon the closing of Mercato Partners' investment in May 2013. Warnock is a co-founder and managing director of Mercato Partners, which describes itself as a "growth-oriented private equity firm focused exclusively on the healthcare industry." Warnock was replaced as Mercato's designee on

Alliance's Board by Defendant Wistner—a partner of Mercato Partners—who was fully aware of Alliance's fraudulent practices, later in 2013.

334.    Wistner's service on the Alliance Board was part of her duties for Mercato Partners.  Indeed, in a July 30, 2013 e-mail to Mercato employees, ███████████████ ███████████████████████████████████████████████████████████████████ Wistner conducted business as a member of Alliance's Board through an e-mail address with the @mercatopartners.com domain.  Wistner used the information she obtained as a member of Alliance's board to keep Mercato Partners apprised of Alliance's activities and help Mercato Partners manage its investment.

335.    When Wistner operated and managed Alliance's practices of fraudulent adjudication, she did so for the purpose of maximizing Alliance's profits for the benefit of Mercato Partners and with the knowledge and approval of Mercato Partners.  Wistner acted as an agent of Mercato Partners in operating and managing Alliance's fraudulent enterprise.

336.    Although Mercato Partners operated and managed Defendants' fraudulent enterprise through Warnock and Wistner, Mercato also learned of Alliance's deceptive and fraudulent practices independently of Warnock and Wistner.  Specifically, the Unit Purchase Agreement effectuating Mercato's multi-million dollar investment in Alliance's predecessor, Ingram, explicitly disclosed Ingram's engagement in adjudication fraud.

337.    On May 10, 2013, ███████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████



338.    On May 9, 2013, Mercato's counsel e-mailed Alison Wistner, writing:

339.    Mercato's ████████████ language does **not** appear in the final version of

the disclosures incorporated by reference into the Unit Purchase Agreement effecting Mercato's

investment, indicating that Mercato ultimately agreed ████████████████████████

████████████████ in exchange for sharing in the profits of the fraud.

340.    Incorporated into the May 15, 2013 Series B Preferred Unit Purchase

Agreement effecting Mercato Partners' investment in Ingram was a schedule of disclosures made

by Ingram to Mercato.  Schedule 2.25 was titled "Material Contracts," and Disclosure 2.25.397

stated:

> Certain Subsidiaries are licensed as retail pharmacies.  Such Subsidiaries applied
> for such license classification because each of the pharmacy benefit managers,
> with whom such Subsidiaries have contracted, owns its own mail order companies
> and will not contract with such Subsidiaries are licensed as a mail order
> pharmacy; however, all of such Subsidiaries' business is through mail order.
> **Such Subsidiaries bill the patient's insurance under the retail pharmacy
> benefit <u>but</u> ship mail order diabetic testing supplies nationwide.**  Due to such
> practices of the Subsidiaries, it is possible that a pharmacy benefit manager may
> terminate its relationship with such Subsidiary and seek contractual remedies,
> which could have a material adverse effect on the Company and its Subsidiaries.

(emphasis added).

341.    Mercato Partners invested substantial sums in Ingram knowing that its

business was based on deceiving PBMs and fraudulently adjudicating NFR strips as retail strips.

By their investment, Mercato Partners substantially assisted Ingram, and consequently Alliance, in carrying out their fraudulent activities.

342.    Wistner regularly apprised Mercato of Alliance's operations.  For example, Wistner internally circulated Alliance's board meeting slide presentations and compliance memoranda that discussed mounting contract terminations and Alliance's growing network of independent pharmacies.

343.    Mercato also was apprised of LifeScan's 2015 investigation into Alliance's adjudication fraud.  On June 29, 2015, Wistner wrote to Justin Leavitt:



344.    On August 17, 2015, ███████████████████████

███████████████████████████████ On October 30, 2015,

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████ To the contrary, the documents confirmed that Alliance engaged in this practice, as its disclosure to the Mercato Partners had long since made clear.

345.    Wistner's decision to ███████████████████████

███████████████████████ demonstrates that she understood herself to be acting as Mercato's agent on Alliance's Board, rather than as an independent actor with fiduciary duties to Alliance.

346.     Rather than use its position on Alliance's Board of Directors to halt Alliance's fraudulent scheme, Mercato chose to protect its substantial investment in that scheme. Through Wistner, Mercato Partners continued to operate and manage Alliance, which it knew to be a fraudulent enterprise, until Alliance went bankrupt in 2017.

**Pritzker Group**

347.     On information and belief, Pritzker Group has at all relevant times held its investment in Alliance and its predecessors through two special purpose vehicles, NWV-Alliance LLC and NWV-Alliance-2 LLC, which are managed directly or indirectly by Jabodon PT Company.

348.     On information and belief, all of the Pritzker Group entities share a principal place of business at 111 South Wacker Drive, Suite 4000, Chicago, Illinois 60606.

349.     Pritzker Group advertises itself as "an investor in leading middle-market businesses" with "a deeply rooted understanding and appreciation for building businesses."  It was represented on Alliance's Board of Directors by its partner, Defendant Koopersmith, who was fully aware of Alliance's fraudulent practices.  Koopersmith was appointed to the Alliance Board as a result of Pritzker Group's substantial investment in Alliance.

350.     Koopersmith's service on the Alliance Board was part of his duties for Pritzker Group.  Koopersmith conducted business as a member of Alliance's Board of Directors through an e-mail address with the @pritzkergroup.com domain, and he used the information he obtained as a member of Alliance's board to keep Pritzker Group apprised of Alliance's activities and help Pritzker Group manage their investment.

351.     When Koopersmith operated and managed Alliance's practice of fraudulent adjudication, he did so for the purpose of maximizing Alliance's profits for the benefit of Pritzker Group and with the knowledge and approval of Pritzker Group.  Koopersmith acted

as an agent of Pritzker Group in operating and managing Alliance's fraudulent enterprise.

352.    Pritzker Group also knew of Alliance's deceptive and fraudulent practices

independently of Koopersmith.

353.    Prior to Ingram's acquisition of AHN,



████████████████████████

████████████████████████████████

████████████████

354.     Incorporated into the January 17, 2014 Asset Purchase Agreement

effecting Ingram's acquisition of AHN was a list of Purchaser Disclosure Schedules; Ingram was

the "Purchaser."  Schedule 4.13 was titled "Claims and Proceedings," and the first disclosure in

that Schedule stated:

> Certain subsidiaries of Purchaser are licensed as retail pharmacies.  Such subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such subsidiaries have contracted, owns its own mail order companies and will not contract with such subsidiaries if such subsidiaries are licensed as a mail order pharmacy; however, all of such subsidiaries' business is through mail order.  **Such subsidiaries bill the patient's insurance under the retail pharmacy benefit <u>but</u> ship mail order diabetic testing supplies nationwide**.  Due to such practices of such subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such subsidiary and seek contractual remedies, which could have a Purchaser Material Adverse Effect.

(emphasis added).

355.     Koopersmith, in close consultation with his colleagues at Pritzker Group,

and acting on behalf of Pritzker Group, approved Ingram's purchase of AHN, knowing that

Ingram was engaged in adjudication fraud and that the combined entity would continue to be

engaged in adjudication fraud.

356.     Thereafter, Pritzker Group maintained and actively managed its

investment in Alliance, knowing that its business was based on deceiving PBMs and fraudulently

adjudicating NFR strips as retail strips.  By this investment, Pritzker Group substantially assisted

Alliance in carrying out its fraudulent activities.

357.     On January 24, 2014—immediately after Ingram's acquisition of AHN—

Koopersmith informed the Pritzker Group Venture Capital team ██████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Koopersmith informed

his colleagues at Pritzker Group:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████

358.    As part of his duties as an agent of Pritzker Group on Alliance's board,

Koopersmith provided Pritzker Group with regular updates on Alliance's business.  For example,

on May 11, 2015, ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

359.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████

360.    Koopersmith's disclosure of ██████████████████████

██████████████████████████ demonstrates that he considered himself to be acting as

Pritzker Group's agent on Alliance's Board, rather than as an independent actor with fiduciary

duties to Alliance.

361.    Rather than use its position on Alliance's Board of Directors to stop

Alliance's fraudulent scheme, Pritzker Group chose to protect its substantial investment in that scheme. Through Koopersmith, Pritzker Group continued to operate and manage Alliance, which it knew to be a fraudulent enterprise, until Alliance went bankrupt in 2017.

## Zions Knowingly and Substantially Assisted Alliance's Fraud

362. On June 24, 2014, Alliance and Zions executed a Credit Agreement refinancing Alliance's $36 million credit facility. That agreement explicitly acknowledged that Alliance was engaged in a number of illegal activities. The agreement also expressly acknowledged that Alliance's business was fundamentally fraudulent.

363. The Credit Agreement expressly disclosed that the Alliance Pharmacies sometimes illegally distribute test strips in states where they are not licensed to do so:

> From time to time, certain Subsidiaries of Borrower have shipped diabetic testing supplies to customers located in various states where such Subsidiary has not been (and may still not be) licensed . . . .

364. The Credit Agreement also acknowledged that Alliance most likely violated State Anti-Kickback Statutes:

> Approximately thirteen states have statutes patterned after the federal Anti-kickback Statute which prohibits payment of any remuneration for referrals of Medicare beneficiaries, though such state statutes are applicable to private insurance beneficiaries. Those states could construe payments for qualified leads on a per lead basis as a violation of those statutes.

365. The Credit Agreement acknowledged that Alliance operated in violation of HIPAA.

366. Most importantly, the Credit Agreement expressly acknowledged the fraudulent "foundational practice" on which Alliance's business was based: selling NFR strips but submitting them for insurance reimbursement as retail strips.

367. In particular, schedule 5.16, paragraph 17 of the Credit Agreement explicitly acknowledged that Alliance Pharmacies shipped mail-order NFR strips to patients but

billed PBMs for retail strips.  That disclosure states:

> Certain Subsidiaries of Borrower are licensed as retail pharmacies.  Such Subsidiaries Applied for such license classification because each of the pharmacy benefit managers with whom such Subsidiaries have contracted owns its own mail order companies and will not contract with such Subsidiaries if such Subsidiaries are licensed as a mail order pharmacy however substantially all of such Subsidiaries business is delivered by common courier.  **Such Subsidiaries bill the patients insurance under the retail pharmacy benefit <u>but</u> ship mail order diabetic testing supplies nationwide.**  Due to such practices of such Subsidiaries it is possible that a pharmacy benefit manager may terminate its relationship with such subsidiary and seek contractual remedies.

(emphasis added).

368.    Having acknowledged that Alliance's business was premised on fraud, Zions proceeded to structure the Credit Agreement for the express purpose of assisting and enabling this fraud.  Indeed, helping Alliance to conceal its widespread fraud was the essential rationale for the Credit Agreement.

369.    Prior to entering into the Credit Agreement, Don Rands, a Zions Senior Vice President, presented a proposal to Zions' Senior Loan Committee that showed he was fully aware of Alliance's fraudulent business model and wanted Zions to abet the fraud.

370.    Rands's loan proposal explained that "[Alliance] has chosen to run its claims through 12 regional pharmacies to diversify its claims so that the volume of any one pharmacy does not appear significant or potentially damaging to the PBMs."

371.    The proposal further explained that because PBMs "could choose to cancel a reimbursement contract in place with a retailer," Alliance "has chosen to diversify through its network of 12 regional pharmacies—where [Alliance] will ship product to the pharmacies and have the local pharmacies process and ship the supplies and then submit a reimbursement claim to the [PBM] for adjudication (review, processing, and payment of a medical service claim)."  By routing claims through "independent pharmacies," Alliance created "a shield . . . from reimbursement pressure from the PBMs while diversifying concentrations."

372.    Zions structured the Credit Agreement to help Alliance deceive PBMs into believing that its subsidiaries were independent pharmacies.  Under the Credit Agreement, a complex web of nominally separate bank accounts belonging to Alliance's subsidiaries was formed.  Although the accounts appeared to outsiders to be independent accounts belonging to independent companies, that was not the case.  Instead, the accounts would "sweep" into a centralized account controlled by Alliance.  This structure, implemented by Zions, permitted Alliance to disguise the fact that supposedly "independent" pharmacies were in fact operating together as part of a single fraudulent enterprise to effect a common fraudulent scheme.

373.    The banking services that Zions provided to Alliance thus were purposefully and knowingly directed at facilitating Alliance's fraudulent business model.

374.    At the time Zions undertook to assist Alliance's fraudulent enterprise by entering into the Credit Agreement, Zions was not a newcomer to the pharmacy industry.  To the contrary, Zions Bancorporation owns ProviderPay.  According to its website, ProviderPay is a "leading provider of third-party payment and reconciliation solutions to all types of pharmacies" that "specializ[es] in helping pharmacies manage and improve financial performance through payment management, reconciliation, and remittance solutions."  In fact, Alliance was a ProviderPay customer and used its software to track the insurance reimbursements it obtained by fraud.

375.    Zions also was not unfamiliar with Alliance before it undertook to assist Alliance's fraud by entering into the Credit Agreement.  Kent Madsen has been the Managing Director of Zions SBIC since 2000; was a member of Zions' Board of Directors from 2006–2015; and has been a member of Zions' Board of Advisors since 2015.  Madsen also is a personal friend of Defendant Jeffrey Smith and an early investor in Alliance.

376.    Although the Credit Presentations prepared in connection with Zions'

Credit Agreements with Alliance attest to compliance with relevant banking regulations governing loans to bank "insiders" like Madsen, those Presentations do not mention Madsen's investment in Alliance.

377.    During the course of its business relationship with Alliance, Zions became aware that LifeScan, which it knew was a test strip manufacturer, had asserted claims against Alliance for the fraud described above.  In December 2015, Alliance informed Zions that LifeScan "believes it may have claims against one or more Subsidiaries of [Alliance], and that its potential claims arise from product sourcing issues in connection with the sale of diabetic testing strips."

378.    On August 5, 2016, Alliance and Zions executed the Second Amendment to the Credit Agreement.  As in the Credit Agreement itself, Zions acknowledged that Alliance's business was predicated upon the Alliance Pharmacies shipping NFR strips to patients but billing PBMs for retail strips.

379.    In the Second Amendment to the Credit Agreement, Zions acknowledged that PBMs had sought to recover nearly $7 million in reimbursements wrongfully provided to Alliance Pharmacies that were in breach of their contracts with PBMs due to this fraud:

> During various audits of Borrower or its Subsidiaries, pharmacy benefit managers have discovered discrepancies and, in connection therewith, have demanded that Borrower or its Subsidiaries pay a recovery amount determined by the pharmacy benefit manager . . . .

380.    The Second Amendment to the Credit Agreement also acknowledged Alliance Pharmacies had lost their contracts with PBMs after the PBMs discovered those pharmacies' fraud.

381.    In a deposition on October 6, 2017, Scotty Deeds, the Zions official responsible for the Alliance loan, confirmed that at the time Zions lent money to Alliance, it understood Alliance would ship mail-order test strips to customers while billing PBMs for retail

strips.  Deeds further confirmed that Zions understood there could be potential legal consequences if the PBMs discovered how Alliance was doing business.  Nevertheless, Zions agreed to facilitate Alliance's fraud by providing the credit necessary to operate the business.

## DAMAGES

382.    Between 2011 and 2017, the Alliance Pharmacies submitted reimbursement claims for approximately 1,836,174 50-count boxes of Roche test strips.  Exhibit A shows the number of claims for Roche retail strips made by each Alliance Pharmacy by year, according to claims data passed directly to Roche from the PBMs who received those claims.

383.    During this same period, the currently-known Alliance Pharmacies and their affiliates legitimately purchased approximately 1,787 boxes of Roche retail strips.  With the exception of the reimbursement claims for these 1,787 boxes, the Alliance Pharmacies' reimbursement claims for retail strips were fraudulent.  1,834,387 of the 1,836,174 boxes for which the Alliance Pharmacies submitted retail reimbursement claims were in fact boxes of NFR strips.

384.    The pharmacy beneficiaries who purchased these 1,834,387 boxes of Roche NFR strips would have purchased Roche retail strips but for Defendants' fraud.  Indeed, the beneficiaries likely had little idea the test strips they purchased were not intended for sale to customers such as themselves.  Accordingly, but for Defendants' fraud, Roche would have sold 1,834,387 additional boxes of retail strips.

385.    Roche is entitled to compensatory damages in the amount of the difference between the price for which it sold the NFR strips and the price at which it would have sold the retail strips the pharmacy beneficiaries should have received.  This amounts to no less than $87 million.

386.    Defendants' fraudulent adjudications also caused Roche to wrongfully

issue over $87 million in rebates to PBMs and other payers.  As described above, Roche issued

these rebates as a direct result of Defendants' fraudulent submission of insurance claims for retail

strips.  The rebates were wrongfully issued because only retail strips were eligible for rebate and

Defendants did not dispense retail strips, despite submitting insurance claims saying they had.

**FIRST CLAIM FOR RELIEF**

**Violation of Federal RICO, 18 U.S.C. § 1962(c)**
**(Against all Defendants Except ZB, N.A.)**

387.     Roche hereby repeats and re-alleges the allegations in paragraphs 1–386

above as if set forth fully herein.

388.     At all relevant times, Roche Diagnostics Corp. and Roche Diabetes Care,

Inc., were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

389.     At all relevant times, Jeffrey C. Smith; Steven L. Hadlock; Sahily Paoline;

David Grant; Justin Leavitt; Blaine Smith; Travis Hughes; Alison Wistner; Adam Koopersmith;

Lee H. Rosebush; Hughes & Company; Hughes & Company Investment Partners, LLC; Kesman

Hughes & Company, LLC; HS Medsource Holdco, LLC; Mercato Management, LLC; Mercato

Partners, LLC; Mercato Partners Growth II GP, LLC; Mercato Partners Growth II, L.P.; Mercato

Partners Growth Affiliates II, L.P.; Mercato Partners AI II, L.P.; Mercato Partners Ingram, LLC;

Mercato Partners Ingram Co-Invest, LLC; Jabodon PT Company; Pritzker Group Venture

Capital LLC; NWV-Alliance LLC; and NWV-Alliance-2 LLC (collectively, the "RICO

Defendants") were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

390.     The entities identified in paragraphs 58–62 above formed an association-

in-fact for the purpose of obtaining NFR blood-glucose test strips; dispensing them to patients by

mail order; submitting false insurance claims representing that they had dispensed retail strips;

and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers

like Roche.  This association-in-fact was a continuing and cohesive unit with specific and

-101-

assigned responsibilities and constituted an "enterprise" within the meaning of RICO, 18 U.S.C.
§ 1961(4).  This enterprise comprises Alliance Medical Holdings, LLC d/b/a Alliance Health and
its predecessor corporations (¶ 58), as well as:

    A.    Alliance's individually operating, nominally "independent" pharmacies that
        Alliance managed, operated, and/or controlled (¶ 62);

    B.    Alliance's corporate-owned pharmacies, as well as the "independent" pharmacies
        that Alliance later acquired (¶ 62);

    C.    Alliance's purchasing and wholesaling subsidiaries (¶ 60); and

    D.    Alliance's operating, managing, and holding entities (¶ 61).

391.    Each RICO Defendant, by engaging in the acts set forth in above,
including those set forth in paragraph 196–361, participated in the operation and management of
the enterprise.  At all relevant times, this enterprise was engaged in, and its activities affected,
interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

392.    Each RICO Defendant, by engaging in the acts set forth above, including
those set forth in paragraphs 196–361, conducted or participated, directly or indirectly, in the
conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning
of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c).

393.    The RICO Defendants, on multiple occasions, and in furtherance of their
scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly
caused to be sent and delivered across state lines by commercial interstate carrier shipments of
products that were represented to be Roche's retail strips but in fact were different products.
Each shipment of NFR strips falsely adjudicated using the NDC for retail strips constituted a
separate violation of 18 U.S.C. § 1341 and a separate act of racketeering.  The RICO
Defendants' purchase and receipt by interstate carrier of Roche or other test strips also was

integral to the operation and maintenance of the scheme.

394.     The RICO Defendants, on multiple occasions and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343.  Each false insurance reimbursement claim was transmitted by means of wire communication in interstate or foreign commerce and constituted a separate violation of 18 U.S.C. § 1343 and a separate act of racketeering.  The RICO Defendants' use of interstate wire communications to continually upload, transmit, and receive patient data and information regarding prescriptions to and from Alliance entities, including via Alliance's proprietary PPMS software; to create and maintain NPI and NCPDP database entries regarding the Alliance entities; and/or to establish additional Alliance entities was also integral to the scheme and the operation and maintenance of the enterprise.

395.     Each RICO Defendant committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, and/or 1343.  In fact, Defendants' racketeering acts were multiple and repeated, with tens of thousands of acts occurring every year from 2011 until Alliance's bankruptcy in 2017.

396.     These multiple racketeering acts were related and constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants; common victims (Roche and other manufacturers of test strips); a common method of commission; and the common purpose and common result of defrauding Roche and insurers, and of enriching the RICO Defendants while concealing their fraudulent activities.

397.     Roche was directly and proximately injured by the RICO Defendants'

pattern of racketeering activity because Defendants' fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to Roche and served as the sole basis and justification for Roche's payment of rebates to those pharmacy-benefit insurance companies and PBMs.

398.    Roche also was directly and proximately injured by Defendants' pattern of racketeering activity because each time Defendants fraudulently substituted a box of Roche NFR strips for the box of Roche retail strips that they claimed to have dispensed, and for which they were reimbursed by pharmacy-benefit insurance companies, such substitution deprived Roche of the sale of a box of Retail Strips that Roche would have sold absent Defendants' fraudulent substitution.

399.    As a result of their misconduct, the RICO Defendants are liable to Roche for its injuries.

400.    The scope of the RICO Defendants' fraudulent enterprise is not known, and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may have perpetuated their scheme through entities as yet unknown.

401.    Pursuant to 18 U.S.C. § 1964(c), Roche is entitled to recover threefold its damages plus costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Violation of New Jersey RICO, N.J. Stat. § 2C:41-2(c)
### (Against all Defendants Except ZB, N.A.)

402.    Roche hereby repeats and re-alleges the allegations in paragraphs 1–386 above as if set forth fully herein.

403.    At all relevant times, Roche Diagnostics Corp. and Roche Diabetes Care, Inc., were "persons" within the meaning of RICO, N.J. Stat. §§ 2C:41-1(b) and 2C:41-4(c).

404.    At all relevant times, the RICO Defendants were "persons" within the

meaning of RICO, N.J. Stat. §§ 2C:41-1(b) and 2C:41-2(c).

405.     The entities identified in paragraphs 58–62 above formed an association-in-fact for the purpose of obtaining NFR blood-glucose test strips; dispensing them to patients by mail order; submitting false insurance claims representing that they had dispensed retail strips; and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers like Roche.  This association-in-fact was a continuing and cohesive unit with specific and assigned responsibilities and constituted an "enterprise" within the meaning of RICO, N.J. Stat. § 2C:41-1(c).  This enterprise comprises Alliance Medical Holdings, LLC d/b/a Alliance Health and its predecessor corporations (¶ 58), as well as:

A.     Alliance's individually operating, nominally "independent" pharmacies that Alliance managed, operated, and/or controlled (¶ 62);

B.     Alliance's corporate-owned pharmacies, as well as the "independent" pharmacies that Alliance later acquired (¶ 62);

C.     Alliance's purchasing and wholesaling subsidiaries (¶ 60); and

D.     Alliance's operating, managing, and holding entities (¶ 61).

406.     Each RICO Defendant, by engaging in the acts set forth above, including those set forth in paragraphs 196–361, participated in the operation and management of the enterprise.  At all relevant times, this enterprise was engaged in, and its activities affected, trade or commerce, within the meaning of RICO, N.J. Stat. § 2C:41-2(c).

407.     Each RICO Defendant, by engaging in the acts set forth above, including those set forth in paragraphs 196–361, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, N.J. Stat. § 2C:41-1(a) and (d), in violation of RICO, N.J. Stat. § 2C:41-2(c).

408.     As alleged in paragraphs 393–394 above, each RICO Defendant

committed and/or aided and abetted the commission of numerous violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 2, 1341, and/or 1343. These violations of Federal law constituted "racketeering activity" under N.J. Stat. § 2C:41-1(a)(2).

409. In addition, the RICO Defendants, on multiple occasions, knowingly made or caused to be made false, fictitious, fraudulent, or misleading statements of material fact in electronic claims and/or records that they submitted, caused to be submitted, or attempted to cause to be submitted, in support of claims for reimbursement from insurance companies and/or insurance policies in violation of N.J. Stat. § 2C:21-4.6. Each fraudulent submission constituted a separate violation of N.J. Stat. § 2C:21-4.6, and a separate incident of racketeering under N.J. Stat. § 2C:41-1(a)(1)(*o*). Each RICO Defendant committed and/or was complicit in the commission of two or more of these racketeering incidents in violation of N.J. Stat. §§ 2C:2-6 and/or 2C:21-4.6.

410. Defendants' racketeering incidents were multiple and repeated, with tens of thousands of acts occurring every year from 2011 until Alliance's bankruptcy in 2017.

411. These multiple racketeering incidents were related and constituted a "pattern of racketeering activity" within the meaning of N.J. Stat. § 2C:41-1(d). The incidents alleged were related to each other by virtue of common participants; common victims (Roche and other manufacturers of test strips); a common method of commission; and the common purpose and common result of defrauding Roche and insurers, and of enriching the RICO Defendants while concealing their fraudulent activities.

412. Roche was directly and proximately injured by the RICO Defendants' pattern of racketeering activity because Defendants' fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to Roche and served as the sole basis and justification for Roche's payment of rebates to those pharmacy-benefit insurance

companies and PBMs.

413.    Roche also was directly and proximately injured by the RICO Defendants'
pattern of racketeering activity because each time Defendants fraudulently substituted a box of
Roche NFR strips for the box of Roche retail strips that they claimed to have dispensed, and for
which they were reimbursed by pharmacy-benefit insurance companies, such substitution
deprived Roche of the sale of a box of Retail Strips that Roche would have sold absent
Defendants' fraudulent substitution.

414.    As a result of their misconduct, the RICO Defendants are liable to Roche
for these injuries.

415.    The scope of the RICO Defendants' fraudulent enterprise is not known,
and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may have
perpetuated their scheme through entities as yet unknown.

416.    Pursuant to N.J. Stat. § 2C:41-4(c), Roche is entitled to recover threefold
its damages plus costs and attorneys' fees.

### THIRD CLAIM FOR RELIEF

**Conspiracy to Violate Federal RICO, 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

417.    Roche hereby repeats and re-alleges the allegations in paragraphs 1–386
above as if set forth fully herein.

418.    At all relevant times, Roche Diagnostics Corp. and Roche Diabetes Care,
Inc., were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

419.    At all relevant times, each Defendant was a "person" within the meaning
of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

420.    Each Defendant was associated with the Alliance enterprise described
above, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and

participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(d).  Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above in paragraphs 196–381.

421.   Defendants' scheme depended upon, among other things, (a) the Alliance Pharmacies' serving as false fronts to which fraudulent adjudications could be attributed; (b) the Alliance Pharmacies' maintenance of the appearance of independence when contracting with and obtaining reimbursements from PBMs; (c) the submission of fraudulent insurance claims to insurers and PBMs for the purposes of obtaining undeserved reimbursements; (d) the collection of the undeserved reimbursements made to each Alliance Pharmacy into Alliance's corporate accounts without revealing the pharmacy's affiliation with Alliance; (e) a large credit facility that ensured continued operations despite fluctuations in corporate revenue caused by frequent PBM chargebacks and contract terminations; (f) a financial institution willing to provide such a credit facility with the assets of Alliance Pharmacies serving as collateral, even though such assets frequently would lose substantially all their value as the result of PBM chargebacks and contract terminations.

422.   Roche was directly and proximately injured by Defendants' pattern of racketeering activity because Defendants' fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to Roche and served as the sole basis and justification for Roche's payment of rebates to those pharmacy-benefit insurance companies and PBMs.

423.   Roche was directly and proximately injured by the RICO Defendants' pattern of racketeering activity because each time Defendants fraudulently substituted a box of

Roche NFR strips for the box of Roche retail strips that they adjudicated, and for which they were reimbursed by pharmacy-benefit insurance companies, such substitution deprived Roche of the sale of a box of Retail Strips that Roche would have sold absent Defendants' fraudulent substitution.

424.     As a result of their misconduct, Defendants are liable to Roche for these injuries.

425.     Pursuant to 18 U.S.C. § 1964(c), Roche is entitled to recover threefold its damages plus costs and attorneys' fees.

### FOURTH CLAIM FOR RELIEF

**Conspiracy to Violate New Jersey RICO, N.J. Stat. § 2C:41-2(d)**
**(Against all Defendants)**

426.     Roche hereby repeats and re-alleges the allegations in paragraphs 1–386 above as if set forth fully herein.

427.     At all relevant times, Roche Diagnostics Corp. and Roche Diabetes Care, Inc., were "persons" within the meaning of RICO, N.J. Stat. §§ 2C:41-1(b) and 2C:41-4(c).

428.     At all relevant times, each Defendant was a "person" within the meaning of RICO, N.J. Stat. §§ 2C:41-1(b) and 2C:41-2(c).

429.     Each Defendant was associated with the Alliance enterprise described above, and agreed and conspired to violate N.J. Stat. § 2C:41-2(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity described herein, in violation of N.J. Stat. § 2C:41-2(d). Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above in paragraphs 196–381.

430.     Defendants' scheme depended upon, among other things, (a) the Alliance

Pharmacies' serving as false fronts to which fraudulent adjudications could be attributed; (b) the Alliance Pharmacies' maintenance of the appearance of independence when contracting with and obtaining reimbursements from PBMs; (c) the submission of fraudulent insurance claims to insurers and PBMs for the purposes of obtaining undeserved reimbursements; (d) the collection of the undeserved reimbursements made to each Alliance Pharmacy into Alliance's corporate accounts without revealing the pharmacy's affiliation with Alliance; (e) a large credit facility that ensured continued operations despite fluctuations in corporate revenue caused by frequent PBM chargebacks and contract terminations; (f) a financial institution willing to provide such a credit facility with the assets of Alliance Pharmacies serving as collateral, even though such assets frequently would lose substantially all their value as the result of PBM chargebacks and contract terminations.

431.     Roche was directly and proximately injured by Defendants' pattern of racketeering activity because Defendants' fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to Roche and served as the sole basis and justification for Roche's payment of rebates to those pharmacy-benefit insurance companies and PBMs.

432.     Roche was directly and proximately injured by Defendants' pattern of racketeering activity because each time Defendants fraudulently substituted a box of Roche NFR strips for the box of Roche retail strips that they adjudicated, and for which they were reimbursed by pharmacy-benefit insurance companies, such substitution deprived Roche of the sale of a box of Retail Strips that Roche would have sold absent Defendants' fraudulent substitution.

433.     As a result of their misconduct, Defendants are liable to Roche for these injuries.

434.     Pursuant to N.J. Stat. § 2C:41-4(c), Roche is entitled to recover threefold

its damages plus costs and attorneys' fees.

## FIFTH CLAIM FOR RELIEF

### Fraud (Including Aiding and Abetting Fraud and Conspiracy to Commit Fraud)
### (Against all Defendants)

435.    Roche hereby repeats and re-alleges the allegations in paragraphs 1–386 above as if set forth fully herein.

436.    Defendants knowingly and intentionally made and caused to be made false insurance reimbursement claims to insurance companies.  These insurance reimbursement claims falsely stated that the Alliance Pharmacies had sold Roche's retail strips to patients, when in fact they had sold NFR strips.  Defendants knowingly and intentionally deprived Roche of sales of retail strips and also caused the insurance companies to submit rebate claims to Roche based on fraudulent insurance claims.

437.    Defendants made or caused to be made those false representations with the intent of defrauding Roche.  Specifically, Defendants made or caused to be made those false representations in order to profit from the higher reimbursements the insurance companies pay for boxes of retail strips.  Defendants knew that the insurance companies could only pay such high reimbursements because they submitted claims for, and received, rebates from Roche.

438.    Defendants, as the executives, principals, directors, owners, and financiers of Alliance and/or the Alliance Pharmacies were personally involved in and approved of the fraudulent scheme.  All Defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme to sell NFR strips to pharmacy beneficiaries and obtain insurance reimbursements for fraudulent claims.

439.    Each Defendant intentionally provided substantial assistance to the others and to Alliance and the Alliance Pharmacies in advancing the fraud against Roche.

440.    Defendants could not have perpetrated their fraud without the substantial

-111-

and material assistance of each other Defendant.  Each Defendant benefited from the success of the fraud.

441.    Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud Roche.  All Defendants adopted the goal of furthering and facilitating this conspiracy.

442.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

443.    Roche and the insurance companies justifiably relied on Defendants' misrepresentations and were unaware of Defendants' fraud.

444.    As a result of Defendants' conduct, Roche as been injured in an amount not less than $87 million.

### SIXTH CLAIM FOR RELIEF

**Unjust Enrichment
(Against all Defendants)**

445.    Roche hereby repeats and re-alleges the allegations in paragraphs 1–386 above as if set forth fully herein.

446.    Defendants caused the Alliance Pharmacies to misrepresent to insurance companies that the product they were selling was retail strips when they in fact sold NFR strips. These misrepresentations were passed along by the insurance companies to Roche, directly causing Roche to pay the insurers millions of dollars in rebates.

447.    As a result of these false representations, Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

448.    Each Defendant personally benefitted as a result of the additional profits Defendants made as a result of the diversion scheme.  Defendants have no right to retain these

unjust gains.

449.    If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

## SEVENTH CLAIM FOR RELIEF

### Negligent Misrepresentation
### (Against all Defendants)

450.    Roche hereby repeats and re-alleges the allegations in paragraphs 1–386 above as if set forth fully herein.

451.    Defendants misrepresented to pharmacy plans that they were selling retail strips when in fact they were selling NFR strips.  These statements of fact and material omissions were false and misleading.  Additionally, these statements and omissions were negligent because Defendants did not exercise reasonable care in verifying the accuracy of these statements or in ensuring that they did not fail to make material disclosures.

452.    Defendants did not take any affirmative steps to correct their materially false statements or material omissions.

453.    Defendants had a duty to provide the pharmacy plans with accurate information because they knew and intended the pharmacy plans would rely on their false representations and material omissions in providing reimbursements to Defendants.  Defendants further knew and intended Roche would rely on Defendants' false representations and material omissions in providing rebates to pharmacy plans.

454.    The pharmacy plans and Roche reasonably relied upon Defendants' misrepresentations and material omissions and were unaware that they were false.

455.    As a result of Defendants' conduct, Roche was injured in an amount not less than $87 million.

## EIGHTH CLAIM FOR RELIEF

### Tortious Interference With Prospective Business Relation
### (Against all Defendants)

456.    Roche hereby repeats and re-alleges the allegations in paragraphs 1–386 above as if set forth fully herein.

457.    Defendants caused the Alliance Pharmacies to misrepresent to insurance companies that the product they were selling was retail strips when they in fact sold NFR strips.

458.    These misrepresentations deprived Roche of the sale of millions of dollars' worth of retail strips and wrongfully caused Roche to pay millions of dollars in rebates to insurance companies.

459.    Defendants' malicious interference with Roche's reasonable expectations of economic advantage caused losses to Roche.

460.    As a result of Defendants' conduct, Roche was injured in an amount not less than $87 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against all Defendants as follows:

(a)  an order entering judgment in favor of Plaintiffs against Defendants, jointly and severally;

(b)  an order awarding Plaintiffs damages in an amount to be determined, but in no event less than $87 million;

(c)  an order awarding Plaintiffs pre-judgment and post-judgment interest;

(d)  an order awarding Plaintiffs punitive damages;

(e)  an order awarding Plaintiffs reasonable attorneys' fees and other costs;

(f)  a permanent injunction against Defendants, as well as all of those in active concert or

participation with them, with notice thereof, enjoining and restraining all of them from engaging

in the unlawful conduct alleged herein; and

(g)  for such additional relief as the Court finds just and appropriate.


DATED:   November 1, 2019          By:     */s/  Peter C. Harvey*
                                            Peter C. Harvey, Esq.
                                            Geoffrey Potter, Esq. (*pro hac vice*)
                                            Aron Fischer, Esq. (*pro hac vice*)
                                            Timothy A. Waters, Esq. (*pro hac vice*)
                                            R. James Madigan III, Esq. (*pro hac vice*)
                                            Nicholas R. Hartmann, Esq. (*pro hac vice*)

                                            PATTERSON BELKNAP WEBB & TYLER LLP
                                            1133 Avenue of the Americas
                                            New York, NY 10036-6710
                                            Tel: (212) 336-2000

                                            *Attorneys for Plaintiffs*
                                            *Roche Diagnostics Corp. and*
                                            *Roche Diabetes Care, Inc.*

## **JURY DEMAND**

Plaintiffs Roche Diagnostics Corp. and Roche Diabetes Care, Inc. hereby demand a trial by jury on all claims asserted in their complaint.

## <u>CERTIFICATION OF NON-ARBITRABILITY AND NON-MEDIATION</u>

In accordance with Local Rule 201.1(d)(1), I certify that the within matter is not subject to compulsory arbitration or to mediation because this action does not consist only of money damages not in excess of $150,000, exclusive of interest and costs and any claim for punitive damages.

DATED:   November 1, 2019

By:   <u>    /s/ Peter C. Harvey            </u>
Peter C. Harvey, Esq.

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2000

*Attorneys for Plaintiffs*
*Roche Diagnostics Corp. and*
*Roche Diabetes Care, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was filed electronically this 1st day of November, 2019.  Notice of

this filing will be sent to all attorneys of record by the Court's CM/ECF system.


<u>    /s/ Peter C. Harvey    </u>
Peter C. Harvey