NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROCHE DIAGNOSTICS CORP., et al.,<br><br>Plaintiffs,<br>v.<br><br>JEFFREY C. SMITH, et al.,<br><br>Defendants. | Civil Action Nos.: 2:19-CV-08761; 2:17-CV-05552<br><br>**OPINION** |

| |
|---|
| LIFESCAN, INC., et al.,<br><br>Plaintiffs,<br>v.<br><br>JEFFREY C. SMITH, et al.,<br><br>Defendants. |

**CECCHI, District Judge.**

I.     **INTRODUCTION**

These matters come before the Court on motions to dismiss Plaintiffs Roche Diagnostics

Corporation and Roche Diabetes Care, Inc.'s ("Roche") First Amended Complaint (19-08761 ECF

No. 170, "Roche FAC") and Plaintiff LifeScan, Inc.'s ("LifeScan") (collectively "Plaintiffs")

Second Amended Complaint (17-05552 ECF No. 245, "LifeScan SAC") pursuant to Federal Rules

of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6), as well as motions to transfer these actions to

the District of Utah, filed by Defendants.[1]  Defendants are former employees and business partners

---

[1] Roche and LifeScan bring virtually identical claims against the same Defendants, with the exception of Defendant Lee H. Rosebush, who is listed as a Defendant only in Roche's operative complaint, the Roche FAC.

of non-party Alliance Medical Holdings, LLC[2] and its network of retail pharmacies ("Alliance"), including:

- Former CEO Jeffrey Smith, former CFO Justin Leavitt, former General Counsel David Grant, former Director of Pharmacy Operations Steven L. Hadlock, former Chief Pharmacy Officer Sahily Paoline, and former Chief Revenue Officer Blaine Smith (collectively, the "Officer Defendants") (No. 19-08761, ECF Nos. 191, 231, 251, 190; No. 17-05552, ECF Nos. 360, 351, 349, 344);

- Travis Hughes, Lee H. Rosebush, Adam Koopersmith, and Alison Wistner – all former members of the Board of Directors and alleged major investors in Alliance (collectively, the "Director Defendants") (No. 19-08761, ECF Nos. 230, 232, 229; No. 17-05552, ECF Nos. 346, 348);

- Zions Bancorporation, N.A., a national banking association alleged to have provided funding and credit to Alliance (the "Bank Defendant") (No. 19-08761, ECF No. 233; No. 17-05552, ECF No. 345); and

- Several investment groups including shareholders and private equity firms – HS Medsource Holdco, LLC, Kesman Hughes & Company, LLC, Hughes & Company and Hughes & Company Investment Partners, LLC, (the "Hughes Entities"); Mercato Management, LLC, Mercato Partners, LLC, Mercato Partners Growth II GP, LLC, Mercato Partners Growth II, L.P., Mercato Partners Growth Affiliates II, L.P., Mercato Partners AI II, L.P., Mercato Partners Ingram, LLC, and Mercato Partners Ingram Co-Invest, LLC (the "Mercato Entities"); and Jabodon PT

---

[2] Alliance entered Chapter 11 Bankruptcy prior to the filing of these actions.  Roche FAC at ¶¶ 185–87; LifeScan SAC at ¶¶ 178–81.

Company d/b/a Pritzker Group Venture Capital (the "Pritzker Group") (collectively, the "Shareholder Defendants") (No. 19-08761, ECF No. 234; No. 17-05552, ECF No. 350) ("Defendants" hereinafter refers collectively to Shareholder Defendants, Officer Defendants, Director Defendants, and the Bank Defendant).

Plaintiffs opposed these motions (No. 19-08761, ECF No. 235 ("Roche Opp."); No. 17-05552, ECF No. 379 ("LifeScan Opp.")), and Defendants replied. No. 19-08761, ECF Nos. 236–42; No. 17-05552, ECF Nos. 403–06, 408–11. The Court held oral argument. For the reasons set forth below, Defendants' motions are denied.

## II.   BACKGROUND

### a. Factual Background

The instant actions arise out of claims by Plaintiffs, manufacturers of two types of diabetes test strips ("Wholesale Strips" and "Retail Strips"), against Defendants regarding numerous alleged instances of insurance fraud that took place between 2013 and 2017 (the "Relevant Period"). In their complaints, Plaintiffs allege that Alliance, operating through a group of wholesalers and affiliated pharmacies, purchased Plaintiffs' Wholesale Strips from third-party distributors on the secondary market and then distributed these strips directly to individuals to further its alleged fraudulent scheme. According to Plaintiffs, Alliance fraudulently marketed and sold these Wholesale Strips to individuals guised as Retail Strips, which enabled Alliance to allegedly collect inflated reimbursement payments from the insurance providers. In other words, Defendants dispensed Wholesale Strips that they purchased on the secondary market to individuals, and allegedly collected a fraudulent Retail Strip reimbursement from insurance companies of up to three times the amount paid for the Wholesale Strips. Ultimately, the insurance companies that paid the purportedly fraudulent reimbursements to Defendants then collected

3

rebates from Plaintiffs to offset the costs incurred through payment of these allegedly false reimbursements.  Thus, Plaintiffs claim that they were injured by this alleged fraudulent scheme because the rebate payments they made to insurers on each allegedly fraudulent claim for a box of Retail Strips would not have occurred had Alliance disclosed that they were in fact distributing and seeking reimbursement for Wholesale Strips.  Put differently, Plaintiffs assert that Defendants' alleged scheme caused Plaintiffs "to wrongfully issue [millions of dollars] in rebates . . . as a direct result of Defendants' fraudulent submission of insurance claims for Retail Strips.  The rebates were wrongfully issued because only retail strips were eligible for rebate and Defendants did not dispense retail strips, despite submitting insurance claims saying they had."  Roche FAC ¶ 386; *see also* LifeScan SAC ¶¶ 339–40.

### i. Sales of Wholesale and Retail Strips

Plaintiffs allege that, during the Relevant Period, individuals purchased Retail Strips at retail pharmacies (including Alliance's stores) pursuant to pharmacy benefit insurance plans, and Wholesale Strips from mail-order vendors, pursuant to wholesale insurance plans.  Roche FAC at ¶¶ 45–77; LifeScan SAC at ¶¶ 61–94.  When a patient with insurance purchased either Retail or Wholesale Strips, the seller was paid by the patient's insurer.  *Id.*  These insurers covered the patient's purchasing costs through a process known as "adjudication."  *Id.*  In particular, while retail pharmacies and mail-order vendors distributed Plaintiffs' test strips to individuals, they would then "adjudicate" and submit reimbursement claims directly to these individuals' insurance providers to receive payment for the cost of the strips.  *Id.*  Plaintiffs further allege that the rate of reimbursement that the retail pharmacies and mail-order vendors received from insurers depended on the type of test strip reportedly sold, *e.g.*, reported sales of Retail Strips demanded higher reimbursement payments from insurance providers than reported sales of Wholesale Strips.  *Id.*

As alleged in the pleadings, Plaintiffs were compensated for sales of their strips in a different manner depending on whether the strips were Retail or Wholesale. As for Retail Strips, Plaintiffs were compensated by selling them directly to distributors at various listed prices ranging from $46 to $78 per box. *Id*. The distributors then sold the Retail Strips on the secondary market to retail pharmacies at a small markup above the wholesale price. *Id.* Then, as noted above, after individuals obtained Retail Strips from retail pharmacies, their insurance providers reimbursed the pharmacies at an additional markup. *Id.* Thereafter, once the insurance companies reimbursed the retail pharmacies, Plaintiffs paid the insurance providers rebates ranging from $30 to $70 for every box of Retail Strips. *Id.*

With respect to Wholesale Strips, Plaintiffs sold them exclusively to mail-order vendors for under $24 per strip box, and insurance providers subsequently reimbursed the mail-order vendors at a small markup on this price following their sales to individuals. *Id.* Given that Plaintiffs sold Wholesale Strips for far less on the secondary market to third-party distributors than Retail Strips, Plaintiffs did not pay rebates to insurance providers in connection with reported sales of Wholesale Strips. *Id*.

Accordingly, Plaintiffs' net profit was the difference between the revenue generated through sales of both Retail Strips and Wholesale Strips to distributors less the amount Plaintiffs paid to insurance providers in rebates for the downstream reported sale of Retail Strips. As such, Plaintiffs allege that it was critical for their profits that retail pharmacies—including Alliance's stores—and mail-order vendors accurately reported the type of test strip sold to insurance providers for reimbursement as these sale reports would ultimately determine how much Plaintiffs paid to the insurance companies in rebates, and, therefore, their profits. *Id.*

### ii.   *Alliance's Fraudulent Scheme*

Plaintiffs allege that Alliance exploited the adjudication process to recoup fraudulent reimbursement payments from insurance providers that were funded by Plaintiffs' rebate payments.  Plaintiffs claim that Alliance's stores purchased Plaintiffs' Wholesale Strips on the secondary market.  *Id.*  Plaintiffs further contend that these same stores adjudicated millions of false reimbursement claims to insurance providers wherein they sold Wholesale Strips to individuals but reported that they had sold Retail Strips.  *Id.*  Plaintiffs allege that the fraudulent scheme produced a windfall for Alliance because, as discussed above: (1) Wholesale Strips were less expensive to purchase on the secondary market than Retail Strips, and (2) the company's reported sales of Retail Strips demanded higher reimbursement payments from insurance providers than reported sales of Wholesale Strips.  *Id.*  Indeed, Alliance employees described this scheme as "foundational," with over 90% of the Company's revenues deriving from it during the Relevant Period.  Roche FAC at ¶¶ 98, 353; LifeScan SAC at ¶ 9.

Plaintiffs assert that an Alliance-affiliated pharmacy located in New Jersey played a particularly "primary role" in the fraud by submitting millions of false reimbursement claims.  Roche FAC at ¶ 33; LifeScan SAC at ¶ 48.  In support, Plaintiffs contend that Defendants established Peterson Pharmacy in New Jersey, through which they allegedly submitted fraudulent claims for more than 12 million test strips between 2014 and 2017, the most of any Alliance-affiliated pharmacy during that time and second most throughout the entire Relevant Period.  Roche FAC ¶ 33, Ex. A; LifeScan SAC ¶ 48. *See also* No. 19-08761, ECF No. 273; No. 17-05552 ECF No. 498 at 133 ¶¶ 1–4 ("Peterson Pharmacy in South Amboy[, New Jersey] fraudulently adjudicated over 12 million test strips between Roche and LifeScan between 2014 and 2017, more than any other Alliance-affiliated pharmacies during that time period."); 51 ¶ 6–17 ("New Jersey

overtook Utah in the fraudulent transactions because the pharmacies that Alliance opened in Utah were closing in 2014, 2015.  Peterson was still operational here in New Jersey, and it had the second largest number of transactions in the United States. . . out of maybe 112 pharmacies"). Nevertheless, Plaintiffs also claim that the fraudulent scheme was national in character, perpetrated in at least Arizona, California, Florida, Georgia, Iowa, Illinois, Kentucky, Maryland, Michigan, Mississippi, Missouri, Nebraska, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia, as well as New Jersey.  Roche FAC at ¶ 33; LifeScan SAC at ¶ 48.

Plaintiffs allege that the fraudulent scheme depleted their profits by millions of dollars during the Relevant Period as they were forced to pay rebates to insurance providers in connection with Alliance's reported sales of Retail Strips that they should not have paid, as Alliance had actually sold Wholesale Strips.  Roche FAC at ¶¶ 45–77, 382–86; LifeScan SAC at ¶¶ 61–94, 337–40.  Plaintiffs also assert that Alliance was aware that these fraudulent reimbursement payments derived from Plaintiffs' treasuries.  Specifically, Plaintiffs allege that Defendants, as veterans in the health care industry, "understood" that manufacturers like Plaintiffs paid rebates to insurance providers in connection with reported sales of Retail Strips so that the insurance providers could then pay higher reimbursement payments.  *See, e.g.*, Roche FAC at ¶ 190; LifeScan SAC at ¶ 327. Plaintiffs also allege that in late 2013 and 2014, Alliance's executives were shown "slide decks and memoranda explicitly discussing the rebates that [insurance providers] receive from test strip manufacturers" like Plaintiffs.  Roche FAC at ¶ 191; LifeScan SAC at ¶ 329.  In addition, Plaintiffs allege that LifeScan complained directly to Alliance's executives in 2015 regarding allegations that Alliance was "engaged in massive billing fraud" concerning the fraudulent scheme that forced LifeScan to pay these improper rebate payments.  Roche FAC at ¶ 162; LifeScan SAC at ¶ 284.

7

Plaintiffs also allege that, given the importance of the fraudulent scheme to Alliance's business, Defendants went to great efforts to conceal the fraud.  In particular, according to Plaintiffs, Alliance consciously deceived insurance providers during their audits of Alliance's adjudication practices by "submit[ting] false and misleading [sales] documents."  Roche FAC at ¶¶ 78–83, 105–18; LifeScan SAC at ¶¶ 95–112.  Further, Plaintiffs allege that Alliance misled insurance auditors into believing that its affiliated pharmacies were actually independent through a "10% Pharmacist-in-Charge" ownership model (the "10% Model"), in which Alliance would "acquire the pharmacy but grant the pharmacist-in-charge a 10% equity stake, allowing the [pharmacist-in-charge] to act as a straw owner," and "Alliance would then over-charge the pharmacy in fees."  Roche FAC at ¶ 95; LifeScan SAC at ¶ 111.  However, while the 10% Model allegedly misled insurance auditors, Plaintiffs assert that Alliance still received numerous complaints from managers employed by its pharmacies regarding its false adjudication scheme. For example, Plaintiffs allege that the Officer and Director Defendants were forced to coordinate a "strategy to deal with Masum Amin," the pharmacist-in-charge of an Alliance-affiliated pharmacy located in New Jersey, after she raised concerns about false billing practices.  Roche Opp. at 81; LifeScan Opp. at 19–20, 82.

Plaintiffs also allege that each Defendant maintained a niche role within Alliance that enabled the fraudulent scheme to flourish.  According to Plaintiffs:

- J. Smith, Hadlock, Paoline, Leavitt, B. Smith, and Grant designed and executed the fraudulent scheme (Roche FAC at ¶¶ 196–240; LifeScan SAC at ¶ 51), including spearheading Alliance's 10% Model to deceive insurance auditors.  Roche FAC at ¶¶ 98–132; LifeScan SAC at ¶¶ 108–12, 121–224.

- Koopersmith, Wistner, and Hughes—acting as the Shareholder Defendants' "representatives"— and Rosebush ratified numerous decisions to further the fraud, including the purchase of a network of pharmacies under the 10% Model.  Roche FAC at ¶¶ 170–298; LifeScan SAC at ¶¶ 238–300.  Further, after joining the Board, Plaintiffs allege that these Defendants received a memo from Grant in late 2015 outlining the fraud

and advising them to accept the risk of continuing the fraud (the "2015 Memo").  *Id.*  Plaintiffs also contend that the Director Defendants subsequently deliberated regarding how to minimize Alliance's litigation and regulatory exposure stemming from the fraud as described in the 2015 Memo.  *Id.*

- Plaintiffs allege that Alliance disclosed the nature and extent of the fraudulent scheme to the Shareholder Defendants in their investment agreements.  Roche FAC at ¶¶ 316–354; LifeScan SAC at ¶¶ 280–300 (the investment agreements stated that Alliance's "[s]ubsidiaries bill patients insurance under the retail pharmacy benefit [(Retail Strips)] but ship mail order diabetic testing supplies [(Wholesale Strips)] nationwide").  Despite their awareness of the fraud, Plaintiffs allege that the Shareholder Defendants nevertheless "actively invested and managed" Alliance through their representatives on the Company's Board.  *Id.*

- The Bank Defendant, while aware of the nature and extent of the fraud via a disclosure within their credit agreements with Alliance, loaned tens of millions of dollars to Alliance to purchase a network of pharmacies under the 10% Plan.  Roche FAC at ¶¶ 362–81; LifeScan SAC at ¶¶ 301–20 (the credit agreements provided that Alliance's "[s]ubsidiaries bill patients insurance under the retail pharmacy benefit [(Retail Strips)] but ship mail order diabetic testing supplies [(Wholesale Strips)] nationwide").

### b.  Procedural Background

LifeScan, on July 28, 2017, and Roche, on March 19, 2019, brought the instant actions against Defendants asserting various racketeering and tort claims.  No. 17-05552, ECF No. 1; No. 19-08761, ECF No. 1.  LifeScan and Roche thereafter filed their amended operative pleadings, with LifeScan filing its SAC on July 5, 2019, and Roche filing its FAC on November 1, 2019.

In both the LifeScan SAC and the Roche FAC, Plaintiffs allege that: (1) each Defendant except the Bank Defendant violated 18 U.S.C. § 1962(c) ("Federal RICO") and N.J. Stat. § 2C:41-2(c) ("NJ RICO"); (2) all Defendants conspired to violate Federal RICO, 18 U.S.C. § 1962(d) and NJ RICO, § 2C:41-2(d); and (3) all Defendants committed common law fraud (including aiding and abetting and conspiracy to commit fraud), unjust enrichment, negligent misrepresentation, and tortious interference with prospective business relations.  *Id.*  The Court heard oral argument from the parties pursuant to Federal of Civil Procedure 78(a) regarding the pending motions.

### III.   LEGAL STANDARD

#### a.   Fed. R. Civ. P. 12(b)(2)

Rule 12(b)(2) provides for dismissal of a claim on the basis that the Court does not have personal jurisdiction over a defendant. "Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007) (citations omitted). To demonstrate personal jurisdiction, the plaintiff may rely on the allegations in the complaint, affidavits, or other evidence. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). "If the plaintiff makes out a *prima facie* case of personal jurisdiction, the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (citations omitted). In deciding a motion to dismiss for lack of personal jurisdiction, the Court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Id.*

#### b.   Fed. R. Civ. P. 12(b)(3)

A defendant seeking dismissal under Rule 12(b)(3) bears the burden of showing that venue is improper. 28 U.S.C. § 1391. *Great W. Mining & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86 (3d Cir. 2011). Venue is proper under Section 1391(b) only in "(1) a judicial district where any defendant resides, if all defendants reside in the same state; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* More

than one venue may be deemed proper for a civil lawsuit under Section 1391(b). *Nat'l Micgrographics Sys., Inc. v. Canon U.S.A. Inc.*, 825 F. Supp. 671, 679 (D.N.J. 1993).

### c.   **Fed. R. Civ. P. 12(b)(6)**

To survive dismissal under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" pursuant to Fed. R. Civ. P. 8(a). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In evaluating the plausibility of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citations omitted). However, factual allegations must support a right to relief that is more than speculative. *Twombly*, 550 U.S. at 555.

### d.   **Transfer Pursuant to 28 U.S.C. § 1404(a)**

28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." *Id.* In deciding a motion to transfer, the Court must first determine whether the alternative forum is a proper venue and that it would have personal jurisdiction over the parties. *Fernandes v. Deutsche Bank Nat'l Trust Co.*, 157 F. Supp. 3d 383, 389 (D.N.J. 2015). If venue and personal jurisdiction would be proper in the alternative forum, "[t]he decision whether to transfer falls in the sound discretion of the trial court." *Park Inn Int'l, L.L.C. v. Mody Enters., Inc.*, 105 F. Supp. 2d 370, 377 (D.N.J. 2000). When deciding whether to exercise its discretion, the Court considers

three factors: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice. *Liggett Group., Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 526 (D.N.J. 2000) (citing 28 U.S.C. § 1404(a); *Jumara v. State Farm Ins.*, 55 F.3d 873, 879 (3d Cir. 1995)). These factors are not exclusive and must be applied through a "flexible and individualized analysis . . . made on the unique facts presented in each case." *Id*. at 527 (citations omitted). The factors have been refined into a non-exhaustive list of private and public interests that courts should consider. *See Jumara*, 55 F.3d at 879–80 ("In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) . . . . While there is no definitive formula or list of the factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).") (citations omitted).

## IV.    DISCUSSION

The Officer, Director, and Shareholder Defendants argue that the pleadings should be dismissed due to a lack of personal jurisdiction. No. 19-08761, ECF Nos. 190-1, 191-1, 229-1, 230-1, 231-1, 232-2, 234-1, 251; No. 17-05552, ECF Nos. 344-1, 346-1, 348-1, 349-1, 360-1, 351-1, 360-1. Further, each Defendant argues that dismissal of the LifeScan SAC and the Roche FAC is warranted because of improper venue and failure to state a claim. No. 19-08761, ECF Nos. 190-1, 191-1, 229-1, 230-1, 231-1, 232-2, 233-2, 234-1, 251; No. 17-05552, ECF Nos. 344-1, 345-6, 346-1, 348-1, 349-1, 350-1, 351-1, 360-1. The Shareholder Defendants and the Bank Defendant also argue that, should the Court not dismiss the pleadings, these actions should be transferred to the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a).[3] No. 19-

---

[3] The Bank Defendant also argues that LifeScan, a former subsidiary of Johnson and Johnson, lacks Article III standing to bring its claims because it has not alleged an injury-in-fact. 17-05552 ECF No. 345 at 2. However, accepting all factual allegations in the SAC as true, because LifeScan alleges an economic injury—rebates paid from its treasury—it has met Article III's standing requirements. *Brown v. Hyundai Motor Am.*, No. 18-11249, 2019 WL 4126710 (D.N.J. Aug. 30,

08761, ECF Nos. 233-2, 234-1; No. 17-05552, ECF Nos. 345-6, 350-1.  In response, Plaintiffs

aver that this Court retains personal jurisdiction over each Defendant, this district is the proper

venue for these actions, the Roche FAC and the LifeScan SAC have adequately pleaded each cause

of action, and these actions should not be transferred to the District of Utah.  Roche Opp.; LifeScan

Opp.

As addressed below, the Court finds that: (1) it maintains personal jurisdiction over each

Defendant under Federal RICO, (2) venue is proper in this district, (3) Plaintiffs have stated a

claim for relief for Federal and NJ RICO as well as for tortious interference, fraud, unjust

enrichment, and negligent misrepresentation, and (4) transfer to the District of Utah is not

warranted.  The Court will address each issue in turn.

### a.  Personal Jurisdiction

Federal Rule of Civil Procedure 4(k)(1)(C) permits courts to exercise personal jurisdiction

over a non-resident defendant when authorized by federal statute.  *Vizant Techs., LLC v.*

*Whitchurch*, 97 F. Supp. 3d 618, 627 (E.D. Pa. 2015) (citing Rule 4(k)(1)(C)).  Here, Plaintiffs

allege that the Court has personal jurisdiction over each Defendant under Federal RICO Sections

1965(b) and (d) (Roche FAC at ¶ 26; LifeScan SAC at ¶ 46).  The Third Circuit has found Section

1965(b) functions as a "statutory basis for personal jurisdiction" pursuant to Rule 4(k)(1)(c).

*Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 116, 117, 120 (3d Cir. 2020).

---

2019) ("[O]verpayment is a cognizable form of injury") (citing *Estrada v. Johnson & Johnson*,
No. 16-7492, 2017 WL 2999026, at *2 (D.N.J. July 14, 2017), *aff'd sub nom.*, 903 F.3d 278 (3d
Cir. 2018) (alleged economic injury is sufficient for Article III standing)).  *See also In re Valent*
*Pharmaceuticals Int'l, Inc.*, No. 16-3087, 2020 WL 9809347, at *14 (D.N.J. Aug. 24, 2020)
(finding that plaintiffs sufficiently alleged an injury in fact through allegations that they paid
artificially inflated prices for pharmaceutical products).

To establish personal jurisdiction over defendants for Federal RICO claims under Section 1965(b), a plaintiff need only show that at least one of the defendants maintains the "traditional" minimum contacts required for personal jurisdiction, *i.e.*, general or specific personal jurisdiction. *See, e.g.*, *Kyko Glob., Inc. v. Prithvi Info. Sols. Ltd.*, No. 18-01290, 2020 WL 1159439, at *35 (W.D. Pa. Mar. 10, 2020), *reconsideration denied*, 2020 WL 3654951 (W.D. Pa. July 6, 2020); *see also Whitchurch*, 97 F. Supp. 3d at 629 ("[T]he 'nationwide jurisdiction' provision of § 1965 of RICO is subject to the limitations of due process . . . [as] a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant.") (citations omitted).

Here, the Court maintains "traditional" minimum contacts required for personal jurisdiction over the Bank Defendant as it failed to object to personal jurisdiction in its motion to dismiss. *Azubuko v. E. Bank*, 160 F. App'x 143, 146 (3d Cir. 2005) ("[P]ersonal jurisdiction may be conferred by consent of the parties, expressly or by failure to object."). Thus, as for Plaintiffs' Federal RICO claims, the Court may exercise original personal jurisdiction over each Defendant under Section 1965(b). The Court may also exercise pendent personal jurisdiction over each Defendant with respect to Plaintiffs' other claims under Section 1965(b) as these claims all "arise[] out of the same nucleus of operative fact." *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002); *see also Mckenna*, 948 F.3d at 123 ("[R]ecogniz[ing] the notion of pendent personal jurisdiction" where a court possesses original personal jurisdiction over a defendant for one claim, but lacks original personal jurisdiction over the defendant for another claim that arises out of the

same nucleus of operative fact).  Accordingly, the Court retains personal jurisdiction over each Defendant with respect to both the LifeScan SAC and the Roche FAC.[4]

### b. Venue

Defendants argue that this district is an improper venue for these actions pursuant to 28 U.S.C. § 1391(b) and therefore the LifeScan SAC and the Roche FAC must be dismissed under Rule 12(b)(3).  No. 19-08761, ECF Nos. 190-1, 191-1, 229-1, 230-1, 231-1, 232-2, 233-2, 234-1, 251; No. 17-05552, ECF Nos. 344-1, 345, 346-1, 348-1, 349-1, 350-1, 351-1, 360-1.  The Court disagrees and finds that venue is properly laid in the District of New Jersey.

Under Section 1391(b)(2), a civil action may be brought in any judicial district where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2).  *Id.*  The phrase "substantial," however, does not require that "a majority of the events . . . take place [in the district], nor that the challenged forum be the best forum for the lawsuit to be venued.'" *Lanard Toys Ltd. v. Toys R US-Delaware, Inc.*, No. 14-1939, 2015 WL 3794595, at *2 (D.N.J. June 16, 2015) (quoting *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)).  Rather, for venue to be proper, the events or omissions giving rise to a plaintiff's claim need only have more than a "tangential" connection to the district at issue.  *Lang v. Patients Out of Time*, No. 20615, 2020 WL 5531249, at *3 (D.N.J. Sept. 15, 2020).  Further, "the defendants bear the burden of showing improper venue." *Bockman v. First Am. Marketing Corp.*, 459 F. App'x 157, 160 (3d Cir. 2012) (quoting *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724–25 (3d Cir. 1982)).

---

[4] The Court does not address the parties' arguments regarding whether it maintains general or specific personal jurisdiction over each Defendant aside from the Bank Defendant because, as described above, the Court exercises personal jurisdiction over each Defendant under Section 1965(b).

Here, Plaintiffs' claims center around the alleged fraudulent scheme, and, as noted above, an Alliance-affiliated pharmacy in New Jersey played a "primary role" in this scheme by purportedly submitting millions of fraudulent reimbursement claims during the Relevant Period. Roche FAC at ¶ 33; LifeScan SAC at ¶ 48. As discussed above, Plaintiffs aver that Defendants' Peterson Pharmacy in New Jersey submitted the most allegedly fraudulent adjudications of any Alliance-affiliated pharmacy between 2014 and 2017, and the second most throughout the full Relevant Period. Roche FAC ¶ 33, Ex. A; LifeScan SAC ¶ 48. *See also* No. 19-08761, ECF No. 273; No. 17-05552 ECF No. 498 at 123 ¶¶ 1–2 ("Peterson Pharmacy is a close second for the entire period and number one from 2014 through 2017.").[5] Thus, venue is proper in this district as more than a "tangential" part of the fraudulent scheme allegedly occurred in New Jersey. *See Umoe Schat Harding, Inc. v. N.Y. Marine & Gen. Ins. Co*., No. 10-3722, 2011 WL 1211462, at *4 (D.N.J. Mar. 29, 2011) ("[I]n such a geographically disparate case, this Court can easily consider the New Jersey litigation and communications and decisions thereto which may have occurred in whole or in part in New Jersey to be a substantial part of the events giving rise to Plaintiffs' claim . . . . Thus, venue is proper); *Dockery v. Heretick*, No. 17-4114, 2019 WL 3530873, at *3 (E.D. Pa. Aug. 1, 2019) ("Under 18 U.S.C. § 1965 (a)–(b), if venue is proper as to one RICO defendant, it may

---

[5] Plaintiffs allege that the Officer Defendants were each personally involved in the purchase, acquisition, operation, and management of Peterson Pharmacy, a primary hub for Alliance's allegedly fraudulent business. Roche Opp. at 79; Roche FAC at ¶¶ 32–34, 134–43, 207, 209–11, 215–16, 218–19, 225–27, 230–33, 239; LifeScan SAC at ¶¶ 48, 51, 151–69, 184, 220–21. Additionally, Plaintiffs contend that the Director Defendants and Shareholder Defendants expressly approved the purchase of Peterson Pharmacy in New Jersey knowing that it would further Alliance's purported fraudulent scheme. Roche FAC at ¶¶ 246–48, 309, 311–15; LifeScan SAC at ¶¶ 52, 274–300. Plaintiffs also aver that the Bank Defendant, managed accounts which collected proceeds from Peterson Pharmacy's allegedly fraudulent adjudications, and further claim that the Bank Defendant purportedly used these proceeds to pay down Alliance's credit with the bank. Roche FAC at ¶¶ 42–44; LifeScan SAC at ¶¶ 54–60.

extend to all other RICO defendants . . . . Otherwise, RICO enterprises could avoid, or at least stymie, civil liability by spreading their participants out across various judicial districts.").

Insofar as Defendants argue that venue is improper in in this district because Alliance operated out of Utah, Defendants have not met their burden as they have not sufficiently rebutted the contention that a substantial part of the events underlying this dispute occurred in New Jersey. *See, e.g.*, No. 19-08761, ECF No. 233-2 at 5–7; No. 17-05552, 345-6 at 9–11.  Instead, as venue may be proper in more than one forum, it is not dispositive whether venue would *also* be proper in some other district.  *Ferratex, Inc. v. U.S. Sewer & Drain, Inc.*, 121 F. Supp. 3d 432, 439 (D.N.J. 2015); *Database Am., Inc. v. Bellsouth Advert. & Pub. Corp.*, 825 F. Supp. 1216, 1224 (D.N.J. 1993) ("[V]enue could be proper in more than one judicial district, provided that 'substantial' activities occurred in multiple judicial districts.").

Finally, to the extent that Defendants argue that venue is improper here because they have insufficient contacts with New Jersey (s*ee, e.g.*, No. 19-08761, ECF No. 233-2 at 5–7; No. 17-05552, ECF No. 345-6 at 9–11)), their contentions are similarly without merit.  The "test for determining venue is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'"  *See Al-Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 522 (D.N.J. 2013) (citing *Cottman*, 36 F.3d at 294).  Accordingly, the Court declines to dismiss Plaintiffs' claims under Rule 12(b)(3) as venue is proper in this district.

### c.  Failure to State a Claim

Defendants move for dismissal of the LifeScan SAC and the Roche FAC under Rule 12(b)(6), averring that Plaintiffs have failed to state a claim for relief.  The Court addresses these arguments below.

i.  *Federal and NJ RICO*[6]

Plaintiffs allege that each Defendant except the Bank Defendant violated Federal and NJ RICO, and each Defendant (including the Bank Defendant) conspired to violate Federal and NJ RICO, by committing or aiding in the commission of several instances of federal wire and mail fraud.  Because the NJ RICO statute mirrors the Federal RICO statute, the Court analyzes both of these claims together.  *Cetel v. Cmmw. Life Ins. Co.*, 460 F.3d 494, 510 (3d Cir. 2006) ("[T]he New Jersey Supreme Court believe[s] the New Jersey RICO statute was and should be consistent with the federal RICO statute.").

To plead a Federal RICO claim under Section 1962(c), a plaintiff must allege: (1) a pattern of racketeering activity, (2) through the conduct of a RICO enterprise.  *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2111, n.1 (2016); *see also* Section 1962(d) (making it unlawful to conspire to violate Section 1962(c)).  A Federal RICO plaintiff must also establish RICO standing, meaning that the "RICO predicate offense not only was a 'but for' cause of [their] injury, but was the proximate cause as well."  *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3d Cir. 2020) (RICO standing is "distinct from Article III standing") (citations omitted).  Racketeering activity includes instances of federal mail fraud (18 U.S.C. § 1341) and federal wire fraud (18 U.S.C. § 1343) but, unlike these underlying offenses, no showing of reliance is required under RICO.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008) ("[N]o showing of

---

[6] Where, as here, "plaintiffs rely on mail and wire fraud as the basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be plead with particularity." *In re Insurance Brokerage Antitrust Litig.*, No. 04-5184, 2016 WL 5219456, at *8 (D.N.J. Sept. 20, 2016).  *See Grant v. Turner*, No. 09-2381, 2010 WL 4004719, at *2 (D.N.J. Oct. 12, 2010).  Ultimately, Rule 9(b) affords a party notice of the particular allegations of fraud against it, but it does not require the Court to "test the factual allegations of the claim." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003)).

reliance is required to establish that a person has violated [RICO] by conducting the affairs of an enterprise through a pattern of racketeering activity").   A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Defendants argue that Plaintiffs failed to sufficiently allege RICO standing, a pattern of racketeering activity, conduct of a RICO enterprise, and a conspiracy to commit a RICO violation. As discussed below, Defendants' arguments are without merit.[7]

### 1.   RICO Standing

RICO standing is satisfied where there is "some direct relationship" between the plaintiff's injury and the defendants' racketeering acts.  *Amos v. Franklin Fin. Servs. Corp.*, No. 10-1285, 2011 WL 5903875, at *6 (M.D. Pa. Nov. 22, 2011), *aff'd*, 509 F. App'x 165 (3d Cir. 2013).  Thus, a plaintiff lacks RICO standing where their injury is "derivative" of the injury suffered by a more immediate victim of the defendants' racketeering acts.  *Gratz v. Ruggiero*, 822 F. App'x 78, 82, n.3 (3d Cir. 2020) (citations omitted); *see also Lancaster Gen. Hosp.*, 967 F.3d at 301 ("To demonstrate some direct relation between the injury asserted and the injurious conduct alleged, the [injury] alleged must not be purely contingent on another.") (citations omitted).

Here, Defendants argue that Plaintiffs failed to establish RICO standing as there is no direct relationship between their injuries and the fraudulent scheme.  In support, Defendants note that Plaintiffs' injuries—the rebate payments—were purely contingent on the injuries suffered by the

---

[7] The Court also rejects Defendants' argument that Plaintiffs are barred from recovery under the "First Sale Doctrine" (*see, e.g.*, 19-0876 ECF No. 234 at 14), as this doctrine is only applicable to intellectual property-based claims.  *See Fish Kiss LLC v. N. Star Creations, LLC*, No. 17-8193, 2018 WL 3831335, at *5 (D.N.J. Aug. 13, 2018) ("The first sale doctrine, codified at 17 U.S.C. § 109(a), prevents the *copyright owner* from controlling future transfers of a particular *copyrighted work* after he has transferred its material ownership to another.") (emphasis added) (internal quotation omitted)

insurance providers—the improper reimbursement payments. *See, e.g.*, 19-08761 ECF No. 233-2 at 15 (arguing that "but for" the improper reimbursements submitted by the insurance providers, the insurance providers would not have received rebates from Plaintiffs); 17-05552 ECF No. 345-6 at 20 (same).

Defendants misconstrue Plaintiffs' allegations.  Plaintiffs assert that only they—and not the insurance providers—were injured by the fraudulent scheme, and, therefore, that they represent the most "direct victim" of Defendants' racketeering acts.  Roche Opp. at 35–42; LifeScan Opp. at 24–37.  Indeed, as Plaintiffs explained during oral argument, while the insurance providers initially submitted higher reimbursement payments to Alliance for reported sales of Retail Strips, their margins remained the same regardless of the type of test strip sold as Plaintiffs paid the insurance providers rebates in connection with reported sales of Retail Strips to cover any difference in costs.  *See* No. 19-08761, ECF No. 273, No. 17-05552, ECF No. 498, at 27, ¶¶ 4–8 ("The [insurance providers] don't have any injury here because . . . [one] hundred percent of the difference between [the reimbursement payments] between the two products . . . came from the manufacturers.").  Thus, because Plaintiffs allege that Alliance used the insurance providers as mere conduits to collect payments from Plaintiffs, Plaintiffs have demonstrated RICO standing. *Amos*, 2011 WL 5903875, at *6, *aff'd*, 509 F. App'x 165; *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 643, 645 (3d Cir. 2015) (plaintiffs pleaded direct injury sufficient to satisfy RICO's standing requirement because the alleged "fraudulent scheme could have been successful only if plaintiffs paid for [the drug at issue], and this is the very injury that plaintiffs seek recovery for").

2.   Pattern[8] of Racketeering Activity

Plaintiffs contend that Defendants engaged in a pattern of racketeering activity by committing numerous instances federal mail and wire fraud.  See 18 U.S.C. §§ 1341, 1343.  To plead federal mail or wire fraud, a plaintiff must allege:  (1) the existence of a scheme to defraud, (2) through the use of mail or wires in furtherance of the fraudulent scheme, (3) with culpable participation by each defendant, "that is, participation by the defendant with specific intent to defraud."  *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005).  These factors are addressed herein.

First, Plaintiffs adequately allege a scheme to defraud under Sections 1341 and 1343 as Alliance's purported pattern of submitting false reimbursement claims involved alleged fraudulent misrepresentations "reasonably calculated [] to deceive persons of ordinary prudence."  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 528 (3d Cir. 1998) (citations omitted).

Second, Plaintiffs sufficiently assert that Defendants used mails and wires to further a fraudulent scheme.  Mail or wire fraud occurs "whenever a person, having devised . . . any scheme . . . to defraud, uses the mail [or wire communications] for the purpose of executing such scheme."  *See Bridge*, 553 U.S. at 647 ("[A]ny mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information.") (citations omitted); *see also Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (same for wire fraud).  Further, "[m]ail and wire fraud do not require that a defendant personally mailed or wired the communication, but rather that its transmission be reasonably foreseeable to the defendant."  *In re*

---

[8] Under 18 U.S.C § 1961(5), a civil RICO plaintiff must also plead at least two predicate acts of racketeering activity within a ten-year period to satisfy the "pattern" requirement.  Plaintiffs have easily satisfied this requirement as they allege numerous instances of federal mail and wire fraud (Alliance's false reimbursement claims).

*Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2017 WL 3642003, at *9 (D.N.J. Aug. 23, 2017) (citing *United States v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002)).  Here, the LifeScan SAC and the Roche FAC allege that Defendants, "on thousands of occasions," caused the transmission of false reimbursement claims and shipments of Plaintiffs' Wholesale Strips to be sent across the country for the purpose of executing the fraudulent scheme.  Roche FAC at ¶ 197; LifeScan SAC at ¶ 353; *see also Bridge*, 553 U.S. at 647.  Moreover, as noted above, Plaintiffs sufficiently allege that it was reasonably foreseeable to Defendants that their intermediaries—Alliance's affiliated pharmacies—would use the U.S. mails and wires to adjudicate and process these false reimbursement claims.  *Ins. Brokerage Antitrust Litig.*, 2017 WL 3642003, at *9.

Finally, Plaintiffs adequately allege that the Officer, Director, and Shareholder Defendants culpably participated in the fraudulent scheme.  Plaintiffs allege that: J. Smith personally sourced Wholesale Strips on the secondary market and directed efforts to conceal Alliance's false adjudication process from government inspectors, insurance auditors, and manufacturers; Hadlock actively misled numerous Alliance-affiliated pharmacists who expressed concern about the Company's billing practices; Paoline personally dispensed Wholesale Strips that were falsely adjudicated as Retail Strips from Alliance's affiliated pharmacies, and "oversaw" Alliance's efforts to deceive insurance auditors regarding the fraudulent scheme and Alliance's 10% Model; Leavitt knowingly provided doctored invoices to insurance auditors and drafted financial disclosures circulated to the Shareholder Defendants and the Bank Defendant that revealed the nature and extent of the fraudulent scheme; B. Smith spearheaded Alliance's 10% Model; and Grant authored the 2015 Memo that outlined the fraudulent scheme and advised the Director Defendants to "accept the risk" of continuing to engage in the fraud.  Roche FAC at ¶¶ 98–132; LifeScan SAC at ¶¶ 108–12, 121–224.

Plaintiffs also allege that Koopersmith, Wistner, Hughes, and Rosebush assessed Alliance's litigation and regulatory exposure from the fraudulent scheme and aided the fraud by approving the Company's plan to purchase a network of purportedly "independent" pharmacies under the 10% Model. Roche FAC at ¶¶ 170–298; LifeScan SAC at ¶¶ 238–300.

Regarding the Shareholder Defendants, Plaintiffs allege that the Pritzker Group, the Mercato Entities, and the Hughes Entities are culpable participants as they are vicariously liable for the acts of their senior executives—Koopersmith, Wistner, and Hughes, respectively—in their capacities as Directors on Alliance's Board. Roche FAC at ¶¶ 37, 316–354; LifeScan SAC at ¶¶ 22–24, 280–300. "[A]n employer may be held vicariously liable for the torts committed by its employee within the scope of employment." *Ricketti v. Barry*, No. 13-6804, 2015 WL 1013547, at *6 (D.N.J. Mar. 9, 2015) (citations omitted). An employee acts within the scope of their employment where they are operating as an "agent" of their employer. *See New Jersey Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co.*, 203 N.J. 208, 220 (2010). Courts hold that such an agency relationship is created "when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Id.* (quoting *Restatement (Third) of Agency* § 1.01 (2006)). Specifically as to whether an investment company faces vicarious liability for the acts of its employee serving as a director for one of the investment company's affiliates, courts have held that vicarious liability may be imposed so long as a sufficient principal-agent relationship is alleged between the investment company and its employee. *See In re On-Site Fuel Serv., Inc.*, No. 18-04196, 2020 WL 3712868, at *34–40 (Bankr. S.D. Miss. May 8, 2020) (plaintiff sufficiently alleged that a private equity firm was vicariously liable for the acts of its senior executive where the firm appointed the senior executive to its portfolio company's board

and where the senior executive actively "monitor[ed]" the portfolio company's alleged fraud at the firm's direction); *Gintowt v. TL Ventures*, 239 F. Supp. 2d 580,  582 (E.D. Pa. 2002) (permitting a RICO claim to proceed against a venture capital firm where plaintiff alleged, *inter alia*, that a director placed on the company's board by the venture capital firm "continued to act as an agent" for that firm); *In re Papercraft Corp.*, 187 B.R. 486, 495, n.7 (Bankr. W.D. Pa. 1995), *rev'd on other grounds*, 211 B.R. 813 (W.D. Pa. 1997), *aff'd and remanded sub nom.*, 160 F.3d 982 (3d Cir. 1998) (venture capital firm's employee, who was appointed to the board of the firm's portfolio company, was considered the firm's agent "[a]s a matter of law" even where the employee was "motived by a desire to serve" the interests of both the firm and the portfolio company).

At this stage, Plaintiffs sufficiently allege an agency relationship to warrant vicarious liability here. The Shareholder Defendants appointed Koopersmith, Wistner, and Hughes to Alliance's Board pursuant to their investment agreements with Alliance,[9] which expressly provided the Shareholder Defendants with a "representative on the Company's Board."  Roche FAC at ¶ 321; LifeScan SAC at ¶ 238.  Once appointed to Alliance's Board, Plaintiffs allege that these Director Defendants ratified numerous decisions to further the purported fraud as direct "representatives" of the Shareholder Defendants.  Roche FAC at ¶¶ 170–298; LifeScan SAC at ¶¶ 238–300.  Moreover, Plaintiffs claim that the Director Defendants consulted with and shared privileged information with the Shareholder Defendants about, among other topics, Alliance's litigation and regulatory exposure concerning the fraudulent scheme and "mounting contract terminations" regarding agreements between insurance providers and Alliance's affiliated

---

[9] Plaintiffs aver that, in these same investment agreements, Alliance expressly disclosed the nature and extent of the fraudulent scheme to the Shareholder Defendants. Roche FAC at ¶¶ 316–354; LifeScan SAC at ¶¶ 280–300. As stated above, the investment agreements provide that Alliance's "[s]ubsidiaries bill patients insurance under the retail pharmacy benefit [(Retail Strips)] but ship mail order diabetic testing supplies [(Wholesale Strips)] nationwide."

pharmacies.  Roche FAC at ¶¶ 342–45, 357–60; LifeScan SAC at ¶¶ 280–300.  Accordingly, Plaintiffs have adequately alleged that each Officer, Director, and Shareholder Defendant acted as culpable participants in the fraudulent scheme.

### 3.  Conduct of a RICO Enterprise

Turning next to the RICO enterprise factor, Plaintiffs allege the existence of an association-in-fact RICO enterprise.  An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Thus, an "association-in-fact" RICO enterprise requires three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009) ("[T]he very concept of an association in fact is expansive[,]" in keeping with RICO's directive that "its terms are to be liberally construed to effectuate its remedial purposes.") (citations omitted).  Further, an association-in-fact enterprise must function distinctly from the persons who allegedly conducted the racketeering activity of that enterprise. *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 77 (E.D.N.Y. 2011) (noting that "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)") (citations omitted).

Here, all three features of an association-in-fact enterprise are adequately alleged.  First, Plaintiffs allege that the enterprise existed for the sole purpose of effectuating the fraudulent scheme.  Second, in alleging relationships among those associated with the enterprise, the LifeScan SAC and the Roche FAC sufficiently detail distinct entities—Alliance, the Shareholder Defendants, and the Bank Defendant—that, while not operating within "the scope of a single corporate structure," worked together to execute the fraudulent scheme. *Newsday Inc.*, 801 F.

Supp. at 78 (citations omitted).  Third, these entities conducted the fraudulent scheme for several years during the Relevant Period.  *See Ins. Brokerage Antitrust Litig.*, 2017 WL 3642003, at *10 (detailing the "longevity" requirement).

Additionally, for the reasons described above, Plaintiffs sufficiently allege that each Officer, Director, and Shareholder Defendant "conducted the affairs" of the enterprise through their participation "in the operation or management of the enterprise itself."  *See Ins. Brokerage Antitrust Litig.*, 2017 WL 3642003, at *9, *11 (citations omitted) ("If members of an association-in-fact enterprise band together to commit violations they cannot accomplish alone, then they cumulatively are conducting the association-in-fact enterprise's affairs, and not simply their own affairs.") (citations omitted).

### 4.   RICO Conspiracy

Finally, Plaintiffs allege that each Defendant, including the Bank Defendant, conspired to violate Federal RICO pursuant to Section 1962(d).

A defendant may be liable for conspiracy under Section 1962(d) even where their own actions would not amount to an underlying violation of Section 1962(c).  *See Pennsylvania by Shapiro v. Think Fin., Inc.*, No. 14-7139, 2019 WL 6217376, at *4 (E.D. Pa. Nov. 20, 2019) (Section 1962(d) "does not require the personal commission of predicate offenses") (quoting *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir. 1985)).  Therefore, to plead a RICO conspiracy, a plaintiff need only allege that a defendant "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise."  *See Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001).  Further, the conspiratorial agreement need not be express, and may be "inferred from words, actions, and the interdependence of activities and persons involved."  *Lewis Fam. Group Fund LP v. JS Barkats PLLC*, No. 16-5255, 2021 WL 1203383, at *9 (S.D.N.Y. Mar.

31, 2021) (citations omitted); *see also United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986) (RICO conspiracy may be proven "entirely through circumstantial evidence").

Defendants' alleged conspiratorial agreement can be inferred from their purported words and actions.  For instance, Plaintiffs assert that the Shareholder Defendants executed investment agreements with Alliance that expressly disclosed the nature and extent of the fraudulent scheme. Roche FAC at ¶¶ 316–354; LifeScan SAC at ¶¶ 280–300 (the investment agreement provides that Alliance's "[s]ubsidiaries bill patients insurance under the retail pharmacy benefit [(Retail Strips)] but ship mail order diabetic testing supplies [(Wholesale Strips)] nationwide").  Moreover, with this knowledge, the Shareholder Defendants appointed their own "representatives" to Alliance's Board to oversee the Company's operations.  *Id.*

Plaintiffs also allege that the Bank Defendant executed credit agreements with Alliance that contained identical disclosures concerning the nature and extent of the fraudulent scheme. Roche FAC at ¶¶ 362–81; LifeScan SAC at ¶¶ 301–20 (the credit facility agreements stated that Alliance's "[s]ubsidiaries bill patients insurance under the retail pharmacy benefit [(Retail Strips)] but ship mail order diabetic testing supplies [(Wholesale Strips)] nationwide").  In addition, Plaintiffs point to internal communications from the Bank Defendant that evidence its awareness of Alliance's 10% Model and Alliance's scheme to deceive insurance auditors.  *Id.*  Still, despite the Bank Defendant's knowledge of alleged potential illegality, Plaintiffs contend that the Bank Defendant structured Alliance's credit facilities to create independent bank accounts for Alliance's affiliated pharmacies, which the Bank Defendant would later use to sweep revenues into a common Alliance-controlled account.  *Id.*

Finally, Plaintiffs cite to numerous internal communications from Alliance involving the Officer and Director Defendants demonstrating that they actively managed and directed the

27

fraudulent scheme, including the resultant litigation and regulatory risks that the Company faced. Roche FAC at ¶¶ 170–298; LifeScan SAC at ¶¶ 140–300.

Accordingly, Plaintiffs have adequately alleged that each Defendant conspired to commit the fraudulent scheme in violation of Section 1962(d).  *See Ins. Brokerage Antitrust Litig.*, 2017 WL 3642003, at *12 (plaintiffs sufficiently alleged a Federal RICO conspiracy even in the absence of an express agreement between defendants).

### ii. Fraud

Plaintiffs allege that Defendants committed fraud under state law (including aiding and abetting fraud and conspiracy to commit fraud) by knowingly and intentionally participating in the alleged widespread fraudulent scheme.[10]  Roche FAC at ¶ 435–44; LifeScan SAC at ¶ 382–90. "To sustain a claim for common law fraud under New Jersey law, a plaintiff must demonstrate: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention [by the defendant] that the [plaintiff] rely on it; (4) reasonable reliance thereon by the [plaintiff]; and (5) resulting damages." *Stockroom, Inc. v.*

---

[10] The parties appear to agree that the sole potential conflict between New Jersey and Utah law pertains to Plaintiffs' claims for aiding and abetting fraud.  Defendants argue that a conflict exists because Utah does not recognize an independent cause of action for aiding and abetting fraud. However, Utah courts have not expressly held that claims for aiding and abetting fraud are noncognizable as a matter of law.  *See, e.g.*, *Martineau v. Currutt*, No. 21-00045, 2022 WL 180735, at *6 n.6 (D. Utah Jan. 19, 2022) ("The court also notes that it is uncertain whether Currutt's alleged aiding and abetting of the [] alleged attempt to defraud MTL qualifies as an improper means under Utah law."); *Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1252 (D. Utah 2017) (acknowledging that "Utah courts have not yet recognized a claim for aiding and abetting fraud," but finding that plaintiff's aiding and abetting fraud claim was subject to Utah's three-year statute of limitations on the ground that the action was "grounded in fraud.").  Thus, it is presently unclear whether the laws of New Jersey and Utah differ on this issue.  Lack of clarity is not a sufficient substitute for an "actual conflict" so as to warrant a choice of law analysis.  *See Arcand v. Brother Intern. Corp.*, 673 F. Supp. 2d 282, 293 (D.N.J. 2009) (finding no conflict between plaintiff's state-law fraud claims and holding that where "there is no actual conflict, the analysis ends and the court applies the law of the forum state.").  Accordingly, the Court will apply New Jersey law to Plaintiffs' claims for aiding and abetting fraud.

*Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 546 (D.N.J. 2013) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)). Plaintiffs' state-law fraud claims must be pleaded with particularity pursuant to the heightened pleading standard of Rule 9(b). *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir.1983) (applying Rule 9(b) to state-law fraud claims). However, Plaintiffs need not plead specific dates or times of allegedly fraudulent misstatements – they are "free to use alternative means" to "inject[] precision and some measure of substantiation into [their] allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). Such alternative means are appropriate, where, as here, there are allegations of concealment of a "corporate fraud, [in which] plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989); *Gray v. BMW of N. Am., LLC*, No. 13-3417, 2014 WL 4723161, at *2–3 (D.N.J. Sept. 23, 2014) (Rule 9(b) satisfied even where plaintiff could not identify the "specific roles" that each defendant played in the alleged fraudulent scheme because plaintiffs, like here, alleged that defendants "actively concealed" their wrongful conduct). Ultimately, as discussed above, "[t]he purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim." *Gray*, 2014 WL 4723161, at *2 (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003)).

Defendants argue that Plaintiffs' fraud claims warrant dismissal on three key grounds: (1) failure to plead material misrepresentations and knowingly fraudulent activity with sufficient particularity as to each individual Defendant under Rule 9(b); (2) failure to adequately allege reliance; and (3) failure to assert a valid, particularized cause of action for aiding, abetting, and conspiracy to commit fraud. *See, e.g.*, No. 19-8761, ECF No. 190–1, at 30–38; No. 17–5552, ECF No. 344–1, at 31–37. For the reasons set forth below, the Court finds Defendants' arguments

unpersuasive, and holds that Plaintiffs have sufficiently pleaded state law fraud violations by all Defendants.

Plaintiffs' pleadings provide each Defendant with notice of the particularized allegations of fraud against them in satisfaction of Rule 9(b).  Plaintiffs sufficiently outline the alleged fraudulent scheme in detail, and specifically identify the purported fraudulent statements at issue – millions of alleged instances of Alliance's false reimbursement submissions for Retail Strips. Roche FAC at ¶¶ 46–96, 393–94; LifeScan SAC at ¶¶ 78, 80.  Moreover, in satisfaction of Rule 9(b), Plaintiffs specifically allege knowledge of and participation in the purported fraudulent scheme as to each Defendant. *See supra* Parts II.a.ii, IV.c.i.2–4; *Prudential Ins. Co. of Am. v. Credit Suisse Secs. LLC*, No. 12–7242, 2013 WL 5467093, at *19 (D.N.J. Sept. 30, 2013) (declining to dismiss fraud claims where the complaint "describe[d] each defendant's respective roles" in the underlying business, alleged which defendants were allegedly involved in the purported fraudulent practice, and stated "how their respective roles put them in a position to make and/or know about the [fraud]"); *see also T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14–04209, 2015 WL 1119475, at *7 (D.N.J. Mar. 11, 2015) (rejecting defendants' arguments that the complaint improperly "lump[ed] them together and fail[ed] to distinguish their respective conduct" because plaintiff's allegations, as here, were "reasonably understood as alleging conduct for which all [] Defendants [we]re responsible"). Specifically, Plaintiffs allege that:

- The Officer Defendants (J. Smith, Hadlock, Paoline, Leavitt, B. Smith, and Grant) were directly responsible for designing and executing Alliance's alleged large-scale insurance fraud scheme (Roche FAC at ¶¶ 196–240; LifeScan SAC at ¶ 51), including spearheading Alliance's 10% Model to deceive insurance auditors. Roche FAC at ¶¶ 98–132; LifeScan SAC at ¶¶ 108–12;121–224.  Plaintiffs go to great lengths to describe in detail each Officer Defendant's role in the alleged fraud. *See* Roche FAC at ¶¶ 198–207; LifeScan SAC at ¶¶ 114–126, 184–93 (J. Smith), Roche FAC at ¶¶ 85–86, 208–13; LifeScan SAC at ¶¶ 139–69 (Hadlock), Roche FAC at ¶¶ 113–18, 214–19; LifeScan SAC at ¶¶ 127–69 (Paoline), Roche FAC at

¶¶ 170–75, 220–28; LifeScan SAC at ¶¶ 114–26, 127–38, 139–69, 206–14 (Grant and Leavitt), ¶¶ 236–40; LifeScan SAC at ¶¶ 114–26 (B. Smith).

- The Director Defendants actively supervised Alliance's alleged fraudulent business practices and actively concealed the purported fraud as part of Alliance's foundational business structure. Roche FAC at ¶¶ 241–307; LifeScan SAC at ¶¶ 238–300. Plaintiffs allege that the Director Defendants ratified numerous decisions to further the fraud, including the purchase of a network of pharmacies under the 10% Model. Roche FAC at ¶¶ 170–298; LifeScan SAC at ¶¶ 238–300. Further, Plaintiffs allege that the Director Defendants had express knowledge of the purported fraud due to Grant's 2015 Memo, but that these defendants allegedly attempted to minimize Alliance's exposure stemming from this alleged fraud and continued the practice rather than incur "lost revenues." Roche FAC at ¶¶ 170–76, 276–98; LifeScan SAC at ¶¶ 274–300. Plaintiffs' claims describe in detail the role of each Director Defendant in the alleged fraud. *See* Roche FAC ¶¶ 259, 263 (Wistner), ¶¶ 260, 278–79 (Koopersmith), ¶¶ 284–86, 292 (Hughes), ¶¶ 178, 306 (Rosebush); LifeScan SAC at ¶¶ 274–300.

- The Shareholder Defendants assented to Alliance's alleged fraud because Alliance disclosed the nature and extent of the fraudulent scheme to the Shareholder Defendants in their investment agreements. Roche FAC at ¶¶ 316–354; LifeScan SAC at ¶¶ 52, 239–300. Despite their awareness of the fraud, Plaintiffs allege that the Shareholder Defendants "actively invested and managed" Alliance through their representatives on the Company's Board. *Id*. As described above, Plaintiffs adequately alleged that the Director Defendants knowingly managed Alliance's purported fraudulent scheme as agents of the Shareholder Defendants.

- The Bank Defendant extended millions of dollars in credit to Alliance while allegedly knowing that the purpose of the funds was to further the purported scheme and to expressly conceal the fraud. Roche FAC at ¶¶ 362–81; LifeScan SAC at ¶¶ 301–20. Plaintiffs' pleadings describe with particularity the Bank Defendant's role in this alleged fraudulent scheme. *Id.*

Such allegations satisfy Rule 9(b) and are sufficient on this motion. To require Plaintiffs to plead more detail at this stage, prior to full discovery, would only "permit sophisticated defrauders to successfully conceal the details of their fraud." *Craftmatic*, 890 F.2d at 645; *see In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16–2765, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017) (holding that because of defendants' "complex corporate structure," the "[p]laintiffs cannot be expected to know the exact corporate structure and degree of each defendant's involvement, at this

stage in the litigation."). Accordingly, the Court denies Alliance's motion to dismiss for lack of particularity under Rule 9(b).

Similarly, the Court finds that Plaintiffs have sufficiently alleged reliance. The reliance element of fraud may be established through allegations of "direct" or "indirect" reliance. *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 101, 108 (2000). Direct reliance requires that the plaintiff heard the statement directly from the defendant, while indirect reliance requires that the plaintiff "heard a statement not from the party that defrauded [them,] but from that party's agent or from someone to whom the party communicated the false statement with the intention that the victim hear it, rely on it, and act to his or her detriment." *Id.* Here, Plaintiffs satisfactorily plead indirect reliance. Plaintiffs' allegations outline an alleged fraudulent scheme whereby Defendants caused insurers to issue falsely inflated reimbursement payments to Alliance. *See generally* Roche FAC; LifeScan SAC. Moreover, Plaintiffs adequately claim that Defendants undertook this purported scheme with full knowledge of the alleged fraud and the intention that Plaintiffs would then be forced to submit artificially inflated rebates to insurers. Roche FAC at ¶¶ 437; LifeScan SAC at ¶¶ 321, 325–36. Plaintiffs put forth that but for their reasonable reliance on Defendants' alleged fraudulent adjudications, they would not have suffered detriment by way of paying artificially inflated rebates to insurers. Roche FAC at ¶¶ 382, 386, 443, 454; LifeScan SAC at ¶¶ 65, 70, 323. Thus, Plaintiffs have sufficiently alleged that Defendants committed this purported fraud with the intention that Plaintiffs rely on it and act on it to their detriment, thereby satisfying the indirect reliance requirement of fraud. *See, e.g.*, *Motwani v. Marina Dist. Dev. Co., LLC*, No. 15-2069, 2015 WL 3448171, at *5 (D.N.J. May 29, 2015) (finding reliance adequately pleaded where defendant "knew such information to be false," and plaintiff "was a foreseeable recipient of the false information.").

The Court also finds that Plaintiffs have validly asserted particularized causes of action for aiding, abetting, and conspiracy to commit fraud.  To plead a claim for aiding and abetting fraud, a plaintiff must plead facts to demonstrate "performance of [a] wrongful act, awareness of the illegality, and knowing and substantial assistance to [the] principal violator." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 576 (2009) (internal citations omitted).  "[I]naction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement." *Failla v. City of Passaic*, 146 F.3d 149, 158 n.11 (3d Cir. 1998).  Here, Plaintiffs adequately allege that Defendants all had knowledge of the purported fraudulent scheme and its "foundational" importance to Alliance's business.  Moreover, Plaintiffs claim that Defendants specifically acted to conceal the alleged fraud, even as internal whistleblowers allegedly raised the alarm and challenged Alliance's fraudulent scheme.  Roche FAC at ¶¶ 119–52; LifeScan SAC at ¶¶ 182–237.  Legal counsel purportedly refused to opine that Alliance's business model was lawful (Roche FAC at ¶¶ 167–76; LifeScan SAC at ¶¶ 182–237), and various defendants considered, but declined, self-reporting Alliance to the federal authorities.  Roche FAC at ¶¶ 177–84; LifeScan SAC at ¶¶ 182–237.  Accordingly, Plaintiff has satisfied the requirements to plead aiding and abetting of fraud.

Further, Plaintiffs sufficiently aver that Defendants are co-conspirators to this alleged fraudulent scheme.  The elements of a claim for a civil conspiracy under New Jersey law are "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages." *Farris v. Cnty. of Camden*, 61 F.Supp.2d 307, 330 (D.N.J. 1999).  To be held liable as a co-conspirator, "[i]t is enough . . . if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Banco Popular N.*

*Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).  As discussed above with regard to RICO (*see supra* Parts II.a.ii, IV.c.i.2–4), Plaintiffs have sufficiently alleged facts satisfying the elements of civil conspiracy and have alleged with particularity the actions taken in furtherance of the purported scheme by each Defendant.  *See* Roche FAC at ¶¶ 241–308, 324, 326, 334, 342–45, 351, 357–81; LifeScan SAC at ¶¶ 182–237, 301–320.  Accordingly, this Court denies Defendants' motions to dismiss Plaintiffs' claims for conspiracy to commit fraud and aiding/abetting fraud.

### iii.  *Negligent Misrepresentation*[11]

Plaintiffs similarly state a valid claim for negligent misrepresentation.  To prove a claim of negligent misrepresentation under New Jersey law, the plaintiff must demonstrate that "1) the defendant negligently provided false information; 2) the plaintiff was a reasonably foreseeable recipient of that information; 3) the plaintiff justifiably relied on the information; and 4) the false statements were a proximate cause of the plaintiff's damages." *McCall v. Metropolitan Life Ins.*, 956 F. Supp. 1172, 1186 (D.N.J. 1996).  Negligent misrepresentation "does not require scienter" and therefore "is easier to prove than fraud." *Kaufman*, 165 N.J. at 110.  The pleadings sufficiently claim that Defendants submitted false reimbursement claims, that Plaintiffs would foreseeably be injured by Defendants' alleged fraudulent scheme, that Plaintiffs justifiably relied on these purportedly fraudulent reimbursement claims, and that the allegedly fraudulent conduct was at least a substantial contributing factor in triggering Plaintiffs' rebate payments.  *See supra* at Parts

---

[11] Courts have declined to apply Rule 9(b)'s heightened pleading standard where, as here, Plaintiffs separately allege both a fraud claim and a negligent misrepresentation claim.  *See, e.g., Premier Health Assocs., LLC v. Med. Tech. Sols.*, 2018 WL 4043289, at *8 (D.N.J. Aug. 24, 2018); *Kirtley v. Wadekar*, 2006 WL 2482939, at *2 (D.N.J. Aug. 24, 2006) ("[B]ecause the [negligent misrepresentation] claim is pled separately from the fraud claims, that is enough to avoid triggering Rule 9(b).").  Regardless, even if the heightened standard were applicable, Plaintiffs have met this standard with respect to their negligent misrepresentation claim.

IV.c.i–ii; *see also Cohen v. Tesley*, No. 09–2033, 2009 WL 3747059, at *13 (D.N.J. Nov. 2, 2009) (Proximate cause "is satisfied where . . . conduct is a substantial contributing factor in causing [a] loss.") (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 438 (3d Cir. 2007)). Moreover, because Plaintiffs have sufficiently alleged fraud against Defendants, their negligent misrepresentation claims also survive. *See, e.g.*, *48 Horsehill, LLC v. Kenro Corp.*, 2006 WL 349739, at *9 (N.J. Super. Ct. App. Div. Feb. 22, 2006) ("Having properly pled the elements of legal fraud, the amended complaint . . . necessarily subsumed the common law cause of action of negligent misrepresentation."); *see also Schechter v. Hyundai Motor Am.,* No. 18-13634, 2019 WL 3416902, at *10 (D.N.J. July 29, 2019) ("[A] negligent misrepresentation claim may stem from a 'defendant's silence or suppression of truth rather than on some affirmative misrepresentation[,]' and, when such circumstances are adequately pled, a plaintiff need not allege a 'special relationship' with the defendant.") (citations omitted).

### iv.  Unjust Enrichment[12]

Plaintiffs next claim that Defendants were unjustly enriched "as a result of the additional profits [they] made as a result of the [fraudulent scheme]." Roche FAC at ¶¶ 445–49; LifeScan SAC at ¶¶ 391–95. To assert an unjust enrichment claim under New Jersey law, a plaintiff must plead: "at plaintiff's expense, defendant received [a] benefit under circumstances that would make it unjust for defendant to retain [that] benefit without paying for it." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (internal numbering omitted). In their motions to dismiss, Defendants argue that: (1) Plaintiffs' loss did not "confer a benefit" on Defendants; (2) there is no "direct relationship" between Plaintiffs and Defendants; and (3) Plaintiffs may not plead unjust

---

[12] Plaintiffs' unjust enrichment claims are subject to the traditional pleading standard under Rule 8(a). *See Re J&J Sports Prods. v. Harris*, No. 16-5250, 2017 WL 4516466, at *3 (D.N.J. Oct. 6, 2017) (Rule 9(b) pleading standard does not apply to unjust enrichment claims).

enrichment because it arises out of the same conduct as their tort claims. The court finds that Defendants' arguments are without merit and Plaintiffs unjust enrichment claims may proceed.

Plaintiffs have sufficiently alleged that they conferred a benefit on Defendants so as to sustain an unjust enrichment claim at this stage. The "benefit conferred need not mirror the actual loss of the plaintiff." *K-Dur*, 338 F. Supp. 2d at 544. Instead, "[t]he critical inquiry is whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct." *Id.* Here, Plaintiffs have adequately alleged that their detriment – the payment of rebates based upon allegedly fraudulent Retail Strip reimbursement claims – effectively flowed from Defendants' purported conduct. Plaintiffs repeatedly assert that but for the alleged falsely inflated reimbursement claims, Plaintiffs would not have paid rebates and thus would not have suffered loss. *See generally* Roche FAC; LifeScan SAC. Thus, under this critical inquiry, Plaintiffs specifically identify how Defendants benefitted at Plaintiffs' expense. Such is sufficient on this motion.

Similarly, Defendants' argument that Plaintiffs lacked a "direct relationship" is without merit, especially considering Plaintiffs have repeatedly alleged that Alliance's entire business model was predicated on Plaintiffs' rebate payments. Moreover, New Jersey courts do not require a "direct relationship" between the parties in order to sustain an unjust enrichment claim when, as here, Plaintiffs adequately allege that Defendants were not "innocent" third parties. *Capital Health Sys., Inc. v. Veznedaroglu*, No. 15-8288, 2017 WL 751855, at *11 (D.N.J. Feb. 27, 2017) (noting that "[t]his District has interpreted New Jersey's 'direct relationship' requirement as unnecessary where it can be demonstrated that the defendant is not merely an innocent third party" and denying a motion to dismiss an unjust enrichment claim on this basis); *Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 197–202 (D.N.J. 2012) (observing that the "direct relationship"

requirement is "meant to protect innocent third-parties from liability where they did not unjustly retain a benefit conferred upon them by the plaintiff" and denying defendant's motion to dismiss a claim for unjust enrichment on that basis).   Because Plaintiffs sufficiently detail Defendants' involvement in the alleged widespread fraudulent scheme, and because Plaintiffs assert that Defendants improperly retained a purported benefit as a result of this scheme, the unjust enrichment claims survive.   *See Equiom (Isle of Man) Ltd. v. Jacobs*, No. 16–4362, 2017 WL 6550481, at *4 (D.N.J. Dec. 22., 2017) (declining to dismiss where plaintiffs "plausibly contend that Defendants orchestrated [a] wider fraudulent scheme – removing Defendants from the class of innocent, attenuated third parties the direct relationship requirement is intended to protect") (citing *Veznedaroglu*, 2017 WL 751855, at *11).

Lastly, Plaintiffs unjust enrichment claims survive because at the motion to dismiss stage of litigation, a plaintiff may plead unjust enrichment as an alternative theory of relief to other related claims asserted in the complaint.   *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 n.8 (3d Cir. 2014). At this juncture, it would be premature to dismiss an unjust enrichment claim "simply because it may later be eclipsed by some other cause of action."   *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 331 (D.N.J. 2014); *see also Palmeri v. LG Elecs. USA, Inc.*, No. 07-5706, 2008 WL 2945985, at *7 (D.N.J. July 30, 2008) ("unjust enrichment is, by its nature, an alternative remedy to contract and tort remedies").   Accordingly, Defendants' motions to dismiss the unjust enrichment claims are denied.

*v. Tortious Interference*[13]

Finally, the LifeScan SAC and the Roche FAC allege that Defendants tortiously interfered with Plaintiffs' business relationships with the insurance providers by causing them to pay millions of dollars in improper rebates to the insurance providers. Roche FAC at ¶¶ 456–60; LifeScan SAC at ¶¶ 402–06.

"Under New Jersey law in order to bring a claim of tortious interference with a prospective or existing economic relationship, a plaintiff must show: (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage;[14] (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference." *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, No. 13-6194, 2014 WL 1767471, at *4 (D.N.J. May 1, 2014) (citations omitted).

While Defendants argue that Plaintiffs fail to plead each element of their claims, the Court is not persuaded. *See, e.g.*, No. 19-08761, ECF No. 190-1 at 43–44; No. 17-05552, ECF No. 344-1 at 44–45. Plaintiffs sufficiently allege a reasonable expectation of economic benefit. They assert that Alliance's practice of purportedly receiving reimbursements from insurers for Retail Strips interfered with the expected sales of *actual* Retail Strips to the public at large. LifeScan SAC at ¶

---

[13] Plaintiffs "need only allege tortious interference . . . under the more relaxed [Rule 8] notice pleading standard." *Suntuity Solar, LLC v. Roseburg*, No. 21-17801, 2022 WL 2373982, at *8 (D.N.J. June 30, 2022).

[14] Courts in this District have "consistently found that a reasonable expectation of economic benefit can exist even where the sale is to the public at large as long as the plaintiff was in the active pursuit of business." *Veznedaroglu*, 2017 WL 751855, at *10 (D.N.J. Feb. 27, 2017) (internal quotations omitted); *see also id.* at *9 (declining to dismiss claim even though plaintiff did "not identify specific customers").

339 ("The Pharmacy Beneficiaries who purchased these 1,147,915 boxes of [Wholesale Strips] would have purchased Retail Strips but for Defendants' fraud. . . .  Accordingly, but for Defendants' fraud, LifeScan would have sold 1,147,915 additional boxes of Retail Strips."); Roche FAC at ¶ 384.  Additionally, Plaintiffs adequately allege a reasonable expectation of the economic benefit they would have retained in unpaid rebates to insurers had Alliance disclosed that they were actually distributing and seeking reimbursement for Wholesale Strips, not Retail Strips.  Roche FAC at ¶ 384–86; *see also* LifeScan SAC at ¶¶ 11, 62–71, 339–40.  Such is sufficient on this motion.  Plaintiffs also adequately allege that Alliance was aware that Plaintiffs paid rebates to insurance providers in connection with reported sales of Retail Strips, but not in connection with reported sales of Wholesale Strips.  For instance, Plaintiffs aver that in late 2013 and 2014, Alliance's executives were shown "slide decks and memoranda explicitly discussing the rebates that [insurance providers] receive from test strip manufacturers" like Plaintiffs.  Roche FAC at ¶ 191; LifeScan SAC at ¶¶ 80, 82, 137-38, 170-72, 182 339–40.  Plaintiffs further sufficiently claim Alliance's wrongful, intentional interference with their expectation of economic benefit by alleging that Alliance's affiliated pharmacies intentionally adjudicated millions of false reimbursement claims with insurance providers during the Relevant Period while knowing that Plaintiffs would be forced to pay improper rebates as a result.  *See generally* Roche FAC; LifeScan SAC.  Plaintiffs additionally assert that, but for Alliance's fraudulent scheme, they would not have paid these improper rebates to the insurance providers.  Likewise, Plaintiffs adequately allege that the fraudulent scheme depleted their earnings by millions of dollars.  *Id.*  Therefore, Plaintiffs sufficiently allege a probability that they would have received an economic benefit through the sale of actual Retail Strips but for Alliance's purported interference.  *Id.*  Accordingly, Plaintiffs have adequately pleaded their tortious interference claims.  *See Wiatt v. Winston & Strawn, LLP*,

No. 10-6608, 2011 WL 2559567, at *21 (D.N.J. June 27, 2011) (tortious interference claim adequately pleaded where the plaintiffs were "damaged by the loss of [a] contract and/or business relationship and its future revenue").

### d. Transfer

The Bank Defendant and the Shareholder Defendants also move to transfer this case to the District of Utah pursuant to 28 U.S.C. § 1404(a) should the Court not dismiss the LifeScan SAC and the Roche FAC. No. 19-08761, ECF Nos. 233-2 at 7–12, 234-1 at 35; No. 17-05552, ECF Nos. 345-6 at 9–17; 350-1 at 30.   As the movants, Defendants here "bear[] the burden of persuasion" in establishing the need for transfer, and must show that the relevant factors "tip the balance 'strongly' in its favor." *Ethicon, Inc. v. Randall*, No. 20-13524, 2021 WL 2206106, at *18 (D.N.J. May 28, 2021) (citing *EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D. Pa. 2005)); *see also Jumara*, 55 F.3d at 879 ("The burden of establishing the need for transfer still rests with the movant").   Moreover, "[t]he Court has broad discretion in making determinations under Section 1404(a)."   *Santi v. Nat'l Bus. Records Mgmt., LLC*, 722 F. Supp. 2d 602, 606 (D.N.J. 2010).

In determining whether transfer is appropriate under § 1404(a), the two threshold questions are whether "(1) venue is proper in the transferee district, and (2) the transferee district can exercise personal jurisdiction over all parties."   *Interlink Prod. Int'l, Inc. v. Crowfoot*, No. 20-10566, 2020 WL 6707946, at *6 (D.N.J. Nov. 16, 2020) (citations omitted).   The District of Utah could: (1) be a proper venue for these cases because a "substantial" part of the events giving rise to Plaintiffs' claims occurred there, and (2) exercise personal jurisdiction over each Defendant under Federal RICO, because numerous Defendants are domiciled in Utah.   Roche FAC at ¶¶ 10–15, 17, 20–21, 23; LifeScan SAC at ¶¶ 14–22, 26–27, 29–37; *see* Sections 1391 and 1965(b) (personal jurisdiction

is proper under Federal RICO where the court retains traditional specific or general personal jurisdiction over at least one defendant).  Nevertheless, Defendants have not met their burden of establishing the need to transfer under § 1404(a) on the balance of private and public interest factors as discussed below.

A series of private and public interest factors are considered by the Court to determine whether "'on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'"  *Crowfoot*, 2020 WL 6707946, at *6 (quoting *Jumara*, 55 F.3d at 879).

The private interest factors include: (1) the plaintiffs' choice of forum; (2) the defendants' choice of forum; (3) where the claim arose; (4) convenience of the parties and witnesses; and (5) the location of books and records.  *Id.*  As to the first two private interest factors, Plaintiffs have chosen to bring their claims in this district, while it appears the Defendants prefer the District of Utah.  While weight is generally given to the plaintiffs' choice of forum, *id.* (citations omitted), such a choice is nevertheless entitled to "less deference" where, like here, the plaintiffs bring charges in a venue that is not their home forum.  *Ricoh Co., Ltd. v. Honeywell, Inc.*, 817 F. Supp. 473, 480 (D.N.J. 1993) (citations omitted).  Accordingly, these two private factors are neutral. Under the third private factor, Plaintiffs allege that their claims arise out of events that took place in multiple states, including in both New Jersey and Utah.  Roche FAC at ¶ 33; LifeScan SAC at ¶ 48 ("While the Defendants' fraud was national in character . . . New Jersey was a major center of the fraud.").  Given these circumstances, this factor also is not dispositive toward either forum. Under the fourth private factor, however, Plaintiffs can only subpoena a key whistleblower in these actions—Masum Amin, the pharmacist in charge of an Alliance-affiliated pharmacy located in

New Jersey—to testify at trial in New Jersey, but not in Utah.[15]  *See* Fed. R. Civ. P. 45(c) (a non-party may only be subpoenaed to testify at trial within the state where the non-party resides, is employed, or regularly transacts business); *see also Crowfoot*, 2020 WL 6707946, at *6 (citing *Jumara*, 55 F.3d at 879) (noting the significance of the fourth private factor where key witnesses are "unavailable in one of the forums").  Moreover, to the extent that the Utah-based Defendants complain of traveling to New Jersey for trial, the Court notes that Plaintiffs and numerous other Defendants and non-party witnesses who do not reside in Utah would have to similarly travel for trial should these actions be transferred.  *See* No. 19-08761, ECF No. 273; No. 17-05552, ECF No. 498 at 213 ¶¶ 6–12; Roche Opp. at 97–98; LifeScan Opp. at 81–82.  Therefore, the fourth private factor weighs against transfer.  Lastly, the parties do not allege that any documents could be produced in one district but not another.  Accordingly, the fifth private factor is neutral.  *Crowfoot*, 2020 WL 6707946, at *6.

The Court also analyzes the public interest factors, which include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty arising from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the forums; and (6) the familiarity of the trial judge with the applicable . . . law." *Id.*  Under the first factor, as both this district and the District of Utah are federal district courts, "it is unlikely that there would be any significant difference in the difficulty of enforcing a judgment rendered by one federal forum or the other." *Id.*  Thus, the first factor is neutral.  Regarding the second public factor, the instant actions have resulted in over five years of litigation and approximately 1,000 docket entries,

---

[15] The Court understands that Ms. Amin will not appear to testify at trial without a subpoena. *See* No. 19-08761, ECF No. 273; No. 17-05552 ECF No. 498 at 60 ¶ 4 – 61 ¶ 1.

several months of mediation, and roughly 100,000 produced documents.  The Court is not only familiar with the complex set of facts and issues presented in these cases, but is also prepared to handle any disputes that may arise through the duration of litigation.  Accordingly, this factor weighs against transfer.   Next, the third public factor regarding the relative difficulty in adjudicating claims arising from court congestion does not weigh heavily in either direction in this case. S*elective Way Ins. Co. v. Glasstech, Inc.*, 191 F. Supp. 3d 350, 362 (D.N.J. 2016) (this factor "holds minimal weight in the overall transfer inquiry").  The remaining public factors—the interest in deciding local controversies at home, the public policies of the forums, and the familiarity of the trial judge with the applicable law—are not dispositive toward either forum.  As described above, while Plaintiffs underscore the significance of Defendants' activities in New Jersey (*see, e.g.*, No. 19-08761, ECF No. 273; No. 17-05552 ECF No. 498 at 133 ¶¶ 1–4), they also acknowledge that Defendants' alleged fraud was "national in character" having been perpetrated in over a dozen states by Defendants who reside across the country.  *See, e.g.*, Roche FAC at ¶ 33; LifeScan SAC at ¶ 48.  In addition, under the purported national scheme, the public policy in both New Jersey and Utah similarly supports a resolution of Plaintiffs' claims.  Finally, as to any applicable state law, this Court routinely applies the law of states other than New Jersey. Defendants do not sufficiently explain why that would be particularly difficult here, if necessary, and it does not appear that the parties have raised a viable conflict of law challenge.

As the movants, Defendants have not met their burden of establishing that the relevant private and public factors "tip the balance 'strongly'" in favor of transfer.   *Ethicon*, 2021 WL 2206106, at *18.  Accordingly, the Court exercises its broad discretion and declines to transfer this action to the District of Utah under Section 1404(a).

V.     <u>**CONCLUSION**</u>

For the reasons set forth above, the Court denies Defendants' motions to dismiss Plaintiffs'

claims and denies Defendants' motions to transfer these actions to the District of Utah.

**DATE**:  September 30, 2022

s/ Claire C. Cecchi

**CLAIRE C. CECCHI, U.S.D.J.**