## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIFESCAN, INC., et al.,<br><br>                                 Plaintiffs,<br>v.<br><br>JEFFREY C. SMITH., et al.,<br><br>                           Defendants | Civil Action No. 17-5552 and 19-8761 (CCC)(JSA)<br><br>**ORDER & OPINION OF**<br>**THE SPECIAL MASTER**<br>**JUDGE DENNIS CAVANAUGH, RET.** |
| ROCHE DIAGNOSTICS CORPORATION, et al.,<br><br>                           Plaintiffs,<br>v.<br><br>JEFFREY C. SMITH., et al.,<br><br>                           Defendants | |

       This motion before the Special Master is filed on behalf of Plaintiffs LifeScan, Inc., Roche Diagnostics Corporation, and Roche Diabetes Care, Inc. ("Plaintiffs"). Plaintiffs seek to compel Defendant Lee Rosebush ("Defendant" or "Rosebush") to appear for additional deposition questioning and to provide responsive answers. In reaching the findings set forth in this Order and Opinion, the Special Master has reviewed the following:

     1. Plaintiffs' letter brief, and exhibit, in support of the motion;

     2. Defendant's opposition to Plaintiffs' motion, and exhibits;

     3. Plaintiffs' reply brief, and exhibit in further support of the motion; and

     4. Deposition transcript of Lee Rosebush, dated January 26, 2023.

The Special Master has also taken into account the arguments advanced by the parties during the course of status conferences, in which this, and other discovery disputes, were explored.

Based upon review of the materials cited above, and the arguments advanced by the litigants, it is the finding of the Special Master that Plaintiffs' motion is **GRANTED.**

**I.        Procedural and Factual History.**

The parties are intimately familiar with the procedural posture and facts, which form the basis of this litigation.  Therefore, the Special Master will only briefly set forth the procedural and factual history pertinent to this motion.

This motion arises from litigation regarding the distribution and sale of diabetic testing strips ("DTS") manufactured by Plaintiffs.  Plaintiffs contend that various defendants, principally officers, directors and investors in Alliance Medical Holdings LLC ("Alliance") engaged in a scheme that defrauded the manufacturers by improperly seeking reimbursement for the sale of these strips through a complex plan, a plan which purportedly involved the creation of covertly owned and operated pharmacies and the improper alteration of NDC codes on the products at issue.

Rosebush is a named defendant in this suit.  He is a lawyer and former pharmacist, as well as, a partner in the firm of Brown & Fortunato, Alliance's outside counsel at times relevant to these events.  Rosebush also held a position as a member of the Board of Directors of Alliance.

On January 26, 2023, counsel for Plaintiffs deposed Rosebush at a site chosen by the deponent in Houston, Texas.  According to the transcript, the deposition was conducted from 9:45 a.m. to 7:24 p.m., including breaks.

2

Plaintiffs contend that Rosebush repetitively provided lengthy, non-responsive and scripted answers to simple questions, conduct they charge was compounded by the actions of his counsel.  Plaintiffs now move for an order (1) permitting them to depose Rosebush again, and (2) directing him to provide responsive answers to the questions posed.  Additionally, in an effort to prevent a recurrence, Plaintiffs ask that the deposition be conducted at the Special Master's office in order to seek intervention if needed.

## II.    Plaintiffs' Arguments.

Relying on the Federal Rules of Civil Procedure[1] (primarily Fed. R. Civ. P. 37) and cases interpreting those rules, Plaintiffs argue that they have a right to depose Rosebush and to receive truthful, responsive answers to their questions.  Additionally, his attorney has an obligation to intervene should he not testify appropriately.

Plaintiffs urge that the motion should be granted since Rosebush and his counsel engaged in a calculated strategy to obstruct the deposition.  Plaintiffs have provided a copy of that deposition transcript which, they say, if reviewed in its entirety, show many instances in which Rosebush or his attorney acted inappropriately and stymied an efficient examination.  Plaintiffs, however, point to several of the most "egregious abuses" of the process.  Briefly summarized, they are as follows.

Plaintiffs note Rosebush played an integral role in the Alliance fraud by facilitating its concealment and, consequently, at the outset of the deposition and thereafter, Plaintiffs questioned Rosebush as to his knowledge of and participation in the fraud.  Rosebush refused to answer a simple question as to whether – or not – Alliance dispensed boxes of DTS using one

---

[1] All subsequent references to a Rule herein are references to a Federal Rule of Civil Procedure.

NDC code, and then submitted reimbursement through pharmacy benefit managers (PBMs) using a different NDC code.  Although the question called for a "yes" or "no" answer, Rosebush instead interjected evasive responses referencing his "understanding of PBM audits," something which had no bearing on the question and for which no answer was supplied.  Plaintiffs say this pattern persisted throughout the deposition with Rosebush failing to answer, in any direct way, questions as to his knowledge of and participation in the Alliance fraud.  In this, say Plaintiffs, he was assisted by his counsel who would place on the record meritless "asked-and-answered" objections.

Another example of Rosebush's evasiveness concerned his advice to Alliance on self-disclosure of its illegal practices to the government.  Rosebush had advised the company to disclose the fraud, an action which never took place.  But when asked about why he recommended self-disclosure, he repeated a circuitous answer that Alliance should self-disclose "[b]ecause they should self-disclose."  Nor would Rosebush answer whether he had told officers and directors of Alliance about the financial consequences of self-disclosure.  Plaintiffs cite several pages of the transcript in which Rosebush failed to answer questions on this topic no matter how it was presented, either in terms of a "settlement payment," "dollar amounts," or "money."

Plaintiffs cite another topic for which Rosebush refused to provide testimony–his actions as a member of Alliance's board of directors.  When PBM audits resulted in financial losses, the cash shortfall required Alliance to seek outside funding.  The board of directors, including Rosebush, sought to raise outside capital, but when confronted during his deposition with a funding resolution bearing his electronic signature, he refused to discuss the document because it was not dated.  Then, when asked about the board's reason for raising capital, Rosebush

stonewalled and took the position that the resolution was "not an effective or finalized document as there is no date to this document to show that it was effective."

### III.   Defendant's Arguments.

In opposition, Rosebush argues that he faced seven hours or more of repetitive questions, principally related to Alliance's practice of switching NDC codes and as to Rosebush's advising that company to self-disclose its practices. Defendant cites specific examples derived from the deposition transcript which, he says, supports his position that he "provided consistent, direct and complete responses without making any refusals to answer."

Furthermore, as a result of what Rosebush contends were repetitive inquiries, he essentially had no choice but to consistently refer to and reiterate his prior testimony. Defendant asserts that Plaintiffs' counsel deliberately questioned him as to irrelevant subject matter, including his recreational hobbies, which supports the notion that Plaintiffs' counsel only intended to utilize the deposition as an opportunity to "torment Mr. Rosebush" simply because Defendant's testimony did not support Plaintiffs' narrative and theories of liability. Throughout, Defendant maintains, he remained composed and provided appropriate and truthful answers.

Rosebush goes on to argue that this form and extent of questioning was an endeavor intended to monopolize all opportunities to examine the witness. Then, at approximately the seventh hour of deposition testimony on the record, Plaintiffs' counsel, in response to inquiries by MedSource's counsel, announced that he needed an additional 90 minutes to continue the deposition. All of this, Defendant maintains, constituted an intentional mismanagement of time by Plaintiffs' counsel, i.e., improper conduct which would be inappropriate if conducted before a judge and consisted of a bevy of questions which were unnecessary for the prosecution of this action.

5

Addressing four cases cited by Plaintiffs in support of their motion, Defendant argues that his conduct and the conduct of his attorney during the deposition in no way compares to the conduct of the witnesses and attorneys in the cited cases.  Those decisions are *Andrews v. Holloway*, 256 F.R.D. 136, 142 (D.N.J. 2009); *Doe I v. Exxon Mobil Corp.*, 539 F. Supp. 3d. 59, 64 (D.D.C. 2021); *E.E.O.C. v. Freeman*, 288 F.R.D. 92, 103 (D.Md. 2012) and *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 186-87 (E.D.Pa. 2008).  Briefly stated, unlike those witnesses, Rosebush did not engage in conduct such as using profanity, refusing to answer questions, storming out of the deposition, causing delays, providing contemptuous, contradictory and untruthful information or otherwise engaging in conduct which would necessitate a court to sanction a witness or party.  Nor did Defendant violate protocol by bringing in detailed notes to reference or assist his testimony, or impede his deposition by repeatedly reading verbatim, non-responsive, scripted and previously prepared notes.

In a similar vein, Defendant argues that the conduct of his counsel was appropriate, referencing *GMAC Bank, supra*, a decision cited by Plaintiffs in support of an argument that Rosebush's counsel should have intervened and corrected improper answers.  Defendant also asserts that the circumstances of that matter do not mirror what transpired at the subject deposition.  In *GMAC Bank*, the witness was found to be hostile, uncivil, had engaged in vulgar conduct, had impeded, delayed and frustrated a fair examination, and either failed to answer or provided intentionally evasive answers.  The witness's attorney, in turn, was described by the court as sitting idly by as a "mere spectator" to his client's outrageous behavior.  He also incorrectly directed the client not to answer questions, dared opposing counsel to file a motion, and joined in the witness's offensive conduct.  In this matter, however, Defendant's conduct did not match the deplorable behavior demonstrated by the witness in *GMAC Bank,* "nor was there

6

any conduct by…counsel that could be construed to aid or assist in any misconduct." Furthermore, there is nothing in the record to suggest that defense counsel pre-planned Defendant's conduct or that he encouraged obstruction during the deposition.

In short, Rosebush argues that he was a cooperative witness who, in fact, gave direct answers to questions and composed himself in a civilized manner while his attorney acted in a professional manner in defending the deposition. According to Defendant, Plaintiffs' counsel deliberately conducted the deposition to harass Rosebush.

Consequently, Defendant asserts that Plaintiffs' counsel, having usurped the time of other parties, is not entitled to a second deposition. Citing *Doe I, supra*, Defendant states that it is presumptively improper to repeatedly ask the same or a substantially identical question once a witness has fully responded. Further, when a witness has done so, it is not necessary to compel an additional deposition for this purpose. Therefore, a second deposition is unnecessary and Plaintiffs' motion to compel should be denied.

## IV.    Plaintiffs' Reply.

Plaintiffs reiterate that Rosebush, while technically providing answers, gave responses unrelated to the questions and then repeated them until time ran out. Pointing to their opening brief, which quoted five exchanges, Plaintiffs argue that Rosebush fails to explain how the testimony is actually responsive and the transcript demonstrates he failed to change his behavior throughout the course of the deposition. These exchanges, say Plaintiffs, are only the tip of the iceberg and Plaintiffs cite other examples of exchanges in which Rosebush was asked a question that clearly called for some variation of an answer of "yes," "no," or "I don't know," but instead of responding that way, Rosebush went on to provide lengthy, irrelevant answers.

Plaintiffs also charge that Rosebush appeared to be "on autopilot" throughout the proceeding and at least nine times provided the same rote answer regarding "understanding of the PBM audits" to questions that did not address PBM audits.  Plaintiffs offer to provide the court with the video in order to assess the deponent's physical conduct and vocal inflection.

As to Rosebush's complaint that he was harassed, Plaintiffs say that Rosebush was treated civilly throughout the deposition and was extended courtesies including agreeing to hour long breaks at Rosebush's request constituting nearly two hours of off-the-record break time. Questions were repeated only when the deponent gave multiple non-responsive answers. Ultimately, the testimony on the record amounted to 7 hours and 3 minutes – just three minutes over the default time limit under the Federal rules.

Plaintiffs reiterate that in their assessment, Rosebush's counsel enabled his client's bad behavior by, among other things, interjecting baseless "asked-and-answered" objections 25 times, thus signaling to Rosebush that it would be acceptable to simply repeat the same non-responsive answers.  Plaintiffs also assert that Rosebush's counsel made improper speaking objections, thereby cluing his client into providing inappropriate responses.

To the extent that Rosebush complains that other parties (specifically Travis Hughes and the Hughes entities) did not have time to ask questions, Plaintiffs say, this was entirely due to Rosebush's own misbehavior.

Consequently, because of this "gamesmanship" which Plaintiffs believe will be repeated, they request that the deposition be held at the Special Master's office.

**V.     Analysis and Findings.**

Rule 37 is the starting point in analyzing this motion.  The rule is entitled, "Failure to

Make Disclosures or to Cooperate in Discovery; Sanctions" and reads, in pertinent part:

> B.  *To Compel a Discovery Response*.  A party seeking discovery may move for an order compelling an answer, designation, production, or inspection.  This motion may be made if:
>
> (i)  a deponent fails to answer a question asked under Rule 30 or 31[.]
>
> [Fed. R. Civ. P. 37(a)(3).]

Furthermore, Rule 37(a)(4) states, "[f]or the purpose of this subdivision (a), an evasive or

incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or

respond."

Plaintiffs cite several decisions in support of their motion including *GMAC Bank*, *supra*,

an opinion which the Special Master finds instructive since it contains a detailed analysis of this

issue as it relates to the conduct of a deponent and a deponent's attorney.  The Special Master

stresses, however, that this decision is different in the sense that the deponent in *GMAC Bank*

engaged in bizarre conduct, including the use of vulgar, threatening language and acted in a truly

hostile manner toward the attorney who questioned him. *GMAC Bank*, 248 F.R.D. at 186-90.

Nothing here, that the Special Master has reviewed, suggests conduct of a remotely similar

nature.  However, the *GMAC Bank* decision closely analyzes the issues which form the basis of

the within motion.

In *GMAC Bank*, the plaintiff moved for an order compelling the defendant to answer

questions and for sanctions.  The plaintiff charged that the defendant-deponent engaged in

abusive conduct toward counsel, obstructed and delayed the deposition and – most importantly

for the purposes of this motion – failed either to answer questions or provided evasive, irrelevant responses. *Id*. at 184.

The court first turned to Rule 30, a rule which provides a "detailed protocol governing the conduct of parties, counsel and deponents at depositions." *Id*. The rule provides that an examination of a deponent proceed as if that examination was conducted at trial. The Rule permits objections by counsel, however, "[a]n objection, at the time of the examination…must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection." *Id.* (internal quotation marks omitted). Furthermore, an objection must be stated "concisely in a nonargumentative and nonsuggestive manner." Fed. R. Civ. P. 30(c)(2).

The court, in examining the testimony, noted that the deponent used vulgarities, interposed his own objections, delayed the proceedings, gave protracted answers and repeatedly interrupted plaintiff's counsel's questioning. The record revealed that the deponent continually failed to answer questions posed to him. When he did answer questions, the answers were evasive and non-responsive. As a consequence of this "clear violation," the court ordered that the witness's deposition be taken under the supervision of a magistrate judge and levied sanctions. *GMAC Bank*, 248 F.R.D. at 199.

As to the witness's attorney, the court considered whether counsel's conduct warranted sanctions as well. The court stated that under Rule 37, sanctions may be leveled against an attorney who "improperly advise[s]" a deponent to provide evasive or incomplete answers. *Id*. at 194. Additionally, an attorney may be sanctioned for engaging in conduct that impedes, delays or frustrates the fair examination of the deponent. *Id*. (citing Fed. R. Civ. P. 30(d)(2)).

The court concluded that the witness's attorney's conduct warranted sanctions. He persistently failed to intercede and correct his client and instead sat idly by "as a mere spectator"

10

to abusive, obstructive and evasive behavior. *Id*. at 195. When he did speak, the attorney either incorrectly directed the witness not to answer, dared opposing counsel to file a motion, or joined the witness in his offensive conduct. *Id*. Counsel's attempts to address the client's behavior consisted merely of mildly worded requests to answer a question or to not interrupt counsel. The court noted that an attorney could be blindsided by a recalcitrant client who engages in unexpected sanctionable conduct, but when faced with such a client, an attorney cannot "simply sit back, allow the deposition to proceed, and then blame the client when the deposition process breaks down". *Id*. The court emphasized that the deponent's misconduct, which started from the inception of the deposition, was so severe and so pervasive that any reasonable attorney would have intervened to curb this misconduct. Instead, the attorney's failure to do so effectively empowered his client to persist in this behavior such that the attorney's silence acted as an endorsement and ratification of the misconduct. *Id*. at 197-98.

A similar issue arose in *Doe I, supra*. In that case, a representative of defendant Exxon was found to have refused to answer most of the substantive questions posed to him at a deposition. Instead, he "repeatedly read non-responsive statements verbatim from prepared notes." *Doe* I, 539 F. Supp. 3d. at 64. The court found that Exxon's witness failed to answer 110 questions as to which defendants had not raised any privilege objections. *Id*. at 70. To many of these questions, the witness had read from a prepared statement, a pattern which recurred throughout the proceedings.

As to the attorney's conduct, the court felt that the record showed defense counsel had sanctioned preplanned conduct. The court concluded that the attorney must have learned prior to the deposition that [the witness] intended to read entire non-responsive portions of his notes to answer specific questions. The court emphasized that an attorney defending a deposition has a

duty to curb his client's misconduct and defense counsel did nothing to encourage the witness to answer questions responsively. Therefore, "[b]ecause the record establishes that defense counsel was responsible for 'imped[ing], delay[ing], or frustrat[ing] the fair examination of [a] deponent,'" sanctions were appropriate. *Id.* at 75. As a consequence, among other aspects of its order, the court directed the witness to be re-deposed and to provide responsive and concise answers to questions, while ordering the attorney to voice only non-argumentative objections when the deposition resumed. *Id*. at 76.

With these legal principles in mind, the Special Master turns to Defendant's deposition testimony.

First, the raw numbers. The transcript is 271 pages. The deposition started at 9:42 a.m. There were multiple breaks and interruptions. At 6:12 p.m., Plaintiffs' counsel was questioned as to how much longer he would be and responded that he would move forward until done. Colloquy ensued to the effect that his position was improper, but the deposition then recommenced. At the time of that colloquy, there were 6 hours and 4 minutes of actual deposition time on the record. At 6:42 p.m., there were 6 hours and 7 minutes of record time. At about 7:18 p.m., Plaintiffs' counsel was again asked how much more time he needed and replied he would require 90 minutes, provided that the deponent was not obstructive. More colloquy followed. There was a brief break and then the deposition was concluded at 7:27 p.m.

The Special Master finds that in reviewing the transcript, Rosebush was an extraordinarily difficult and evasive witness. In their moving papers, Plaintiffs cite three or four examples of this evasiveness but, in the Special Master's view, these examples do not fully encompass the extent of the deponent's unwillingness to respond to counsel's questions. Often, Defendant interjected statements and asides which had no bearing on what was asked. He

12

regularly maintained that a question had been "asked and answered" and requested that the court reporter read back his answer, rather than actually providing a direct response. As an example, Defendant was directly questioned as to whether Alliance had engaged in wrongful conduct. Rather than answering "yes" or "no," Defendant repeated that the company, in his estimation, had engaged in a "risky business model" or "risky practices." These responses certainly suggested that the witness had prepared a "mantra" in advance of the deposition in an effort to deflect pertinent questions relating to Alliance and that company's activities.

As another example, and on multiple occasions, when asked a direct question as to communications regarding Alliance's business practices, he repeated the following response (paraphrased here but in substantially similar form):

> …I believe that Alliance [was] engaged in risky business practices. I recommended to Alliance's board and general counsel, David Grant, as well as other team members, up to Jeff Smith [Alliance's CEO] that they self-disclose secondary purchases of products, as well as retail versus non-retail aspects.

> [See Deposition Transcript of Lee Rosebush, attached as Exhibit A to Plaintiffs' Motion, at T107:15-20.]

As to this advice, Rosebush repeatedly stated, he understood it was to be "taken up to the board." *Id.* at T39:10-11; T44:6-7; T45:9-10; T46:6-7; T51:9-10; T54:19-20; T92:23-93:2; T95:12-13; T96:22-24; T97:16-17; T99:5-6; T105:23-24, to name a few.

While Defendant argues that he was harassed during the deposition, the Special Master finds this was simply not the case. Posing follow up questions to evasive or disingenuous answers does not constitute harassment. A notable example begins on transcript page 43. After testifying that he had recommended "self-disclosure" to Alliance, Defendant was asked "[a]nd the reason to disclose is to attempt to mitigate the penalty they [Alliance] may suffer for having

engaged in the practice; is that correct?" *Id.* at T43:4-6. Despite several attempts to elicit an answer, Defendant never answered a simple inquiry:  *Why* did you make this recommendation?

Defendant also argues he was harassed when questioned about certain recreational activities – fishing, hunting, motorcycles – a line of inquiry he asserts is irrelevant and designed merely to annoy.  However, the brief line of questioning arose out of an email with Alliance's CEO, Jeff Smith, which suggested that Defendant might be treated to such activities (according to Plaintiffs, in exchange for him coming on board in the Alliance fraud).  While this line of questioning was arguably off the beaten path, it was *de minimus* and not repeated thereafter. This hardly constitutes a pattern of harassment.

Plaintiffs cite other examples of Defendant's evasiveness which were noted previously and will not be repeated here.  Suffice it to say, the Special Master finds that much of Defendant's testimony consisted of evasive or incomplete answers which, pursuant to Rule 37(a)(4), "must be treated as a failure to disclose, answer or respond."  Therefore, the parties seeking discovery here are entitled to the relief sought, meaning Plaintiffs are entitled to continue Defendant's deposition under the parameters that will be set forth in detail at the conclusion of this Opinion.

In summary, throughout the deposition, Rosebush was presented with seemingly pertinent questions which, by any rational analysis, called for a simple "yes" or "no," "I don't know," or "I don't recall" response – or a reasonable variation thereof.  But Defendant failed often to choose any of those options, instead providing what Plaintiffs describe as a "rote" response or by answering a question that had not been asked.  Defendant indeed spoke words, but did not provide answers, thereby preventing effective examination.

As to Plaintiffs' assertion that the actions of Rosebush's counsel contributed to his client's evasiveness further supporting this application, the Special Master will briefly address this argument.  Although difficult to discern from reviewing a "dry" record, there is insufficient evidence derived from the transcript to suggest that Rosebush's responses were pre-planned or orchestrated with the assistance of counsel.  However, there were indeed several instances of telling "speaking objections," and other instances which would have prompted any client to repeat an answer or have the court reporter read an answer back.  While not truly egregious, as discussed at the most recent conference, the Special Master, if called upon during the course of this litigation, will not only scrutinize efforts by witnesses to avoid answering appropriate questions, but also the efforts of attorneys voicing objections designed to suggest answers or otherwise disrupt proper questioning.

Plaintiffs, by way of this motion, have also asked that Rosebush's continued deposition be conducted at the office of the Special Master in order to seek intervention should issues arise during the proceeding.  The Special Master finds that this is unnecessary.  Instead, the Special Master directs that the parties agree upon a location, date and time for the deposition and then provide the Special Master with advanced notice of these arrangements to ascertain the Special Master's availability.  Should issues arise during the course of that deposition, the parties may contact the Special Master telephonically and request intervention.

Finally, and in accordance with the discussions which have transpired during the course of the status conferences in this matter, parties other than Plaintiffs are also entitled to question Defendant when the deposition continues.  Times allotted to the parties for questioning are set forth in the Conclusion of this Order and Opinion.

15

In summary, the Special Master **GRANTS** Plaintiffs' motion to compel Defendant Lee Rosebush to appear for an additional deposition and to provide responsive answers under the conditions and within the parameters set forth below.

**VI.    Conclusion.**

For the reasons set forth above, the Special Master orders that:

1.  Plaintiffs' motion to compel Defendant Lee Rosebush to appear for an additional deposition is **GRANTED**;

2.  Defendant is directed to provide responsive and concise answers to the questions presented and counsel is directed to provide concise and non-argumentative objections, if necessary;

3.  The deposition is to be conducted at a place and time and on a date agreed upon by counsel;

4.  Counsel is directed to advise the Special Master, at least one week in advance, of the proposed date and time so that the Special Master can confirm his availability to be reached telephonically to address any issues which may arise during the course of the deposition;

5.  Plaintiffs are entitled to continue the deposition of Defendant for a period of time not to exceed more than four (4) hours; and

6.  Any other party who wishes to question Defendant is entitled to do so for a period of time that does not collectively exceed two (2) hours.


Date:   April 14, 2023                        *Dennis M. Cavanaugh*
                                               DENNIS M. CAVANAUGH
                                               Special Master

16