# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIFESCAN, INC., et al., | Civil Action No. 17-5552 and 19-8761 (CCC)(JSA) |
| Plaintiffs, | |
| v. | **ORDER & OPINION OF THE SPECIAL MASTER JUDGE DENNIS CAVANAUGH, RET. AS TO THE MEDSOURCE ENTITIES' MOTION TO COMPEL PLAINTIFFS TO SUPPLEMENT THEIR RESPONSES TO RFPs AND DESIGNATE A RULE 30(b)(6) WITNESS** |
| JEFFREY C. SMITH., et al., | |
| Defendants | |

| | |
|---|---|
| ROCHE DIAGNOSTICS CORPORATION, et al., | |
| Plaintiffs, | |
| v. | |
| JEFFREY C. SMITH., et al., | |
| Defendants | |

Defendants, the Medsource Entities ("the Medsource Entities" and/or "Defendants")[1], have filed a motion before the Special Master in which they seek to compel Plaintiffs to supplement their responses to certain Requests for Production (RFPs) and to designate Rule 30(b)(6) witnesses to give testimony regarding topics concerning financial documents and customer "churn rate."

---

[1] The Medsource Entities collectively refers to defendants HS Medsource Hold Co., LLC, Kesman Hughes & Company, LLC, and Hughes & Company and Hughes & Company Investment Partners, LLC (improperly pled as two different entities).

In deciding this motion, the Special Master has reviewed and considered the following items:

1. The Medsource Entities' letter brief and exhibits in support of the motion to compel dated January 26, 2024;

2. Plaintiffs' letter brief and exhibits in opposition dated February 6, 2024; and

3. The Medsource Entities' reply brief dated February 12, 2024.

In addition to filing these submissions, during the course of the status conference held on February 25, 2024, the parties addressed this motion. Thereafter, in advance of a status conference held on March 21, 2024, the parties provided a joint submission, setting forth information as to recent developments impacting this motion.

For the reasons set forth in this Order and Opinion and within the parameters described, it is the finding of the Special Master that the Medsource Entities' motion is **GRANTED**.

## I.     Procedural History and Factual Background

Again, the Special Master writes primarily for the benefit of the parties. Therefore, the Court will only address the pertinent procedural and factual events which form the basis of this motion.

This litigation involves two lawsuits which have been coordinated for discovery purposes but not consolidated. The actions arise out of what the parties have called the "Alliance fraud." This fraud involves the distribution, sale and reimbursement of diabetic test strips ("DTS") manufactured by the two Plaintiffs, LifeScan, Inc. ("LifeScan") and Roche Diagnostics Corporation/Roche Diabetes Care, Inc. ("Roche"). Plaintiffs charge that a now bankrupt entity known as Alliance Medical Holdings LLC ("Alliance") through its officers, directors, investors and lenders created a scheme to sell non-retail DTS (sometimes referred to as "NFR") to diabetic

patients but were reimbursed through the sale of higher priced retail strips, profiting from the difference.  Plaintiffs essentially contend that they suffered damages by paying excessive rebates to pharmacy benefit managers ("PBMs") for the higher priced retail strips.  Plaintiffs also contend they suffered lost profits as the same customers would have purchased pricier retail boxes instead of the NFR sold by the Alliance owned or controlled pharmacies.  The Medsource Entities were one of Alliance's investors who, Plaintiffs charge, profited as a result of this scheme.

 In October 2023, the Medsource Entities serially served both LifeScan and Roche with two sets of requests for production (RFPs).  By November 24, 2023, both Plaintiffs had responded. The Medsource Entities also served deposition notices demanding that Plaintiffs provide a corporate representative on certain topics listed in the notices which related to the document demands.

As a result of objections to the RFPs made by Plaintiffs, and despite attempts by the parties to resolve those issues, an impasse exists.  Consequently, the Medsource Entities now move to compel Plaintiffs to supplement their responses to the document demands and to provide appropriate corporate witnesses to testify at a Rule 30(b)(6) deposition.

Although numbered differently, the RFPs served on LifeScan and Roche are identical. Using those served on LifeScan, the RFPs read, in pertinent part:

> **RFP 77.**  All monthly and quarterly financial reports, from 2010 through 2017 that show the sales, product inventory, costs, chargebacks and rebate payments for Your Test Strips in the United States.

**RFP  78.**   Documents  sufficient  to  show  customer turnover/churn rate by month, quarter, and/or year for the Test Strip products at issue in this Action during Your alleged damages period.

**RFP 79.**   All  customer  surveys,  internal  memorandums, reports or analyses regarding customer turnover, churn rate, and/or the ability of a diabetes patient…to switch to a different Test Strip brand/manufacturer.

**RFP 85.**   To  the  extent  not  encompassed  by  [Request 77]…all  Documents,  including  monthly,  quarterly,  and  annual financial reports from 2009 to 2015, that show revenue and Costs details sufficient to determine gross profits, operating profits, and net income generated by You from sale of Mail-Order Test Strips, DME Test Strips and Retail Test Strips.

Although LifeScan's and Roche's responses to the RFPs vary slightly in verbiage as to each  demand,  Plaintiffs  both  uniformly  objected  to  these  requests  on  the  basis  that  the information sought concerned the respective companies' finances "separate from the sales and rebate  payments  involving  Alliance",  sought  documents  not  kept  in  the  ordinary  course  of business, were duplicative as to other discovery requests to which each Plaintiff had responded and were overbroad and irrelevant to any claim or defense pertinent to the action.  Each Plaintiff also indicated that it would not search for or produce additional documents in response to the requests.

As to the topics set forth in the Rule 30(b)(6) deposition notices, the Medsource Entities sought testimony as to each Plaintiff's "annual and quarterly financials from 2009 to the present" and "profits generated from sales of Your Test Strips."

## II.   The Medsource Entities' Argument

The Medsource Entities charge that Plaintiffs have been obstructive and dilatory in producing discovery.  The RFPs at issue were part of a larger set of 23 "newly issued document requests" for which Plaintiffs outright refused to produce documents or refused to search for any new documents, instead citing previous interrogatory responses or document productions.

The Medsource Entities emphasize that both LifeScan and Roche are "titans" in the healthcare industry and as for profit enterprises routinely keep track of basic financial figures integral to the success of their businesses and to comply with financial reporting regulations. Additionally, the requests and the deposition topics directly relate to Plaintiffs' damages theories, described as: (1) a rebate model; and (2) lost profits.  Despite this, instead of responding appropriately to the RFPs, Plaintiffs cite previously produced documents which – according to the Medsource Entities – contain inconsistent financial figures reported by year, some of which are indecipherable.  Consequently, the movants seek monthly reports showing contemporaneously reported financials that will be "consistent and decipherable" and can be used to validate, "fill in the holes" and explain Plaintiffs' previously produced financial documents.  In a similar vein, the Medsource Entities request that Plaintiffs' 30(b)(6) witnesses testify to these financials but Plaintiffs have also refused to present witnesses to do so.

The Medsource Entities say that Plaintiffs should be compelled to produce financial documents created in the ordinary course of business.  Citing testimony of Plaintiffs' witnesses, the Medsource Entities say it is undeniable that at least a large subset of the requested financial

reports and "dashboards" (real time data as to business performance) exist.  Instead, in response to these requests, Plaintiffs assert boilerplate objections as to relevance and undue burden, both of which are unfounded.

The Medsource Entities say the monthly financial reports and dashboards are relevant to damages since they represent contemporaneous (as opposed to litigation-created) financial reporting of profits and losses.  If provided, these documents give the Medsource Entities the ability to test the assumptions of Plaintiffs' lost profit damages theory.

Contrary to Plaintiffs' position, Defendants say, requesting these financial documents is not a "wild goose chase."  The testimony of Plaintiffs' witnesses verifies the documents were circulated widely throughout each company by specific financial divisions and should be easy to locate.  Nothing suggests that Plaintiffs will face an *undue* burden in locating and producing these documents.

In a similar fashion, Plaintiffs do not have a valid objection to preventing Rule 30(b)(6) witnesses to speak to each company's finances and profits generated from the sales of their test strips.  While Plaintiffs intend to submit a lost-profits damages theory, they simultaneously seek to prevent Defendants from asking questions of corporate representatives as to profits generated from the sale of DTS.

As to the customer turnover data or "churn rate," the historical rate of such turnover is plainly relevant to rebutting LifeScan's and Roche's claim that customers who purchased non-retail strips (adjudicated as retail) would have purchased retail strips from the same manufacturers through Alliance.  The Medsource Entities argue that Alliance customers who received NFR strips, when given a choice, may have purchased retail strips manufactured by others.

6

Finally, given that the request is for very specific documents, Plaintiffs have nevertheless made no representations that they have conducted even a preliminary search to determine the level of burden.

## III.   Plaintiffs' Opposition

Plaintiffs argue that they have produced all available, relevant financial data as to the test strips, including company-wide sales data, rebate data as to Alliance-affiliated pharmacies, price lists and available data on chargebacks to non-Alliance affiliated distributors.  Nevertheless, Defendants seek irrelevant and belatedly requested financial information having no bearing on this matter.  Moreover, Defendants failed to serve their requests until October 2023, many years into discovery, having made no attempts to challenge Plaintiffs' production of financial data before that point.  Finally, at this juncture, Plaintiffs say that it would be unduly burdensome and disproportionate to collect and produce these additional documents.

Plaintiffs assert that they are advancing two alternative measure of damages – rebates and lost profits.  As to the rebates, Plaintiffs maintain they are entitled to damages equal to the rebates that were wrongfully paid based on Alliance's submission of fraudulent insurance claims.[2]  Simply put, had the Alliance-affiliated pharmacies truthfully represented they were dispensing not-for-retail strips, Plaintiffs would not have paid the excessive rebates which represent their rebate damages.

Plaintiffs say they have produced the documentation necessary to determine the amount of wrongfully paid rebates – (1) data on retail claims submitted by Alliance pharmacies; (2) data

_____

[2]  Plaintiffs also note that Defendants' damages figure of $500 million each is wildly inaccurate with the true figures closer to $87 million (for Roche) and $50 million (for LifeScan).  However, if successful on the RICO claims, Plaintiffs will be entitled to treble damages.

on rebates paid on those claims; and (3) the number of retail boxes that Alliance pharmacies acquired as to the small number of non-fraudulent insurance claims.

As to lost profits damages, Plaintiffs maintain that the customers in question would have acquired retail boxes had Alliance not provided NFR boxes. Therefore, the data to compute lost profits on a given box is the difference between the price of a retail box and the price of an NFR box – data Plaintiffs have produced along with an explanation as to how to compute the average price for an NFR box.

Furthermore, the Medsource Entities' requests are belated. The RFPs themselves were not served until October 19 and October 24, 2023, respectively which was more than four years after service of Defendants' initial demands. After objecting to the production and despite attempts to have the Medsource Entities articulate a relevance justification, Plaintiffs say they Defendants have failed to narrow or clarify the demands.

Plaintiffs argue that the Medsource Entities bear the initial burden of proving relevance of the requested information, citing *Rudolf v. Am. Int'l. Grp., Inc.*, No. CV 19-1468, 2022 WL 2757684, at *1 (W.D.Pa. July 24, 2022), and Defendants have not met this minimal burden. Plaintiffs go on to say that many courts have found that requests for company-wide finances which take into account products not at issue are irrelevant to damages, citing *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prod., LLC*, No. CV 09-1685, 2011 WL 13199148, at *1 (M.D.Pa. Dec. 21, 2011) as well as other non-District decisions.

Here, Defendants are conflating specific lost profits with LifeScan's and Roche's overall, company-wide profits and losses which have no bearing on the amount of money lost due to

Alliance's fraudulent conduct.  The Medsource Entities have failed to explain how Plaintiffs' general financial reports illuminate specific lost profits analysis as to retail DTS.[3]

As to Defendants' assertion that the financial reports are needed as "gap fillers" and to explain "indecipherable spreadsheets" already produced, Plaintiffs say they have produced rebate and sales data in the form they were kept in the ordinary course.  Defendants' inability to read a spreadsheet is not a reason to order production of additional financial data.

Roche has produced chargeback data for its NFR products while LifeScan has searched but could not locate any data.  Plaintiffs also argue that the only potential relevance of chargebacks would be if LifeScan intended to rely on them to increase damages claims and, therefore, LifeScan's inability to locate this data benefits – not prejudices – Defendants.

As to "customer churn" data, Plaintiffs say this is irrelevant principally because customers with a pharmacy benefit plan did not go to Alliance pharmacies seeking NFR strips. Instead, these patients had pharmacy benefit plans that covered only retail strips and sought the brand of their choosing at the pharmacy.  Therefore, Plaintiffs are relying on the choice each patient in fact made.

Finally, Plaintiffs state that it is not simple to produce the additional financial documents and churn data and that the testimony from the witnesses who identified the existence of this information is equivocal.  LifeScan says it is unaware of any current central repositories where these historical documents might reside.  Plaintiffs say they have done a preliminary search of the custodial documents from the witnesses but have not located any sought by Defendants. Therefore, further searches would require the identification and collection of documents from

---

[3]  Plaintiffs' submission stresses that the Medsource Entities are seeking documents related to "company-wide profits and losses," suggesting Defendants are seeking data for all the companies' products.  Yet Defendants' requests are quite specific to DTS, i.e., "Your Test Strips in the United States," "for the test strip products at issue," and "income generated by You from sale of Mail-Order Test Strips, DME Test Strips and Retail Test Strips."

new custodians.  LifeScan points to its recent experience producing documents from the PBM project team as being "disproportionately expensive."  That collection cost over $50,000 in data processing fee and more than 200 hours of attorney and support staff time as well as $5000 per month "to house the new data through the duration of discovery."[4]  Plaintiffs assert that this is an inappropriate burden and cost at this late stage of litigation.  Proportionality considerations in discovery should be assessed in light of the case as a whole, not motion-by-motion, citing as an example *Saleh v. Pfister*, No. 18-C-1812, 2021 WL 326361, at *3 (N.D.Ill. Feb. 1, 2021).

## IV.    The Medsource Entities' Reply

Generally, the Medsource Entities repeat the proposition advanced in their motion, i.e., that Plaintiffs' financial dashboards and reports are relevant since they reflect the costs associated with selling DTS and directly relate to their damages theories.

Defendants are not seeking "companywide financial reports" but documentation relating directly to DTS.  Defendants stress that Plaintiffs' witnesses, including David Barnes, Roche's former CFO, have testified that the monthly financials existed solely for the diabetes care division.  Once provided for that unit, they would be integrated into consolidated companywide financials.

Furthermore, under both of Plaintiffs' alternative measures of damages, they entirely ignore costs without which Plaintiffs' theory creates a damages windfall.  While Plaintiffs maintain that manufacturing costs of retail and NFR strips are identical, Defendants say that they incur other costs for retail strips not incurred in the sale of NFR including sales team costs, rebate processing costs, distribution costs, destruction costs, and inventory costs.  Given that a

---

[4] LifeScan provides these figures in its opposition brief but there is no certification submitted in support, nor have Plaintiffs provided a certification addressing costs and expenses associated with a search for the documents sought in this motion.

lost-profit analysis requires calculating profit, the true costs associated with selling and distributing retail as opposed to not-for-retail DTS requires financial dashboards and reports to make an accurate calculation.  Citing testimony from a former LifeScan employee, Meredith Vornholt, the Medsource Entities say that the financial dashboards contain sales, expenses, profit and loss reporting and therefore encompass the complete picture of profits and losses.

Defendants maintain that the records produced by Plaintiffs are still incomplete and are at times inconsistent and indecipherable.  The financial documents they seek "should contain uniform financial reporting that can verify LifeScan's scattershot sales documents."

As to the requests being untimely, Defendants respond that they were issued seven months prior to the close of fact discovery and, additionally, discovery related to damages frequently occurs late in the discovery period.

As to the "churn data," which Plaintiffs contend is irrelevant, Defendants intend to argue that some customers seeking retail DTS from Alliance would find no retail test strips from Plaintiffs available so they would need to visit a different pharmacy to fill the order or purchase a different manufacturer's strips.  The churn data would reflect the number of customers that stopped purchasing Plaintiffs' strips over a given period and thereby provide evidence of the likelihood that these customers would choose to purchase a different manufacturer's test strip.

## V.    Recent Developments

Prior to the Special Master's status conference of March 21, 2024 in a joint submission, the parties commented further as to current status of this discovery impasse.

Defendants say that at the time of the February conference, Plaintiffs represented that they had provided all of the cost data from their databases in the best available form and then, at a subsequent meet and confer, promised to produce cost data that had been recently identified.

However, Defendants charge, this production of cost data fails to encompass what the Medsource Entities seek. It consisted of a single spreadsheet for each plaintiff and expert reports that contained no data. Defendants assert that the spreadsheets are facially deficient, in part, providing cost data for only five of eight years as to LifeScan. Roche's spreadsheet reflects a wider timeframe "but similarly offers no detail of what these purported costs represent or how they were calculated." Furthermore, Defendants say, the spreadsheet was prepared for this litigation and, therefore, does not represent data maintained in the normal course of business.

Defendants charge that Plaintiffs' expert reports also offer no cost data, merely opinions that costs are identical for retail and not for retail (NFR strips). Defendants argue they are not required to accept that manufacturing costs are the only costs relevant to a damage analysis. Finally, the spreadsheet was only recently created but Defendants seek documents which witnesses testified were created contemporaneously years ago.

In short, Defendants say that despite this additional production, nothing has changed regarding their demands.

Plaintiffs counter that they have produced the "unit cost data" (the total expenditure to produce, store and sell one unit of a particular product or service) as kept in the ordinary course of business. All of the data relied on by their experts has been produced. Furthermore, business expenses which Defendants assert were incurred for retail strips "are not accounted for as unit costs in the ordinary course of business and are irrelevant to damages." Finally, Plaintiffs say that the data is, in fact, what Plaintiffs maintain in the ordinary course of business.

## VI.     Analysis and Findings

This is yet another discovery dispute among the parties in this litigation which turns upon the application of Fed. R. Civ. P. 26(b)(1).  That Rule addresses the scope and limits of discovery and in pertinent part reads, "Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  The Rule goes on to provide that in determining the scope of discovery, the Court needs to consider the importance of the issues at stake, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Additionally, "[t]he information within this scope of discovery need not be admissible in evidence to be discoverable".  *Id.*

As our Courts have repeatedly found, Rule 26 is to be construed liberally and in favor of disclosure given that relevance is a broader inquiry at the discovery stage (where we are with this matter) than at the time of trial.  *Pella-Radio Sys. Ltd. v. DeForest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981).  Put differently, it is "well recognized that the federal rules allow broad and liberal discovery."  *Pacini v. Macy's*, 193 F. 3d 766, 777-78 (3d Cir. 1999).  While relevant information may not be admissible at trial, in order for a court to grant disclosure, the burden remains on the party seeking discovery to "show that the information sought is relevant for the subject matter of the action and may lead to admissible evidence."  *Carver v. City of Trenton*, 132 F.R.D. 154, 159 (D.N.J. 2000).  When establishing the parameters of discovery relevance, it is the claims and defenses of the parties, as set forth in the complaint and other pleadings, which set the guardrails for discoverable information.  *Nat'l. Union Fire Ins. Co. of Pittsburgh, PA v.*

*Becton, Dickinson & Co.*, No. 14-4318, 2019 U.S. Dist. LEXIS 68536, 2019 WL 1771996, at *3 (D.N.J. Apr. 23, 2019).

Concerning this dispute, as the Special Master sees it, Plaintiffs do not seriously take issue with the proposition that the Medsource Entities are entitled to explore Plaintiffs' damages theories – that the rebates were wrongfully paid (essentially overpaid) but also that LifeScan and Roche were caused to incur lost profits. Instead, Plaintiffs effectively take the position that through a series of document productions they have already given Defendants more than sufficient information to address both of these damages theories.

Neither parties' submissions clearly address what purportedly is or should be contained within the financial reports and dashboards which have been the subject matter of discovery and depositions. However, it is evident to the Court that to the extent these documents contain information as to the sales of diabetic test strips, or to the costs associated with the sales and distribution of those strips, the contents of these financial records are facially relevant since they clearly are associated with Plaintiffs' damages. Moreover, while some of the records may overlap or be duplicative of information contained in responses previously provided by Plaintiffs, Defendants are entitled to a further production if for no other reason than to test the validity of the documents previously produced in light of Plaintiffs' damages theories.

While Plaintiffs say that Defendants are seeking "companywide financial reports" (suggesting that the documents sought are not limited to diabetic test strip products but also include data as to other products manufactured by LifeScan and Roche), the MedSource entities have presented at least a *prima facie* showing that there may have existed regularly distributed monthly reports or dashboards specific to the diabetic test strips. Moreover, deposition testimony indicates that data was first produced to the departments or units of Plaintiffs'

corporations most interested in the information before it was consolidated into companywide financials which apparently contain data related to non-DTS products.  Therefore, unlike the disputed discovery demands in the cases cited by Plaintiffs, Defendants here are not directly seeking company-wide financial statements that take into account numerous products not at issue, but instead those directly related to the relevant product – diabetic test strips.  See, *Kimberly-Clark Worldwide,* 2011 WL 13199148*; Willis Elec. Co. v. Polygroup Trading, Ltd.*, No. 15-cv-3443, 2021 WL 568454, 2021 U.S. Dist. LEXIS 27974, at *25 (D.Minn. Feb. 16, 2021) and *Luminara Worldwide, LLC v. Liown Elecs. Co.*, Civ No. 14-3103 ,2016 WL 6908198, 2016 U.S. Dist. LEXIS 198891, at*2 (Jan. 11, 2016).  *See, also*, deposition of David Barnes, p. 24, l. 1-20 (Defendants' Exhibit J); deposition of Meredith Vornholt, p. 29, l. 13 to p. 30, l. 21 (Defendants' Exhibit L); and deposition of Mary Zolner, p. 26, l. 16 to p. 27, l. 12 (Defendants' Exhibit M).  As to the deponents, each identified the creation of monthly data which addressed the sales of diabetic test strips manufactured by Plaintiffs.  Contrary to Plaintiffs' argument, the testimony was not equivocal as to the then *existence* of these reports.

In a similar vein, Defendants have made an adequate showing that when calculating lost profits, that calculation is not simply a matter of subtracting the difference in price between retail and not-for-retail strips.  Although there is no way for the Court to verify this simply by reviewing the parties' competing submissions, the Special Master finds that the Medsource Entities have made a plausible argument that the costs of selling and distributing retail strips *may* be greater than the costs associated with selling and distributing NFR strips.  If that were the case, logically this would reduce the total amount of Plaintiffs' claimed lost profit damages.  Defendants assert that the documents sought by way of this motion would contain information relating to such costs thereby enhancing the relevancy of the documents they seek.

In summary, to the extent that cost data may still exist and is still retrievable, this information is relevant to the claims and defenses asserted in this lawsuit and, in the Special Master's opinion, is proportional to the needs of the case.  Accordingly, the Special Master finds that Defendants are entitled to its production.

While Plaintiffs assert that the production of the documents and data at issue is complicated and costly, the Special Master is not persuaded by this argument.  If the documents and data at issue still exist – and Defendants have pointed to testimony reflecting that they existed at one time and were regularly made available to employees for their review – then the process of searching for and retrieving these materials does not suggest that Plaintiffs are subject to an *undue* burden or cost.  As Defendants argue, the employees' testimony provides a roadmap of sorts to retrieve these documents, including information as to the departments involved and employee mailboxes which may contain this information.  Given this, the Special Master concludes that the likely benefit of retrieving these materials outweigh the burden or expense in doing so.

Unfortunately, the litigants' recent commentary as to the developments and status of this discovery impasse fails to provide more insight as to whether or not Plaintiffs' responses provided thus far meet the demands.  Therefore, a dilemma exists.  Plaintiffs say that they have either provided responsive information or what Defendants seek no longer exists or is not retrievable.  If so, the Court cannot compel production of documents, or in this case the production of data, which no longer exists or is not in possession of the party from which it is sought.  Given this, and allowing for the contingency that the data and documents sought by Defendants may no longer be in existence or retrievable, in order to resolve this impasse, the Special Master rules as follows:

1. Plaintiffs are ordered to provide all available, contemporaneously produced monthly, quarterly, semiannual, or annual financial reports and/or dashboards as to DTS for the timeframe at issue and which are responsive to LifeScan RFP 77 and Roche RFP 80;

2. Plaintiffs are ordered to provide all available, contemporaneously produced customer turnover/churn rate information as to DTS for the month, quarter or year for the timeframe at issue and which are responsive to LifeScan RFP 78 and Roche RFP 81;

3. Plaintiffs are ordered to provide all available, contemporaneously produced documentation responsive to LifeScan RFP 79 and Roche RFP 82;

4. Plaintiffs are ordered to provide any other documents, not previously included in response to the RFPs set forth above, responsive to LifeScan RFP 85 and Roche 87;

5. To the extent that Plaintiffs assert they have, in fact, provided documents and data responsive to each of the enumerated RFPs or that the documents and data do not exist or existed but are no longer retrievable, each Plaintiff shall provide a detailed certification setting forth what documents and data they contend have been produced specific to each demand, the steps taken to determine whether additional data and documents exist or existed, and the results of those steps along with any other information that would establish Plaintiffs have complied in responding to Defendants' RFPs at issue in this motion.

In making this ruling, the Special Master further states that to the extent that Plaintiffs have been ordered to produce documents and data, the Order is limited to only documents and

data as to diabetic test strips (DTS) sold during the timeframe relevant to the issues in this lawsuit.  Plaintiffs are not obligated to produce documents which reflect sales, product inventory, cost, revenue, rebates or other financial information unrelated to DTS.

As to Rule 30(b)(6) witnesses, the parties have only barely briefed this issue.  It is unclear to the Special Master where the locus of the impasse lies.  However, given the ruling set forth in this Order and Opinion as to the production of the documents at issue, the Special Master rules as follows:

The Special Master Orders that Defendants are entitled to question a corporate representative as to "profits generated from the sales of [DTS]" (LifeScan topic 8, Roche topic 7).  As to the other topic, i.e., Plaintiffs' "annual and quarterly financials from 2009 to present," the Special Master finds that this topic is overly broad as it is not restricted to financials concerning diabetic test strips and appears to exceed the time period at issue in this litigation.  Therefore, the Special Master will not compel Plaintiffs to produce Rule 30(b)(6) witnesses to address this specific topic.  The parties, however, are encouraged to meet and confer to resolve this issue.

In summary, as to the primary issue arising from this motion, in accordance with Fed. R. Civ. P. 26(b)(1), the Special Master finds that the discovery sought by Defendants is relevant to Plaintiffs' claimed damages (payment of excessive rebates and lost profits) as well as the Medsource Entities' defenses to those damages claims, that the discovery is proportional to the needs of this high-stakes, multi-million dollar litigation, that the data at issue was created by and potentially remains within Plaintiffs' access, and that the benefit of producing the discovery outweighs any burden and expense associated with retrieving the discovery.

18

Therefore, the Special Master finds that the Medsource Entities' motion is **GRANTED** within the parameters set forth in this Order and Opinion.

**VII.    Conclusion**

For the reasons set forth, the Medsource Entities' motion is **GRANTED** within the parameters of this Order and Opinion.

Date:   April 5, 2024                        *Dennis M. Cavanaugh*
                                             DENNIS M. CAVANAUGH
                                             Special Master

19